UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| LOBSTER 207, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19-CV-00552-LEW |
| | ) | |
| WARREN B. PETTEGROW, ANTHONY | ) | |
| D. PETTEGROW, JOSETTE G. | ) | |
| PETTEGROW, STEPHEN M. | ) | |
| PEABODY, POSEIDON CHARTERS | ) | |
| INC., and TRENTON BRIDGE | ) | |
| LOBSTER POUND, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS AND
DEFENDANT WARREN PETTEGROW'S
<u>MOTION TO COMPEL ARBITRATION AND FOR STAY</u>**

In this action, Plaintiff Lobster 207, a Maine LLC, contends its former chief executive officer, Warren Pettegrow, conspired with his parents, owners of the Trenton Bridge Lobster Pound ("the Pettegrow Defendants"), and others, to cheat Lobster 207 out of substantial revenue through a variety of self-dealing schemes. Although the case principally involves state law contract and tort claims, Lobster 207 filed suit in federal court because it believes its allegations against the Defendants also state a plausible claim for relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 – 1968 ("RICO").

The matter is before the Court on Lobster 207's Motion for Attachment and Attachment on Trustee Process (ECF No. 4), the Pettegrow Defendants' Motion to Dismiss (ECF No. 45), Stephen Peabody's Motion to Dismiss (ECF No. 42), and Warren Pettegrow's Motion to Compel Arbitration (ECF No. 44).  This Order resolves the motions to dismiss and the motion to compel arbitration and stay, but reserves judgment on the motion for attachment (and the attendant motions to strike), pending a hearing.

## I.   BACKGROUND FACTS

Plaintiff Lobster 207, LLC, is a wholesaler of live lobsters.  Lobster 207 acquired its wholesale business from Defendant Trenton Bridge Lobster Pound, Inc., with a closing date of March 24, 2017.  Through an Asset Purchase Agreement (ECF No. 1-2), Lobster 207 acquired all outstanding corporate stock, real estate, inventory, equipment, goodwill, and other assets of the wholesale business, from Defendants Anthony and Josette Pettegrow, the holders of Trenton Bridge Lobster Pound's outstanding stock.  The Asset Purchase Agreement did not include Trenton Bridge Lobster Pound's restaurant and lobster retail business in Trenton, which continues to operate under the Pettegrows' management.

Integral to the Purchase Agreement is a Noncompetition Agreement (ECF No. 1-3), through which Trenton Bridge Lobster Pound and Anthony and Josette Pettegrow agreed to reject all wholesale orders and refer them to Lobster 207 for the duration of the noncompetition period.

The same parties also agreed that Trenton Bridge Lobster Pound could continue to operate as a lobster buying station, and that the Pettegrows could continue to operate a lobster smack boat, *The Poseidon*, but that they would sell to Lobster 207 all lobsters they

2

landed that were not used in the retail operations of Trenton Bridge Lobster Pound, at the then-existing, standard offer dock price. Supply and Offtake Agreement (ECF No. 1-4).

Lastly, as part of the parties' negotiations over the purchase and sale of the wholesale business, Lobster 207 agreed to employ Anthony and Josette Pettegrow's son, Warren Pettegrow, to serve as the chief executive officer of the wholesale business, for a period of ten years. Warren's Employment Agreement (ECF No. 1-5) includes a non-competition provision.

Lobster 207 terminated Warren Pettegrow on April 4, 2019, purportedly for his participation in a variety of schemes with the other Pettegrow Defendants and Stephen Peabody, dock manager at the Beals Jonesport Co-op ("B.J. Co-op"), which schemes, according to Lobster 207, fraudulently or unreasonably enriched the Pettegrows at Lobster 207's expense.

## II.   MOTIONS TO DISMISS - SUBJECT MATTER JURISDICTION

Lobster 207 alleges the Pettegrow Defendants engaged in multiple schemes that deprived Lobster 207 of substantial revenue through means varyingly described as embezzlement, fraud, theft, conversion, breach of trust, and self-dealing (and breach of contract). Lobster 207 filed suit in this Court because it believes the alleged schemes give rise to RICO liability. The Pettegrow Defendants and Stephen Peabody contend Lobster 207 has failed to state a claim under RICO and, if they are correct, this Court lacks jurisdiction to hear the other claims presented in the action.

"Federal courts are courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511

U.S. 375, 377 (1994).  Because the Plaintiff and the Defendants are citizens of Maine, this Court lacks jurisdiction to resolve their state law dispute unless a federal claim is part of the same case or controversy that gives rise to the state law dispute.  *See* 28 U.S.C. §§ 1331, 1332, 1367; *Exxon Mobil Corp. v. Allapattah Servs*., *Inc*., 545 U.S. 546, 552 – 53 (2005).

RICO is a federal statute designed to provide tools to combat organized criminal enterprise.  *Home Orthopedics Corp. v. Rodríguez*, 781 F.3d 521, 527 (1st Cir. 2015).  One such tool is a private right of action for those persons "injured in [their] business or property by reason of a violation of section 1962."  *Id.* (quoting 18 U.S.C. § 1964(c)).  Relevant to present purposes, section 1962(c) reads:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ….

18 U.S.C. § 1962(c). As a remedial statute, RICO is deserving of a liberal construction. *Sedima*, *S.P.R.L. v. Imrex Co*., 473 U.S. 479, 497 – 98 (1985).

Consistent with § 1962(c), a plaintiff who brings a civil RICO claim must plausibly allege that the defendant participated in the (1) conduct of (2) an enterprise, through (3) a pattern of related racketeering activity.  *Home Orthopedics*, 781 F.3d at 528.  As discussed in more detail below, baked into these elements are additional requirements that the plaintiff identify the specific so-called "predicate acts" that ground the RICO claim and explain how the predicate acts cohere to depict a pattern of racketeering activity.

To avoid dismissal, Lobster 207 must provide "a short and plain statement of the claim showing [it] is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Practically speaking, this means the Complaint must provide "enough facts to state a claim to relief that is plausible

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In applying this standard, the Court will accept factual allegations as true and consider whether the facts, along with reasonable inferences that may arise from them, describe a plausible, as opposed to merely conceivable, claim.  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011); *Sepúlveda–Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010). However, this placid pleading standard does not apply to allegations of fraud.  When alleging fraud, a plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

## A.      Labor Management Embezzlement

Lobster 207 alleges that because its sole member is the Maine Lobster Union, every scheme alleged in the Complaint supports a RICO claim because RICO makes labor management embezzlement a predicate act of racketeering.  *See* Complaint ¶¶ 14, 187, 189 & 197.  The labor management embezzlement provision reads:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, *directly or indirectly*, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

29 U.S.C. § 501(c) (emphasis added).  RICO includes this provision as the kind of criminal activity that can support a RICO civil action.  18 U.S.C. §§ 1961(1)(C), 1962(c), 1964(c).

Defendants argue that subject matter jurisdiction cannot be predicated on labor management embezzlement because Lobster 207 is an LLC and cannot plausibly allege it is a labor organization.  Lobster 207 argues it does not matter that it is a separate corporate entity, because the Maine Lobster Union is its sole member, which makes Lobster 207 the

asset of a labor organization, and which makes Warren Pettegrow the "indirect" employee of a labor organization.

Lobster 207's theory – that the MLU is a labor organization because it calls itself a union – is misguided. The Labor Management Reporting and Disclosure Act defines "labor organization" as "a labor organization engaged in an industry affecting commerce[,] … which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment …." 29 U.S.C. § 402(i). To qualify, then, Plaintiff must have pled the MLU exists, in whole or in part, for the purpose of dealing with employers concerning the labor-related grievances described in Section 402(i).

Plaintiff has not done so. Furthermore, the MLU is a "fish marketing association" organized under the auspices of Chapter 87 of Maine Revised Statutes Title 13. Maine fish marketing associations are authorized to "engage in any activity in connection with the marketing, selling, preserving, harvesting, drying, processing, manufacturing, canning, packing, grading, storing, handling or utilization of any fishery products produced or delivered to it by its members," and certain related activities. 13 M.R.S. § 2231. The list of authorized activities does not include labor organization activity, and Plaintiff does not otherwise plead in its Complaint that Lobster 207 or the MLU engages in the listed activities in Section 402(i). Moreover, membership in a fish marketing association is restricted to persons engaged in the fishery business. *Id.* §§ 2051, 2059. Although the statute does not define "persons," the MLU's Articles of Incorporation plainly state that membership in the Association is restricted to "natural persons." Articles of Incorporation,

Art. 13.  In short, not only is the MLU not a labor organization, but by law, none of its members can be a labor organization.

Finally, it matters not that the MLU's Articles also require that its members enroll in the International Association of Machinists and Aerospace Workers ("IAMAW"), because the IAMAW is not, and cannot be, a member of the MLU, and the mere fact that the MLU's members have separate membership in the IAMAW does not transform the MLU into a labor organization or make Lobster 207 the asset of a labor organization.  Nor can it reasonably be maintained that the officers of Lobster 207 are "indirect" employees of a labor organization.[1]

## B.   Wire Fraud

Lobster 207 separately alleges that the Pettegrow Defendants performed predicate acts of wire fraud, *see* 18 U.S.C. §§ 1343, 1961(1)(B), that will sustain a RICO claim. Specifically, Lobster 207 alleges a scheme in which the Pettegrows, through Trenton Bridge Lobster Pound, placed international orders for delivery of inferior "tubed" lobsters during the winter offseason, which they then sold to Lobster 207 at or above the standard offer dock price, using invoices that failed to disclose the inferior quality of the product being sold.  This scheme, according to Lobster 207, was only viable because Warren Pettegrow facilitated it.

---

[1]  Lobster 207 has expended a significant amount of ink to bait the Court into a different conclusion, but none of the cases it cites in its memoranda are persuasive in the specific context of this case, where the MLU is a cooperative fish marketing association whose members are natural persons engaged in the fishery business and state law does not authorize the MLU to act as a labor organization.  Despite the protestations in its motion papers, Lobster 207's Complaint does not plead facts to substantiate MLU's status as a labor organization.

When the alleged racketeering activity is wire fraud, the plaintiff must allege the acts of wire fraud with particularity, including in regard to their interstate quality, *Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997), although in some cases leeway is provided to conduct focused discovery to meet the particularity requirement, *New England Data Servs.*, *Inc. v. Becher*, 829 F.2d 286, 290 – 92 (1st Cir. 1987); *see also Feinstein v. Resolution Tr. Corp.*, 942 F.2d 34, 42 (1st Cir. 1991).  Here, the interstate component of the wire transaction is evident from the pleadings.  Lobster 207 also provided particularized allegations that identify the timeframe of the transactions (winter of 2017-18 and winter of 2018-19), the parties to the interstate transactions, the volume and classes of lobsters in question, and the profit the Pettegrows realized.  This is much more than notice pleading of a scheme to defraud through the importation and sale of inferior tubed lobsters.[2]  *See also* Complaint Attach. 1, Schedule E.

Importantly, the interstate wire component of the scheme does not have to contain a fraudulent communication.

> The mail- and wire-fraud statutes criminalize the use of the mails or wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341 (mail fraud); § 1343 (wire fraud). The honest-services statute, § 1346, defines "the term 'scheme or artifice to defraud' " in these provisions to include "a scheme or artifice to deprive another of the intangible right of honest services."

---

[2] Lobsters can be preserved in tubes for months, during which time they gradually waste away.  Although tubing evidently is an accepted practice of the industry, I accept the representation that tubed lobster is generally an inferior quality food product due to reduced weight and increased loss of product.  According to Lobster 207, the Pettegrows not only overcharged for inferior lobster but caused additional reputational injury because of customer dissatisfaction with the product. Lobster 207 does not need to prove these allegations at this time, and I accept them as true for present purposes.

*Skilling v. United States*, 561 U.S. 358, 369 n.1 (2010). As alleged, the tubed lobster scheme relied on the use of the wires to further a scheme to defraud Lobster 207, and the fraudulent nature of the scheme is plausibly demonstrated by the fact that it depended on Warren Pettegrow's willingness to deprive Lobster 207 of the intangible right of honest services.

There is one[3] other vent in the RICO trap through which the Pettegrow Defendants seek to make their exit from federal court. A RICO action must involve a pattern of racketeering activity, which the Supreme Court has construed to require a showing that predicate acts have both a relationship and continuity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) ("RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."). The Pettegrow Defendants argue the tubed lobster scheme does not meet the continuity standard. Pettegrows' Motion to Dismiss at 13 – 14.

To establish a RICO "pattern," a plaintiff must begin by showing "at least two acts of racketeering occurred within ten years of each other." *Home Orthopedics*, 781 F.3d 528 (citing 18 U.S.C. § 1961(5)). Here, the alleged tubed lobster scheme transpired during

---

[3] The Pettegrow Defendants also incorporate Stephen Peabody's argument that the allegations do not describe a RICO "enterprise." Pettegrow Defendants' Motion to Dismiss at 6 n.2. For reasons that should be obvious, the enterprise conducted in the tubed lobster scheme includes the legitimate enterprise known as Lobster 207. As alleged, each "person" has joined with the others to conduct an "enterprise" that siphons funds from Lobster 207 by means of inflated Trenton Bridge invoices and defalcation on the part of Warren Pettegrow. The enterprise is not merely the defendants by another name. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 – 65 (2001).

two different winter episodes, each comprised of multiple international invoices, which means it fits the bill.

"The Supreme Court has additionally required that 'the racketeering predicates [be] related, and that they amount to or pose a threat of continued criminal activity.'" *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). This can be either a closed period of repeated criminal activity or criminal activity that presents the threat of repetition if left unchecked (so-called, open-ended patterns). *Id.* But schemes that have a singular objective and target "few victims" will not suffice even though they are advanced through several criminal acts. *Giuliano v. Fulton*, 399 F.3d 381, 390 (1st Cir. 2005) (citing *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 19 (1st Cir. 2000) ("[C]ombination of single scheme, single injury, and few victims ... makes it virtually impossible for plaintiffs to state a RICO claim." (internal quotation marks omitted)). On the other hand, if the victims are many, and/or the nature of the scheme is recurring as part of the enterprise's regular way of doing business, the continuity requirement will be met. *Home Orthopedics*, 781 F.3d at 531 (citing *Feinstein v. Resolution Tr. Corp.*, 942 F.2d 34, 45 (1st Cir. 1991)).

Had the Pettegrow Defendants not re-upped the tubed lobster scheme in the winter of 2018-19, and limited the activity to the winter of 2017-18, I likely would conclude that the tubed lobster scheme was a sporadic or singular scheme that did not involve a continuous pattern of racketeering, even though the allegations reveal multiple foreign invoices and related transactions between Lobster 207 and Trenton Bridge. However, as alleged, the Pettegrow Defendants not only returned to the scheme, but also doubled down on the volume of tubed lobster, according to the schedule attached to the Complaint. For

purposes of a motion to dismiss, these allegations depict a pattern of racketeering activity likely to extend into the foreseeable future. *Cf. Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.*, 113 F.3d 308, 310 (2d Cir. 1997) (vacating summary judgment where the facts revealed a pattern of excessive billings facilitated by an inside agent on a regular basis over a period of 15 months); *Huntair, Inc. v. Gladstone*, 774 F. Supp. 2d 1035, 1046 (N.D. Cal. 2011) (finding continuity where the record provided no indication that the alleged scheme would have stopped had the employee not been terminated). In other words, the allegations permit the inference that the Pettegrows' winter profit taking from the sale of tubed lobster, an abuse of Warren Pettegrow's position as CEO of Lobster 207, was the Pettegrows' intended "regular way of conducting [their] ongoing … business … or … enterprise." *H.J. Inc.*, 492 U.S. at 243.[4]

---

[4] In *HJ*, the Supreme Court observed:

> The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists. The development of these concepts must await future cases, absent a decision by Congress to revisit RICO to provide clearer guidance as to the Act's intended scope.

492 U.S. at 243. I am concerned that a higher court might conclude that an "open-ended" pattern does not meet the continuity requirement when it is based on a solitary-but-perennial scheme of short duration that would not be deemed continuous, but rather isolated or sporadic, if considered in the context of any one particular year. Nevertheless, the allegations support a plausible inference that the Pettegrow Defendants would implement the scheme with regularity into the foreseeable future, and the allegations otherwise meet the statutory requirements (i.e., two or more acts within ten years).

The Pettegrow Defendants contend that their agreements with Lobster 207 entitled them to purchase tubed lobster from Canada and resell it to Lobster 207, or else that such conduct merely breached the agreements without constituting fraud. Nothing in this Order prevents them from trying to support those contentions through a summary judgment motion. As for the Pettegrow Defendants' "thermonuclear" argument, this is a familiar refrain when RICO claims are raised between commercial parties. However, RICO says what it says. The Supreme Court has indicated that if there is to be a prohibition on the use of RICO in commercial disputes it is a fix for Congress to make, not the federal courts. *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 660 (2008).

C.      **Jurisdiction Summary**

Federal subject matter jurisdiction exists in this case because Lobster 207 has alleged, both plausibly and with particularity, a pattern of racketeering activity consisting in wire fraud, which activity resulted in injury to Lobster 207's business.  For this reason, the Pettegrow Defendants' Motion to Dismiss will be denied in part as to Counts I (RICO) and II (RICO conspiracy).

The Motion will be granted in part, however, because the RICO counts are only actionable in relation to the tubed lobster scheme.  Lobster 207's labor management embezzlement theory is dismissed, as are the RICO claims directed at Stephen Peabody, who, based on a reading of the Complaint, did not participate in the tubed lobster scheme.

Because the Complaint pleads a plausible RICO action against the Pettegrow Defendants, including Trenton Bridge, and because the non-federal claims form part of the same case or controversy, there is supplemental jurisdiction to resolve the related state law claims, including the state law claims against Stephen Peabody, absent a persuasive showing why supplemental jurisdiction should not be exercised.  28 U.S.C. § 1367(a), (c).  Because the Defendants have not objected to the exercise of supplemental jurisdiction, I will proceed to address the remaining issues raised in the parties' motions.

### III.  MOTIONS TO DISMISS (STATE LAW CLAIMS)

The Defendants argue that Lobster 207's tort claims are barred by the economic loss doctrine and that the only viable claim is a breach of contract claim.  The economic loss doctrine, as it is generally understood, precludes tort recoveries in actions involving allegations that goods and services provided pursuant to contract failed to meet

expectations.  Daniel Rapaport et. al., *Tort Killer: The Applicability of the Economic Loss Doctrine to Service Contracts*, 20 Me. B.J. 100, 102 (2005).  Defendants argue that each scheme alleged in the Complaint succumbs to the economic loss doctrine because the alleged harms can be remedied through a breach of contract claim.

Based on a catalogue of alleged schemes that would result in economic loss to the company, Lobster 207 advances, in addition to a breach of contract claim, claims of fraud, conversion, breach of fiduciary duty, civil conspiracy, unjust enrichment/constructive trust, and a claim for declaratory relief.  I am not persuaded that the economic loss rule negates these tort claims.  In particular, insofar as Lobster 207 complains of schemes that post-date its retention of Warren Pettegrow as its CEO, the schemes involve the alleged breach of Warren's duty of care and loyalty to Lobster 207.  Maine law states that this duty requires a corporate officer to act in the best interest of the company, exhibit good faith in transactions involving the company, and refrain from using a position of influence "to gain any special privilege or advantage."  *Thompson's Point*, *Inc. v. Safe Harbor Dev. Corp.*, 862 F. Supp. 594, 599 (D. Me. 1994) (quoting *Rosenthal v. Rosenthal*, 543 A.2d 348, 352 (Me.1988)).  *See also* 13-C M.R.S. § 843 (listing good faith, reasonable care, and best interest, and incorporating by reference relevant provisions of 13-C M.R.S. § 832, including as relevant here, § 832(1)(B)(3) and (5)).

Because the allegations state a plausible claim for breach of the duty of care and loyalty of a corporate officer, and a civil conspiracy to profit from Warren's position of influence, Lobster 207's recourse to tort remedies does not result in the sort of societal harm the economic loss doctrine is designed to prevent (i.e., increased costs in the provision

of goods and services due to the availability of "for-want-of-a-nail-the-kingdom-was-lost" recoveries in cases involving the mere failure to meet bargained-for expectations). *Koken v. Auburn Mfg.*, *Inc.*, No. 1:02-cv-83, 2004 WL 1877808, at *14 (D. Me. Aug. 20, 2004) (Kravchuk, Mag. J., R&R) (quoting *Rardin v. T & D Mach. Handling*, *Inc.*, 890 F.2d 24, 28 (7th Cir. 1989) (Posner, J.)); *see also E. River S.S. Corp. v. Transamerica Delaval*, *Inc.*, 476 U.S. 858, 872 (1986) (explaining the basis for the doctrine as a concern over the "increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself"); *Stillwagon v. Innsbrook Golf & Marina*, *LLC*, No. 2:11-CV-1338, 2013 WL 1180312, at *18 (W.D. Pa. Mar. 20, 2013) (declining to apply economic loss doctrine where the allegations involved the breach of a corporate officer's duty of loyalty). Accordingly, I do not find the economic loss doctrine to be the sealskin Defendants seem to think it is.

Nor am I persuaded by Defendants' argument that Plaintiffs have failed to plead plausible tort claims given that there are alleged schemes involving breaches of trust that are extra-contractual in nature. Specific to fraud, in particular, a material misrepresentation can take the form of an omission when the defendant is one who has a duty to disclose, *Glynn v. Atl. Seaboard Corp.*, 728 A.2d 117, 120 (Me. 1999), and an allegation of reliance is plausible where a corporate officer fails to disclose self-dealing. Given the extra-contractual nature of a corporate officer's duties, I also conclude that dismissal of Lobster 207's unjust enrichment claim is not warranted. It is not clear, at this juncture, that contract remedies will prove adequate in all respects. *In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 192 (D. Me. 2010) (collecting cases); *Hyams v. Old Dominion*

*Co.*, 93 A. 747, 752-53 (Me. 1915) ("There is no doubt, we think, that a court of equity may, at the instance of a stockholder, afford a remedy from the consequences, not only of fraudulent acts of the corporation, or its officers, but of such acts as are a breach of the trust and confidence which are implied by the very nature of the corporate relations."). This characteristic of the dispute, moreover, defeats Defendants' contention that acceptance of the lobsters at the invoiced price is a complete defense against Lobster 207's action, citing the Uniform Commercial Code. *See Associated Hardware Supply Co. v. Big Wheel Distrib. Co.*, 355 F.2d 114, 120-21 (3d Cir. 1965) ("In this case rescission is out of the question since the defendant has admitted that it has sold the goods. Thus, fraud, as alleged here, is an independent action, the recovery for which may be set off against or may even exceed the amounts due and owing under the contract."); *see also* U.C.C. § 1-103 ("Unless displaced by the particular provisions of [the Uniform Commercial Code], the principles of law and equity, including the law merchant and the law relative to … principal and agent, estoppel, fraud, misrepresentation, … and other validating or invalidating cause supplement [the Code's] provisions."); *accord* 11 M.R.S. § 1-1103(2).[5]

Defendants may be correct that not every alleged scheme fits under every tort heading, and that some are exclusively contractual matters, but categorizing each and every alleged scheme as either contract or tort is an endeavor better suited to summary judgment practice. Accordingly, to the extent the Pettegrow Defendants move for the dismissal of the state law tort claims, their motion to dismiss is denied.

---

[5] I make the observation intending no prejudice to Defendants' ability to advance it in defense of Lobster 207's claims based on evidence that Lobster 207 was on notice or should have been on notice of the alleged invoice practices, including through course of dealings.

Stephen Peabody's motion requires further analysis. For reasons already outlined, I will dismiss Peabody as a defendant on the RICO claims (Counts I and II). That leaves, as to Peabody, claims of fraud (Count III), conversion (Count IV), civil conspiracy (Count VI), and unjust enrichment/constructive trust (Count IX).

Peabody argues the fraud claim is not sufficiently particularized as to him, Peabody Motion to Dismiss at 8, and that there is no plausible "justifiable and reasonable reliance on a misrepresentation to support a fraud claim against [him]." *Id.* at 18. However, in development of the argument, all Peabody offers is the assertion that nothing in the fraud claim "states that Warren Pettegrow, as CEO of Lobster 207, justifiably relied on any allegedly material false statement by Peabody." *Id.* at 19. For reasons already discussed, this is beside the point if Peabody acted in league with Warren to skim profit away from Lobster 207. Peabody also argues the conspiracy claim fails for want of an underlying tort. *Id.* The argument assumes a premise I have rejected. Finally, Peabody argues an unjust enrichment claim should not be asserted where a relationship is governed by contract. *Id.* This is not a fruitful argument for him because he was not party to a contract with Lobster 207. I do not take the analysis further because these are the only arguments presented. Peabody's request for dismissal of the state law claims is denied.

## IV.  MOTION TO COMPEL ARBITRATION

Warren Pettegrow has moved the Court to compel arbitration pursuant to a provision in his employment contract that reads:

> In the event the parties cannot settle a dispute or controversy arising out of this Agreement, the parties shall submit such dispute or controversy to binding arbitration in Portland, Maine. . . . Either party may invoke this arbitration provision by giving written notice to the other of its demand for

> arbitration. … If the parties cannot mutually agree on an arbitrator within twenty days after the demand for arbitration has been made, the party demanding arbitration may invoke the procedures of the American Arbitration Association for selection of an arbitrator. The arbitrator shall follow the rules of the American Arbitration Association. …
>
> Nothing in this Section shall preclude the Company from seeking, or a court of competent jurisdiction from granting, interim or provisional relief, including, without limitation, a restraining order or an injunction, to enforce the obligations set forth in Sections 7 [confidentiality and return of company property] and 8 [non-competition] of this Agreement.

Employment Agreement § 12 (emphasis in original) (ECF No. 44-1).

Lobster 207 is opposed to arbitration of any aspect of this litigation. It argues that its arbitration provision is too narrow to forestall litigation because even its contract claims are broader than the scope of just the Employment Agreement, relying in part on the Supply and Offtake Agreement associated with the continued operation of the *Poseidon*. Lobster 207 also argues that the arbitration provision did not survive Lobster 207's termination of the Employment Agreement, and that Warren has waived arbitration because he filed an action in state court to obtain his employment file and did not file a motion to compel arbitration immediately in this action, in advance of all his other filings.

"Federal courts will grant a motion to stay a case and compel arbitration pursuant to the FAA when '(i) there exists a written agreement to arbitrate, (ii) the dispute in question falls within the scope of that arbitration agreement, and (iii) the party seeking an arbitral forum has not waived its right to arbitration.'" *United States v. Consigli Constr. Co.*, 873 F. Supp. 2d 409, 412 (D. Me. 2012) (quoting *Combined Energies v. CCI, Inc.*, 514 F.3d 168, 171 (1st Cir. 2008)).

Concerning the first prong of the standard, Lobster 207 argues that it is no longer subject to the arbitration provision, "because it terminated Warren for cause," and cites a contract provision stating:

> If the Company terminates the Employee for "Cause" …, the Employee shall be entitled only to: (i) Compensation and benefits earned to the date of termination of employment; and (ii) such other benefits as may be provided under the group benefits policies or programs ….  All other obligations of the Company under this Agreement shall cease.  No year-end profit-sharing shall be due for the year of dismissal or any following year if Employee is terminated for "Cause".

Employment Agreement ¶ 6.1(a).  Lobster 207's argument is without merit.  It is obvious from the above-quoted passage that it purports only to vitiate Lobster 207's "obligations" in relation to pay and benefits from the date it exercises its right to terminate Warren for cause.  The agreement to arbitrate follows and clearly indicates the parties' intention to arbitrate disputes arising from the Employment Agreement, which would encompass disputes over the existence of cause for termination.  Moreover, all of the claims in this litigation involve alleged breaches by Warren of contract and common law duties during his tenure as Lobster 207's CEO, so this is not a case in which expiration of the contract would be material to the existence of an arbitration provision.  *Compare Breda v. Cellco P'ship*, 934 F.3d 1, 7 (1st Cir. 2019).

Lobster 207 also considers the arbitration provision to have negligible force because the scope of the provision is limited to Lobster 207's contract claim and, even then, only part of the contract claim.   As the party invoking the arbitration provision, Warren bears "the burden of demonstrating that a particular claim comes within the scope of an arbitration agreement," but ambiguities in that regard are resolved in his favor.  *Breda*, 934

F.3d at 7; *see also Moses H. Cone Memo. Hos. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.").

Here, the provision calls for the parties to arbitrate if they "cannot settle a dispute or controversy arising out of this Agreement." Based on my reading of the Complaint, the case presents a "dispute or controversy arising out of" Warren's employment, and a common sense reading of what it means for parties to agree to arbitrate matters arising out of a contract of employment should encompass claims based on duties associated with the employment relationship, even without the interpretive aid of the ambiguity rule. *See*, *e.g.*, *Simitar Entm't, Inc. v. Silva Entm't, Inc.*, 44 F. Supp. 2d 986, 996 (D. Minn. 1999).[6] I also observe that the section of Lobster 207's motion that discusses the meaning and scope of its arbitration provision (pages 6 – 8) does not cite any contrary authority.

This brings us to the question of waiver. When considering whether a party's actions amount to a waiver of a contractual right to arbitrate, the burden shifts to the party advocating the waiver, and its labors in this regard will be in direct opposition to the fair wind and following sea that favor the course to arbitration. *See Joca-Roca Real Estate, LLC v. Brennan*, 772 F.3d 945, 948 (1st Cir. 2014). In practical terms, this means the party must show something more than mere delay; they must also show "resultant prejudice."

---

[6] The Employment Agreement also contains a "waiver of a jury trial on any issue, cause of action, dispute or controversy arising out of or resulting from the employment relationship." Employment Agreement § 14. Although this is much plainer language than the "arising out of this Agreement" language in the arbitration provision, nevertheless the scope of the arbitration provision is still read, reasonably, to encompass claims arising from employment, to include claims based on duties arising from Warren's status as CEO of the company.

*Id*.  The standard allows for consideration of a "salmagundi" – here a seafood salad – of factors, including the extent of the delay, the degree to which the proponent of arbitration participated in litigation, whether a significant amount of discovery or similar "litigation-related activities" has transpired, the proximity of the request to the anticipated trial date, and whether the referral to arbitration would feel like a keelhaul due to resulting prejudice. *Id.*; *see also FPE Found. v. Cohen*, 801 F.3d 25, 29 (1st Cir. 2015).

Lobster 207 believes Warren has instituted litigation and delayed assertion of the arbitration provision to such a degree that waiver is the natural result.  Specifically, Warren filed a proceeding in state court to secure his employment records pursuant to 26 M.R.S. § 631, which provides in relevant part:

> Any employer who, following a request pursuant to this section, without good cause fails to provide an opportunity for review and copying of a personnel file, within 10 days of receipt of that request, is subject to a civil forfeiture of $25 for each day that a failure continues.  The total forfeiture may not exceed $500.  An employee, former employee or the Department of Labor may bring an action in the District Court or the Superior Court for such equitable relief, including an injunction, as the court may consider to be necessary and proper.

Additionally, Lobster 207 faults Warren for filing the motion to compel arbitration four months after Lobster 207 filed this action, and not before twice moving to extend his deadline to respond to the motion for attachment, and for filing, in tandem, a motion to dismiss that challenges the merits of the pleadings.  Lobster 207 also complains that Warren requested and received several thousand pages of documents from Lobster 207 to facilitate his response to the motion for attachment.

My review of the docket indicates that the delay associated with the timing of Warren's filings in this litigation is the product of several legitimate factors.  In particular,

I note that Lobster 207 filed the Complaint in December, 2019, but did not immediately serve the summons.  Warren's counsel filed a waiver of service in January, 2020, and the parties agreed that the Defendants would respond to the Complaint and motion by mid-February.  However, a further extension was granted based, in part, on a significant health matter, and then, yet another extension was granted on account of the COVID-19 pandemic.  In my view, the delay associated with these various developments does not warrant a finding of waiver.  Nor am I persuaded that defendants' counsel's request for production of documents to enable a response to the motion for attachment is a functional waiver of the arbitration provision where, as here, Lobster 207 insists that its request for such relief should be granted even if the Court concludes that referral for arbitration is appropriate.  (Pl.'s Opp'n to Mot. to Compel Arbitration and Mot. to Stay at 8 – 9.)

As for prejudice, I am not persuaded that Lobster 207 has worked the oars powerfully enough to overcome the federal policy in favor of arbitration.  In particular, Lobster 207 seeks an attachment against all of the Defendants (and has very recently supplemented its showing in that regard), so Warren's delay and Defendants' counsel's request for documents really is no prejudice at all.  I also see no prejudice inherent in Warren's failure to demand arbitration before Lobster 207 sued him.  As to Warren's presentation of a simultaneous motion to dismiss, the other Defendants are joined in that effort and would have pressed the motion in any event, and frankly, the jurisdictional concern called for a challenge to the RICO claims.  This kind of litigation activity is not inconsistent with a request to arbitrate.  *See, e.g.*, *Gollo v. Seaborne P.R.*, *LLC*, No. 15-1771 (JAG), 2017 U.S. Dist. LEXIS 23244 (D.P.R. Feb. 17, 2017); *Trout v. Organización*

*Mundial De Boxeo*, *Inc*., No. 17-1953 (PAD), 2018 U.S. Dist. LEXIS 170486 (D.P.R. Sep. 30, 2018).

This leaves Warren's decision to file an action in state court, in the interim, to force Lobster 207 to comply with a statutory obligation related to his personnel file. According to Warren, it would be a bad policy to treat an employee's effort to force access to his personnel file as a waiver of arbitration on more weighty claims of the kind presented in this action. Warren also observes that the waiver provision in the Employment Agreement cuts in his favor, because it states: "Failure by the Company or the Employee to rely on any provision in this agreement in any instance shall not constitute a precedent or be deemed a waiver." Employment Agreement § 14.

Lobster 207's position about the significance of the personnel record litigation is, at best, doubtful. *See FPE Found.*, 801 F.3d at 30 (citing 1 Domke on Commercial Arbitration § 23:6 (2014) ("Only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate.")). I reject it because I conclude that Warren's resort to state court litigation concerning his personnel record was not a substantial enough litigation endeavor to justify waiver of a right to arbitrate the kind of employment dispute with which Lobster 207 now gaffs him. Additionally, while there may come a point at which a court would have an interest in preventing a party from relying on a non-waiver clause to undermine rulings it does not like, *see Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012); *Republic Ins. Co. v. PAICO Receivables LLC*, 383 F.3d 341, 348 (5th Cir. 2004); *Nat'l Union Fire Ins. Co. of Pittsburgh*, *P.A. v. NCR Corp.*, 376 F. App'x 70, 73 (2d Cir. 2010),

at this stage of *this* litigation, I conclude it is fair that an employer who uses such a non-waiver clause in a contract of employment be subjected to its terms in relation to an arbitration clause.  In other words, the existence of the non-waiver clause reinforces my assessment that referral for arbitration is appropriate in this matter, although I would grant the motion to compel even in its absence.

Warren Pettegrow's Motion to Compel Arbitration will be granted.

## V.    MOTION FOR ATTACHMENT

The matter of Lobster 207's motion for attachment remains.  Rule 64 of the Federal Rules of Civil Procedure provides that provisional remedies like attachment are available in a federal court to the extent they would be available in a state court within the District. Maine law therefore supplies the standard.  Under Maine law, the award of an attachment remedy calls for a hearing.  And although Lobster 207 decries the delay because it filed the motion for attachment in December of 2019, the showing contained in its original affidavits was entirely conclusory on the issue of the standard offer dock price it used to compute the lion's share of the alleged damages.  Lobster 207 supplemented that showing at the end of April, through a reply filing, which then yielded motions to strike the supplemental affidavits.  Given the need for a hearing, and given the issues raised in the motions to strike the reply affidavits, the motion for attachment is not yet under advisement.

## CONCLUSION

The Pettegrow Defendants' Motion to Dismiss (ECF No. 45) is GRANTED IN PART AND DENIED IN PART.  Although the action will remain in this Court based on

the RICO wire fraud theory, the labor management embezzlement RICO theory is DISMISSED.  In all other respects, the Pettegrow Defendants' motion is denied.

Stephen Peabody's Motion to Dismiss (ECF No. 42) is GRANTED IN PART AND DENIED IN PART.  All RICO claims are DISMISSED as to Mr. Peabody.  In all other respects, Mr. Peabody's motion is denied.

Warren Pettegrow's Motion to Compel Arbitration and Stay (ECF No. 44) is GRANTED IN PART.  A referral for arbitration is appropriate and the request to compel arbitration is therefore granted.  As to the matter of the requested stay, that request is DENIED WITHOUT PREJUDICE.  The Court will return to the matter of a stay in the context of a scheduling conference, to be conducted after it resolves the Motion for Attachment.

The Motion for Attachment (ECF No. 4) and the associated Motions to Strike (ECF Nos. 59 & 60) are RESERVED for hearing on June 2, 2020.

SO ORDERED.

Dated this 1st day of June, 2020.

  /s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE