## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

LOBSTER 207, LLC,            )
                            )
         Plaintiff,         )
                            )
        v.              )      Docket No.  1:19-cv-00552-LEW
                            )
WARREN B. PETTEGROW et al.,   )
                            )
        Defendants.      )

**STEPHEN M. PEABODY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Defendant Stephen M. Peabody ("Peabody"), by his counsel Pollack Solomon Duffy

LLP, respectfully submits this motion to dismiss the claims against him in the First Amended

Complaint ("FAC"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### Introduction

The Court already dismissed all claims against Peabody in the original Complaint

brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968

("RICO"), finding that plaintiff Lobster 207, LLC ("Lobster 207") was not a labor union and

therefore could not rely on the labor management embezzlement theory under 29 U.S.C. § 501(c)

as a predicate act, and because the only actionable RICO conduct in the original Complaint

(referred to as the "tubed lobster scheme") was not directed at Peabody. (Dkt. 72).

Lobster 207 now seeks to reframe its allegations against Peabody, claiming that various

"schemes" constituted wire fraud, but does not add any meaningful factual allegations, instead

speculating that because Peabody routinely used his and his employer's telephones to conduct

business with defendant Warren Pettegrow, the then-CEO of Lobster 207, for the benefit of

Peabody's employer non-party Beals-Jonesport Co-op, Inc. ("BJ Co-op"), that such

communications necessarily related to some type of fraud. When analyzed under controlling

caselaw, Lobster 207's allegations as to four fraudulent "schemes" alleged against Peabody fail. The new allegations also make clear that Peabody served his employer's interest, not any continuing interest of an "enterprise," let alone as in operation or management of an enterprise.

First, the alleged misrepresentations by Peabody that *his employer* historically received a $0.20-per-pound premium on lobsters sold to Trenton Bridge Lobster Pound, Inc. ("Trenton Bridge") over *other docks*, when in fact it received a smaller premium per pound (the "BJ Co-op Scheme"), fails to meet the particularity requirements of Fed. R. Civ. P. 9(b), because the FAC alleges no facts to explain how Peabody even had knowledge of the wholesale lobster prices charged by *other docks* or if that knowledge was accurate or based on false statements by other dock managers. Nor can Lobster 207 allege that it reasonably relied on any material misstatement when, at all pertinent times, Lobster 207 (but not Peabody or BJ Co-op) had unfettered access to Trenton Bridge's pertinent historical pricing information, a cursory review of which made obvious the truth or falsity of such information. Nor has Lobster 207 alleged, as it must, how any wire communications constituted or furthered any alleged fraudulent conduct.

Second, all claims based on what Lobster 207 calls the "Phantom Lobster Scheme," whereby BJ Co-op submitted *one* immaterial invoice for lobsters without intending to fulfil the delivery of lobsters, must be dismissed because Lobster 207 admits that Trenton Bridge repaid to Lobster 207 the amounts at issue and, therefore, Lobster 207 was not harmed.

Third, the allegations regarding the "Recoupment Scheme" by which *other defendants* allegedly altered BJ Co-op invoices are insufficient to state wire fraud against Peabody because Lobster 207 has not, and cannot, allege factually that Peabody even knew about any of the alleged invoice alterations or that the prices ultimately paid by Lobster 207 on those invoices were higher than the *actual* daily lobster prices in effect on a given day.

Fourth, Lobster 207's passing effort to implicate Peabody in the "Poseidon Scheme," involving claims of defendant Warren Pettegrow misusing his lobster smack boat for improper competitive activity, is empty as against Peabody because it relies *solely* on a conclusory assertion that mere existence of routine telephone communications between Warren (then-CEO of Lobster 207) and Peabody "indicates" that Peabody must have been involved in the scheme.

Finally, the state law claims against Peabody for conversion and unjust enrichment fail because Peabody is not alleged to have benefited personally from any of the alleged conduct, the common law fraud claim fails for the same reasons as the wire fraud claims, and the conspiracy claim fails for Lobster 207's failure to allege an underlying tort. When it comes to Peabody, Plaintiff still casts far too wide of a net.

## Facts

Lobster 207 is a Maine limited liability company that, prior to the 2017 lobster season, purchased a lobster wholesale business from Anthony and Josette Pettegrow, the owners of Trenton Bridge. As part of the transaction, the Pettegrows' son Warren Pettegrow – previously the head of Trenton Bridge's wholesale business – became Lobster 207's CEO, and Trenton Bridge agreed to withdraw from the wholesale business altogether. (FAC ¶¶ 1, 10).

Plaintiff claims that after Trenton Bridge sold its wholesale business to Lobster 207, Anthony and Josette, with their son Warren, formed an unlawful enterprise, referred to in the FAC as the Pettegrow Lobster Enterprise. (*Id.* ¶11). The FAC does not allege any particular hierarchy or structure within the Pettegrow Lobster Enterprise, but alleges, in relevant part, that after the sale of Trenton Bridge to Lobster 207 closed on March 24, 2017, Lobster 207 began overpaying *BJ Co-op* for lobsters based on alleged misrepresentations by Peabody and others as to historical pricing between BJ Co-op and Trenton Bridge, which facilitated embezzlement and

conversion of funds by Defendants and unspecified "others." (*Id.* ¶¶ 12-13).

***Allegations in the First Amended Complaint Specific to Stephen Peabody***

Lobster 207 breaks down into ten "schemes" various allegations by which permutations of the Defendants overbilled Lobster 207. Four of the schemes allegedly included Peabody:

- The "BJ Co-op Scheme" (¶¶ 66-77), whereby Warren, Anthony, and Peabody allegedly caused Lobster 207 to overpay BJ Co-op for lobsters by misrepresenting that Trenton Bridge had historically paid BJ Co-op a $0.20 per pound premium over other docks and co-ops for BJ Co-op's lobsters;

- the "Phantom Lobster Scheme" (¶¶ 78-95), whereby Warren allegedly conspired with and caused Peabody to submit to Lobster 207 *one* bogus BJ Co-op invoice in the amount of $55,269 for lobsters that were never intended to be delivered;

- the "Recoupment Scheme" (¶¶ 96-106), whereby Trenton Bridge, Warren and Peabody – after Trenton Bridge *paid back* the $55,269 – altered subsequent BJ Co-op invoices for actual sales to Lobster 207 in order to recoup the $55,269; and

- the "Poseidon Scheme" (¶¶ 137-176), whereby Trenton Bridge and Warren submitted false and fraudulent invoices to Lobster 207, for lobsters collected by Warren's smack boat the *Poseidon*.

Lobster 207 does not allege any contract or commercial relationship with Peabody. Lobster 207 does not allege any particular role in the hierarchy or structure of an enterprise that Peabody played beyond submitting invoices for his employer in the ordinary course of his work, separately from any enterprise and in the interests of his actual employer. Nor has Lobster 207 alleged any facts suggesting that Peabody benefited personally from any of the alleged schemes. Significantly, Lobster 207 acknowledges that prior to the Closing, Trenton Bridge conducted business with Peabody's employer BJ Co-op "on a daily basis," which daily business continued after the Closing of the transaction between Trenton Bridge and Lobster 207. (FAC ¶¶ 57, 67).

Putting aside other forms of improper collective and conclusory pleading, the following is a summary of allegations directed at Peabody, all of which demonstrate he acted in the interests of his employer BJ Co-op, not a separate structure that supposedly constituted an association-in-fact enterprise, and that "others" not named in the FAC did the same thing:

- Despite contractual prohibitions, as soon as the sale of Trenton Bridge to Lobster 207 closed on March 24, 2017, Anthony and Josette, *with the help of* Warren, Trenton Bridge, Peabody, *and others*, began operating a competitive wholesale lobster business, submitting fraudulent invoices, embezzling and converting funds from Lobster 207's member-fisherman, and stealing lobster products, which in many instances were re-sold to Lobster 207 at a premium. (FAC, ¶ 12);

- Anthony, Josette, and Warren, together with Defendants Trenton Bridge, Poseidon Charters and Peabody, and with the aid and assistance of employees, agents, and co-conspirators, established an association-in-fact which used deception, self-dealing, manipulation, forgery, and theft to embezzle and convert funds and lobster product from Lobster 207 in order to further their competing interests and enrich themselves (i.e. the "Pettegrow Lobster Enterprise"). (*Id.* ¶ 44);

- Warren, Anthony, and Peabody told Lobster 207 that Trenton Bridge *had paid BJ Co-op a $0.20 per pound premium for* lobster prior to the Closing *over other docks and co-ops*, when in fact, Trenton Bridge had paid BJ Co-op only a $0.10 per pound premium. (*Id.* ¶¶ 66, 74);

- Relying on those misrepresentations, Lobster 207 agreed to *pay BJ Co-op* a $0.20 per pound premium over what it would pay to other docks and co-ops. (*Id.* ¶ 68);

- Peabody prepared *BJ Co-op invoices* to Trenton Bridge bearing the inflated price and gave those invoices to the drivers who picked up the lobster from BJ Co-op. (*Id.* ¶ 72);

- Warren, Anthony, Josette, Trenton Bridge and Peabody made extensive use of the wires in furtherance of the BJ Co-op Scheme because, as phone records demonstrate, Warren was in near-daily contact with Peabody and others concerning the price and quantity of lobster *that BJ Co-op* and Trenton Bridge *sold to Lobster 207* throughout Warren's entire tenure as Lobster 207's CEO. (*Id.* ¶ 77);

- Using Warren's control over Lobster 207's billing and inventory processes, Warren and Peabody also developed and implemented a scheme that fabricated *one invoice* for non-existent, "phantom" lobsters the proceeds of which were used by Peabody to generate sufficient funds to make up a $55,269 shortfall needed for *BJ Co-op* to *pay fishermen members of BJ Co-op* a holdback bonus of $1.40, the largest in BJ Co-op's history. Peabody is not claimed to have personally profited from this scheme, but allegedly engaged in it *to ingratiate himself to BJ Co-op's fishermen*, whatever that means (the "Phantom Lobster Scheme)." (*Id.* ¶¶ 78-82);

- To accomplish the Phantom Lobster Scheme, Warren and Peabody agreed to fraudulently bill Trenton Bridge for the $55,269 shortfall by means of a false invoice, BJ Co-op Invoice No. 6636, that stated that on November 30, 2017, Trenton Bridge, on behalf of Lobster 207, purchased 138 crates of new shell lobsters weighing 12,420 pounds at a total price of $55,269, but that neither Trenton Bridge, Warren nor Peabody ever intended to sell and deliver such lobster to Lobster 207. (*Id.* ¶¶ 83, 87);

- After David Sullivan (of Lobster 207) confronted Warren about the $55,269 invoice, *Trenton Bridge paid the $55,269 back to Lobster 207* in January 2018. (*Id.* ¶¶ 91, 93);

- Defendants used the wires in furtherance of the Phantom Lobster Scheme. (*Id.* ¶ 94);

5

- Having been caught and forced to ***pay back*** the $55,269 converted from Lobster 207, Trenton Bridge, Warren, and Peabody conspired and agreed to recoup those very funds through yet another fraudulent scheme whereby ***they*** would up-charge for lobsters that Lobster 207 actually purchased from BJ Co-op during the 2018 lobster season (the "Recoupment Scheme"). (*Id.* ¶ 96);

- For the 2018 fishing season, while Peabody continued to submit BJ Co-op invoices to Trenton Bridge for lobsters that Trenton Bridge would resell to Lobster 207, ***Trenton Bridge and Warren*** (but not Peabody) began altering BJ Co-op invoices by fraudulently increasing the price of lobster by an additional $0.10 per pound by physically manipulating those invoices before sending them to Lobster 207 for payment in order to re-coup the $55,269 that Trenton Bridge had repaid to Lobster 207. (*Id.* ¶¶ 97, 98);

- Warren, Trenton Bridge and Peabody used the wires in furtherance of the Recoupment Scheme. Warren spoke by telephone with both his parents, Trenton Bridge, BJ Co-op and Peabody nearly every day on which Trenton Bridge transmitted a fraudulent invoice to Lobster 207. (*Id.* ¶ 105);

- With respect to the alleged Poseidon Scheme, Peabody is alleged to have spoken to Warren by telephone on nearly every day that Trenton Bridge issued Lobster 207 an invoice in connection with the *Poseidon* scheme lobster, ***"indicating"*** that Warren and Trenton Bridge communicated with Peabody concerning the volume of lobster that BJ Co-op intended to sell to Lobster 207 so that Warren and Trenton Bridge could disguise the BJ Co-op lobster as "*Poseidon*" lobster and charge Lobster 207 additional and fraudulent transportation fees. (*Id.* ¶ 163).

## Discussion[1]

To successfully plead a RICO claim, Plaintiffs must allege four elements: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *See Guiliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005). Claims sounding in fraud, including under RICO, must be pleaded with particularity. *See Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997) (it is "well settled law in this circuit that RICO pleadings of mail and wire fraud must satisfy the particularity requirements of Rule 9(b)"). "[M]ere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." *Hayduk*

---

[1] In addition to the arguments directed to the Lobster 207's flawed effort to allege wire-fraud against Peabody (Point I), Peabody re-raises certain arguments regarding Lobster 207's failure to allege a RICO claim that the Court did not need to reach when dismissing the RICO claims against Peabody in the original Complaint (Point II), as well as certain new arguments regarding the flawed nature of Plaintiff's state law claims (Point III).

*v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985) (citations omitted). In order to survive, the RICO claims against Peabody in the FAC must contain *factual* allegations of a structure and hierarchy that constitutes an "enterprise," that Peabody conducted the affairs of an enterprise, and that the enterprise engaged in a pattern of racketeering.

To survive dismissal of its fraud-based claims, Lobster 207 must plead sufficient facts supporting each such claim that: (i) Peabody made a false representation of a material fact with knowledge of its falsity for the purpose of inducing Lobster 207 to act thereon, (ii) Lobster 207 relied upon the representation as true and acted upon it to his detriment, (iii) that Lobster 207's reliance was reasonable under the circumstances, and (iv) causation of damages. *Rodi v. S. New England Sch. of Law*, 532 F.3d 11, 15 (1st Cir. 2008); *Am. Aerial Servs., Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 110 (D. Me. 2014). To plead wire fraud with the requisite particularity under Rule 9(b), Lobster 207 must, at a minimum: (i) specify the statements that it contends were false or misleading; (ii) explain why the statements were materially false; (iii) state when and where the statements were made; and (iv) identify the speaker or speakers. *Allen v. New World Coffee, Inc.*, No. 00 CIV 2610 AGS, 2001 WL 293683, at *4 (S.D.N.Y. Mar. 27, 2001).

Where multiple defendants are accused of wire fraud, plaintiff must plead fraud with particularity as to each defendant. *Allen*, 2001 WL 293683, at *4 (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir. 1993)). Indeed, "[c]ourts have been particularly sensitive to [Rule 9(b)] pleading requirements in RICO cases in which the 'predicate acts' are mail fraud and wire fraud, and have further required specific allegations as to *which* defendant caused *what* to be mailed (or made which telephone calls), and *when* and *how* each mailing (or telephone call) furthered the fraudulent scheme." *Penn, LLC v. Prosper Bus. Dev. Corp.*, No. 2:10-CV-993, 2011 WL 2118072, at *11 (S.D. Ohio May 27, 2011) (quoting *Berent v. Kemper*

7

*Corp.*, 780 F. Supp. 431, 448 (E.D. Mich.1991) (emphasis in original)); *C.A. Westel de Venezuela v. American Telephone & Telegraph Co.*, No. 90 Civ. 6665, 1992 WL 209641, at *21 (S.D.N.Y. Aug. 17, 1992) ("[i]n a civil RICO action in which the predicate acts consist of mail fraud or wire fraud, the plaintiff does not satisfy Rule 9(b) merely by pleading with particularity *the communications transmitted by the mails or wires* in furtherance of the scheme or artifice to defraud; rather, the plaintiff must plead with particularity *the allegedly fraudulent statements themselves*, regardless of the manner in which they were communicated." (emphasis added)). One court aptly explained the pleading requirements of the manner in which the use of wires furthered the alleged fraudulent scheme, which Lobster 207 has failed to do here:

> plaintiff must additionally allege how each specific act of mail or wire fraud actually furthered the fraudulent scheme. In sum, the plaintiff "must sketch out who (i.e., which defendants) caused what to be mailed [or used the telephone] when, and how that mailing [or phone call] furthered the fraudulent scheme." The Landons provide an extensive list of telephone calls and mailings and identify dates and specific individuals. They do not, however, allege the contents of those calls and letters and, more importantly, how each furthered the fraudulent scheme or related to one of the transactions that constitute the pattern. Defendants are entitled to such allegations before answering the complaint. For these reasons, the RICO claim is dismissed.

*Landon v. GTE Commc'ns Servs. Inc.*, 696 F. Supp. 1213, 1218 (N.D. Ill. 1988) (internal citations omitted); *see also Justice v. Nelson*, No. 3:19-CV-185, 2019 WL 6971371, at *2 (E.D. Tenn. Dec. 19, 2019) (a RICO complaint sounding in wire fraud "must allege the time, place, and content of the misrepresentation upon which Plaintiffs relied"); *Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009) (group pleading does not comply with the requirements of RICO or Rule 9(b)).

## I.    Plaintiff Has Failed to Plead Fraud with Particularity for Each of the Alleged Four "Schemes" that it Asserts against Peabody in Counts I, II and III.

### *The "BJ Co-op Scheme"*

Lobster 207's claims against Peabody in relation to the "BJ Co-op Scheme" boil down to an allegation that Peabody and others told Lobster 207 that Trenton Bridge had historically paid BJ

8

Co-op a $0.20 cent per pound "premium" over what plaintiff calls the "Standard Offer dock price," which it defines as the wholesale market price "that a wholesaler such as Lobster 207 or Trenton Bridge announces it will pay *all docks or co-ops on that day for lobster*," when in fact Trenton Bridge had paid only a $0.10 cent "premium." (*See* FAC ¶¶ 58, 66, 74 (emphasis added)).

The FAC does not, however, even attempt to explain, much less with particularity, how Peabody, the dock manager *for BJ Co-op*, had knowledge as to what *other docks or co-ops* were getting from Trenton Bridge for their lobsters on any given day. Without alleging how Peabody possessed knowledge of what *his employer's competitors* had historically charged Trenton Bridge, or if that knowledge was even accurate or based on false statements by other dock managers, Lobster 207's allegations fall well short of alleging with requisite particularity that Peabody made a materially false representation of a material fact *with knowledge of its falsity*. *See Am. Aerial Servs., Inc. v. Terex USA LLC*, No. 2:12-CV-00361-GZS, 2013 WL 1898535, at *4 (D. Me. Mar. 6, 2013), *aff'd*, No. 2:12-CV-00361-GZS, 2013 WL 1898533 (D. Me. May 7, 2013) (dismissing fraud claim where plaintiff failed to allege how any of the defendants had knowledge that the alleged false statements were false, explaining that "courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity…."). The FAC's failure to allege facts as to Peabody's knowledge of falsity, let alone material falsity, of his alleged pricing representation alone requires dismissal.

In addition, Lobster 207 fails to plead how it could justifiably have relied on Peabody's alleged misrepresentation as to historic pricing between Trenton Bridge and *other* lobster suppliers. As the party with superior knowledge and possession of the pertinent financial information, Lobster 207 either knew about the alleged falsity of Peabody's statement or such falsity was obvious upon a cursory review. *See Rared Manchester NH, LLC v. Rite Aid of New*

*Hampshire, Inc.*, 693 F.3d 48, 55 (1st Cir. 2012) ("When, however, the undisclosed fact is known all along to the allegedly defrauded party, or should have been obvious to him, an action for fraud will not lie."); *Photias v. Graham*, 14 F. Supp. 2d 126, 132–33 (D. Me. 1998) (under Maine law, "Plaintiff may not justifiably rely on a fraudulent misrepresentation if he knows it is false or its falsity is obvious to him."); *In re Cassar*, 325 B.R. 62, 65 (Bankr. D.N.H. 2005) (lender that had in its possession debtor's the tax returns for years 2000 and 2001, which did not have any evidence of payment, could not justifiably rely on alleged misrepresentation that taxes had been paid); *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) (party to a sophisticated transaction cannot demonstrate reasonable reliance without making inquiry and investigation if it has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment); *Shappirio v. Goldberg*, 192 U.S. 232, 241-42 (1904) (reliance is not justifiable if "means of knowledge are open and at hand ... and no effort is made to prevent the party from using them").

Here, the FAC alleges that pursuant to the August 29, 2016 Asset Purchase Agreement ("APA"), Lobster 207 purchased Trenton Bridge's wholesale business, "including all of Trenton Bridge's tangible and intangible personal property, goodwill, customer data, and contracts." (FAC ¶ 28.) The purchased assets expressly included Trenton Bridge's "[d]atabases, customer lists, sales records, contact information, all as related to or used in connection the Wholesale Business … in its ordinary Quickbooks or other format importing the data into Purchaser's software." (Dkt. 157-1 at p. 150). The APA required that from its date until the Closing, Lobster 207 "shall have full access to the financial and business records of [Trenton Bridge], including Seller's customer ***and supplier*** lists…" (*Id.* at p. 161 (emphasis added)). In addition, the APA bound its parties to keep the terms of negotiations and existence of the APA confidential from third parties like Peabody and the BJ Co-op. (*Id.* at p. 163).

In other words, the FAC alleges that at all pertinent times Lobster 207 had unfettered access to Trenton Bridge's historical financial records, a cursory review of which would have made obvious any difference between the wholesale prices that Trenton Bridge historically paid to BJ Co-op and those that it paid to other lobster docks or co-ops. Under those circumstances it was unreasonable for Lobster 207 to rely upon allegedly false price comparisons allegedly provided by the dock manager *of the BJ Co-op*, who would naturally be seeking to negotiate the best lobster price for *the BJ Co-op*.

In addition, Lobster 207 has failed to allege how any specific telephone call or group of calls actually furthered the fraudulent scheme. Instead, Lobster 207 alleges in a broad conclusory manner that Peabody made extensive use of the wires "in furtherance of the BJ Co-op scheme," based on a mere existence of dozens or more calls between Peabody and Lobster 207's then-CEO that took place in the context of nearly two years of lobster transactions between BJ Co-op and Lobster 207. Lobster 207 does not allege, nor can it, that Peabody made any fraudulent statements to anyone on any particular phone call, and does not even attempt to identify any specific calls that pertained to the alleged "scheme." The common law fraud and RICO claims in the FAC against Peabody predicated on the "BJ Co-op Scheme" must therefore be dismissed.

### The "Phantom Lobster Scheme"

Lobster 207 expressly alleges that Trenton Bridge repaid to Lobster 207 the $55,269 for lobsters that Lobster 207 alleges were never intended to be delivered. (FAC, ¶ 93 ("After Mr. Sullivan informed Warren that he needed to return the converted funds to Lobster 207, Trenton Bridge paid the $55,269 to Lobster 297 on or about January 29, 2018.")). On the face of the FAC, Lobster 207 not been damaged as a result of the Phantom Lobster Scheme, which requires that all fraud and RICO claims in the FAC predicated on that "scheme" be dismissed.

**The "Recoupment Scheme"**

The Recoupment Scheme, as alleged, is the epitome of inadequate conclusory group pleading. Lobster 207 alleges that *other defendants* altered BJ Co-op's invoices by up-charging for BJ Co-op lobsters and delivered those altered invoices to Lobster 207 in order to recoup the $55,269 that *Trenton Bridge* had earlier repaid to Lobster 207. (FAC, ¶¶ 96-105). The FAC does not allege a single fact that Peabody was involved in altering invoices or that he knew about alleged actions of other defendants or that he or his employer benefited from such actions. Instead, the FAC broadly concludes that "Trenton Bridge, Warren, and Peabody conspired and agreed to recoup those very funds" and that "Warren, Trenton Bridge and Peabody used the wires in furtherance of the Recoupment Scheme," while relying on the same telephone records as it does for each alleged "scheme." Such conclusions are plainly insufficient to state a fraud claim against Peabody, requiring dismissal of all claims predicated on the "Recoupment Scheme."

**The "Poseidon Scheme"**

Finally, Lobster 207 makes a feckless effort to implicate Peabody in the "Poseidon Scheme," relying on the sole allegation concerning Peabody in paragraph 163:

> Warren also spoke to BJ Co-op and/or Peabody by telephone on nearly every day that Trenton Bridge issued Lobster 207 an invoice in connection with the Poseidon scheme lobster, *indicating* that Warren and Trenton Bridge communicated with Peabody concerning the volume of lobster that BJ Co-op intended to sell to Lobster 207 so that Warren and Trenton Bridge could disguise the BJ Co-op lobster as "Poseidon" lobster and charge Lobster 207 additional and fraudulent transportation fees.

(emphasis added). Not a single other allegation related to Peabody appears in paragraphs 137 through 176 of the FAC describing the "Poseidon Scheme." Putting aside Lobster 207's speculations, the lack of any factual allegations against Peabody in relation to the Poseidon Scheme makes it much more plausible that routine telephone calls between BJ Co-op's dock manager and Lobster 207's then-CEO concerned ordinary business dealings between the two

entities, and not some imagined racketeering activities. Indeed, Plaintiff's efforts to stretch ordinary business activities by Peabody in furtherance of his employer's interests are not remotely sufficient to support the claims that sound in fraud.

For these reasons, Counts I, II and Count III of the FAC must be dismissed.

## II. FAC Fails to Allege a RICO Enterprise Generally or that Peabody Can be Considered an Associate that Conducted the Affairs of any Such Enterprise.

Lobster 207 has also failed in its attempt to allege a RICO enterprise and Peabody's participation in the management of such an enterprise.

### A. Lobster 207 Fails to Plead an Association-in-Fact Enterprise.

A RICO enterprise must have its own structure, rather than just a group of participants each of whom tends to their own business in a manner that commits collective misconduct. *See Boyle v. United States*, 556 U.S. 938, 945 (2009) ("an association-in-fact enterprise must have a structure"); *United States v. Turkette*, 452 U.S. 576, 583 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages"). Taken together, *Boyle* and *Turkette* establish that the existence of an "enterprise" is a separate element under RICO from the requisite racketeering activity, that the proof of these elements may coalesce in some cases, and that proof of one of these elements does not necessarily satisfy the other. *Boyle*, 556 U.S. at 951 (to constitute an enterprise, an association-in-fact needs "structural attributes" including a "framework," and relationships among associates functioning "as a continuing unit"); *Turkette*, 452 U.S. at 583 ("While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other."); *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009) ("an association-in-fact enterprise must be meaningfully distinct from the entities that comprise it such that the entity sought to be held liable can be said to have

controlled and conducted the enterprise rather than merely its own affairs"); *Greenberg v. Blake*, No. 09 Civ. 4347(BMC), 2010 WL 2400064, at *4-5 (E.D.N.Y. June 10, 2010) (to state a valid claim under RICO, a plaintiff must allege that the defendants "formed and organized a separate entity (formal or informal) on whose behalf they acted; it is not enough if they merely acted together to commit the wrong" rather than "functioned as a unit" in a "distinct entity"); *Myers v. Lee*, No. 1:10cv131, 2010 WL 3745632, at *4  (E.D. Va. Sep. 21, 2010) (dismissing RICO claim where complaint failed to allege "a RICO enterprise that operates or functions in a way distinct from the defendants themselves"); *Conte v. Newsday*, 703 F. Supp. 2d 126, 133-134 (E.D.N.Y. 2010) (the "structure" must constitute a "continuing unit"); *Freund v. Lerner*, No. 09 CV 7117(HB), 2010 WL 3156037, at *6 (S.D.N.Y. Aug. 10, 2010) (dismissing RICO claim because "an association-in-fact enterprise must have an ascertainable structure").

Here, Lobster 207 not only fails to make factual allegations amounting to a distinct enterprise, but it actually includes allegations that foreclose such an enterprise and Peabody's status as an associate that conducted its affairs. Essentially, Lobster 207 alleges that Peabody and unidentified "others" submitted inflated invoices in the interests of their own employers or themselves. Because the allegations simply do not allege a distinct enterprise structure in which participants tended to more than their own business, the RICO claims fail for that reason alone.

At most, the allegations in the FAC may give rise to an inference of opportunistic business opportunities or aggressive negotiations for participants in their own business areas without any exercise of control by or through a distinct structure. For example, Paragraph 12 of the FAC specifically alleges Peabody "and others" not allegedly known by Peabody, submitted inflated invoices. Even if one or a few of the participants had contact with others, that does not make the group a unit or create a sufficient relationship among associates having a distinct

14

structure from the alleged members' respective business activities. *See United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013) (despite allegations of "fact that Walgreens's and Par's activities were by all appearances illegal," court held that conduct together "show[ed] only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity" in a way that could "elevate that inference from a 'sheer possibility' to something that is 'plausible on its face'"); *Connecticut General Life Ins. Co. v. Advanced Surgery Center of Bethesda, LLC*, 2015 WL 4394408, at *14 (D. Md. 2015) (allegations "fall short of plausibly alleging that each ASC and SurgCenter were engaged in concerted affairs that were undertaken on behalf of a separately identifiable association-in-fact that is distinct from the ASC and SurgCenter" because "it is unclear what affairs each ASC and SurgCenter conducted separate from their own affairs").

Such allegations about Peabody and unidentified "others" fall shy of even a classic hub-and-spoke conspiracy, which has been held not to constitute a RICO enterprise. *See McDonough v. First Am. Title Ins. Co.*, No. 10-CV-106-SM, 2011 WL 285685, at *5-7 (D.N.H. Jan. 28, 2011) (analyzing pre- and post-*Boyle* decisions rejecting the expansion of "enterprise" to civil RICO claims that allege only hub-and-spoke structures).

Here Lobster 207 repeatedly alleges that Peabody engaged in problematic invoicing on behalf of non-party BJ Co-op, not on behalf of a distinct RICO enterprise. There is no allegation of "relationships" that formed a "unit" involving Peabody beyond each alleged participant engaging in his, her or its respective professional and business activities. There is no allegation of joint management. There is no allegation of a significant let alone dominating economic interdependence. There is no allegation of commingled funds. Simply put, Lobster 207 alleges

15

that each participant tended to his, her or its business in a way that Lobster 207 treats in a conclusory way as a collective wrong. That does not suffice for RICO.

Accordingly, this Court should dismiss all RICO claims because there are insufficient allegations of the sort of distinct structure arising from "relationships among associates" that formed a "unit" qualifying as an association-in-fact enterprise.

### B.  The RICO Claims Against Peabody Must Be Dismissed Because of Insufficient Allegations that He Conducted the Affairs of an Enterprise.

Importantly, to conduct or participate, directly or indirectly, in the affairs of an enterprise requires a showing that a defendant took "some part in directing [the enterprise's] affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993) (finding as a matter of law that accounting firm used as a conduit had not "conducted" the affairs of the alleged RICO enterprise, but rather just its own affairs); *see Rectrix Aerodome Centers, Inc. v. Barnstable Mun. Airport Comm'n*, 632 F. Supp. 2d 120, 125 (D. Mass. 2009) (enumerating elements of RICO claim that include a part in "directing" the affairs of the enterprise not just one's own affairs), *aff'd*, 610 F.3d 8 (1st Cir. 2010). This crucial element has become well-established within and outside of this Circuit. *See Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 572 (W.D.N.Y. 2011) ("On a RICO claim, plaintiffs must allege facts showing that each defendant exerted control over the alleged RICO enterprise."). Simply having a business relationship with or performing valuable services for an enterprise, even with knowledge of the enterprise's illicit nature, is therefore not enough to subject an individual to RICO liability.

This essential element under § 1962(c) of "directing" affairs of an enterprise or "control" over them has precluded the imposition of RICO liability on law firms that have allegedly "counselled their respective clients to continue to participate in the fraudulent transactions" with "full knowledge" of the fraud and to keep it "hidden from the victims of the fraud." *Bowdoin Const. Corp. v. Rhode Island Hosp. Trust Nat. Bank, N.A.*, 869 F. Supp. 1004, 1009-10 (D. Mass.

16

1994) ("as there are no allegations that he participated in the operation or management of the Sea Crest, the alleged enterprise, or that he did anything other than provide legal advice and legal services, the RICO claim must be dismissed"), *aff'd sub nom, Schultz v. Rhode Island Hosp. Trust Nat. Bank, N.A.*, 94 F.3d 721 (1st Cir. 1996) (affirming dismissal of RICO claims).

Here, despite lengthy conclusory paragraphs in the FAC, the allegations against Peabody amount to a rambling patchwork, way too thin to nudge the proposed RICO claims from the conceivable to the plausible. As alleged, Peabody provided invoices on behalf of his employer, BJ Co-op, which is not even named as a defendant. At best, Lobster 207 attempts to elevate aggressive pricing concerns into racketeering, which RICO does not permit. *See Meier v. Musburger*, 588 F. Supp. 2d 883, 913 (N.D. Ill. 2008) ("RICO was not intended by Congress to establish a code of business or professional ethics, the breach of which permits suit in federal court for treble damages and attorneys' fees.").

Accordingly, because Lobster 207 has failed to plead adequate facts from which to plausibly infer that Peabody conducted the affairs of a RICO enterprise all RICO claims against Peabody should be dismissed. Under the controlling law discussed above, the invoicing allegations, expressly alleged multiple times as being done on behalf of BJ Co-op, do not amount to conducting the affairs of a RICO enterprise. *See Reves*, 507 U.S. at 185.

### C.  Lobster 207 Fails to Allege Adequate Facts from Which to Infer a Pattern of *Racketeering* Activity Under RICO.

In construing the pattern element of civil RICO, the Supreme Court has held that the predicate acts must be related and must pose a threat of continued criminal activity. *See Meier*, 588 F. Supp. 2d at 900 (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989)). Because RICO was enacted to combat "long-term criminal conduct," the "continuity" requirement is only met when the predicate acts pose "a specific threat of

repetition extending indefinitely into the future[or]...are part of an ongoing entity's regular way of doing business." *See Home Orthopedics Corp. v. Rodriguez,* 781 F.3d 521, 531 (1st Cir. 2015) (quoting *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 45 (1st Cir. 1991)). No claim exists where there are a few predicate acts, sporadic activity, one or two targeted victims, or a scheme that is not designed to operate indefinitely into the future. *See Home Orthopedics Corp.* at 530-31 (holding open-ended scheme must allege a "pattern "by showing a 'threat of' future criminal activity—this is, 'a realistic prospect of continuity over an open-ended period yet to come." (internal quotations omitted)). Broadly, "where only a few predicate acts are alleged, *or* where the period of time is short, continuity can never be established." *Guiliano*, 399 F.3d at 387 (dismissing close-ended RICO claim for lack of continuity (emphasis in original)) (citing *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 447 (1st Cir. 1990)); *see H.J. Inc.,* 492 U.S. at 240 (alleging predicate acts covering a few weeks or months is inadequate); *Efron v. Embassy Suites (PuertoRico), Inc.,* 223 F.3d 12, 18 (1st Cir. 2000) (predicate acts over a 21-month period held insufficient); *cf. Sion,* 893 F.2d at 446-47 (alleging 95 predicate acts over four and a half years was sufficient to state a RICO pattern).

Finally, as to the continuity requirement, the court analyzes whether each purported predicate meets the legal definition and was used to further the alleged fraudulent scheme. *See Efron,* 223 F.3d at 16 n. 4. Only those acts that are particularly plead and that actually caused the plaintiff's injuries may be relied upon by the court. *See id.* at 17*; Sion,* 893 F.2d at 445 (requiring predicate acts to be plead with particularity). Businesses alleged to have committed plain garden-variety fraudulent acts do not constitute a predicate act under RICO and are insufficient to support a RICO claim. *See DeMauro v. DeMauro,* 215 F.3d 1311 (1st Cir. 2000) ("Rather, the [plaintiff] must demonstrate that the predicate acts ... were a regular

way of conducting the ongoing businesses…" (quoting *Sion*, 893 F.2d at 448)).

As explained above, the RICO claims against Peabody must be dismissed because Plaintiff has either failed to allege a predicate RICO act with particularity or has failed to allege any harm, and has failed to plead open-ended or closed-ended continuity constituting a "pattern." Moreover, the two "schemes" that even allege some type of conduct by Peabody are separate isolated events – a single alleged misrepresentation about historical pricing and an issuance of one invoice – far from a pattern of racketeering activity.

### D.   The RICO Conspiracy Claim Similarly Fails.

A RICO conspiracy allegation cannot circumvent the need to plead and prove an agreement to, among other things, direct the affairs of an enterprise. When claims lack allegations of facts sufficient to support a plausible inference that a defendant knew of and agreed to further racketeering activity, a complaint fails to state a claim against that defendant for RICO civil conspiracy. *See RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051-52 (D.C. Cir. 2012) (dismissing RICO claim, holding that "allegations that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate economic incentives, do 'not suffice ... to show illegality'"). The FAC lacks particularized allegations about how or when Peabody entered into a conspiracy rather than just acted in BJ Co-op's interests, which requires the RICO conspiracy claim be dismissed.

### III.   Lack of Allegations that Peabody Benefited Personally Requires Dismissal of the Unjust Enrichment (Count IV) and Conversion (Count IX) Claims.

The FAC does not contain a single fact from which the Court could plausibly infer that Peabody, *personally*, received any financial or other benefit from any of the alleged "schemes" or acquired possession of any property of Lobster 207. Plaintiff's group pleading of the elements of conversion and unjust enrichment in paragraphs 296 and 332 of the FAC is insufficient. *See*

*Griffin v. Schneider*, 995 F.2d 1061 (1st Cir. 1993) (under Maine law, absent some meaningful basis for an allegation that defendant, ***personally***, was unjustly enriched, the count cannot survive dismissal) (emphasis added); *Gen. Motors Acceptance Corp. v. Anacone*, 160 Me. 53, 83 (1964) (elements of conversion include defendant acquiring possession of plaintiff's property).

**IV.     The Conspiracy Claim (Count VI) Fails for Want of an Underlying Actionable Tort.**

In Maine, "a civil conspiracy claim requires proof of the commission of an underlying tort." *Marr v. Maine Dept. of Human Services*, 215 F. Supp. 2d 261, 273 (D. Me. 2002). Because Lobster 207 has failed to allege an actionable tort, the conspiracy claim must be dismissed.

**Conclusion**

Based on the foregoing, Mr. Peabody respectfully submits that this Court should dismiss all of the claims in the First Amended Complaint against him with prejudice.

Dated:  July 7, 2021

Respectfully submitted,

/s/Phillip Rakhunov
Barry S. Pollack (*Pro Hac Vice*)
Phillip Rakhunov (*Pro Hac Vice*)
POLLACK SOLOMON DUFFY LLP
101 Huntington Avenue, Suite 530
Boston, MA 02199
(617) 439-9800
prakhunov@psdfirm.com

Donald F. Brown
LAW OFFICES OF DONALD F. BROWN
424 South Main Street
Brewer, ME 04412
(207) 989-3030
don@donbrownlaw.com
*Attorneys for Defendant Stephen Peabody*

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2021, a true copy of the above-document, filed through the ECF system, will be served electronically through the ECF system on the registered participants as identified on the Notice of Electronic Filing.

/s/Phillip Rakhunov