**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| LOBSTER 207, LLC, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | Docket No. Case 1:19-cv-00552-LEW |
| | : | |
| WARREN B. PETTEGROW, ANTHONY D. | : | |
| PETTEGROW, JOSETTE G. PETTEGROW, | : | |
| STEPHEN M. PEABODY, POSEIDON | : | |
| CHARTERS, INC., and TRENTON BRIDGE | : | |
| LOBSTER POUND, INC., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS ANTHONY D. PETTEGROW, JOSETTE G. PETTEGROW, WARREN
PETTEGROW, POSEIDON CHARTERS, INC. AND TRENTON BRIDGE LOBSTER
POUND, INC.'S RENEWED AND PARTIAL MOTION TO DISMISS COUNTS I AND II
OF PLAINTIFF LOBSTER 207, LLC'S AMENDED COMPLAINT AND
ACCOMPANYING MEMORANDUM OF LAW**

## I.     INTRODUCTION

Plaintiff, Lobster 207, LLC ("Lobster 207"), has filed an Amended Complaint

seeking to resurrect the lion's share of its RICO claims that this Court dismissed in June 2020.

The amended claims are as infirm as the original ones.  Lobster 207's latest pleading failure is

particularly acute given the stage at which the proposed amendment arrives.  The parties have

taken extensive discovery in the twelve months since the claims were originally dismissed, and

this past May and June they completed an extensive eight-day arbitration.  Against the mountain

of resulting material, Lobster 207 is still unable to plead a tenable theory of RICO liability, much

less plead facts with particularity that would plausibly support its RICO claims.

Lobster 207's continued inability to plead its RICO claims is not surprising, since

this is not a case about racketeering.  It is not about embezzling union funds.  It is not about wire

fraud.  And it is not about money laundering.  This is a commercial contract and tort dispute between parties that executed numerous contracts as part of a business transaction.  Yet from its outset, Lobster 207 has attempted to transform this case into something it is not solely for the purpose of slandering the Pettegrows and, of course, exploiting the RICO statute's treble damages provision.  The Amended Complaint is just its latest attempt to do so.

This case had been pending since December 2019.  More than a year ago, this Court dismissed the vast majority of Lobster 207's RICO claim, and set the Parties on a course to try this case as the business dispute the Court correctly recognized it is.  Enough is enough.  It is time for the Parties to get on with the case the Court has ruled that Lobster 207 actually brought.  Lobster 207's efforts to revive an already dismissed theory of RICO liability and assert two new ones that are utterly unsupported by the vast discovery to date must be rejected.

## II.     STATEMENT OF RELEVANT FACTS

### A.     Factual Overview

The facts alleged by Lobster 207 are familiar to the Court and discussed in detail in the Defendants' original Motion to Dismiss.  In brief, this dispute arises out of a March 24, 2017, Asset Purchase Agreement ("APA") entered into by Lobster 207 and Trenton Bridge Lobster Pound, Inc. ("Trenton Bridge") by which Lobster 207 acquired certain assets of Trenton Bridge's lobster wholesale business from Anthony and Josette Pettegrow ("the Pettegrows").  *See* ECF 72, "Memorandum of Decision and Order" ("MTD Or.") at 2.  In connection with the APA, Lobster 207, on the one hand, and Trenton Bridge and the Pettegrows, on the other hand, entered into several other contracts that governed their post-transaction relationship.  *Id.* at 2.

The APA and related contracts are replete with exceptions and carve outs to assist Lobster 207 in its start-up phase.  The Parties contractually agreed, among other things, that Trenton Bridge would remain involved in the lobster industry as both a buyer and seller of

lobsters, including using its long term relationships in the industry to acquire and sell lobsters to Lobster 207. As such, they executed a contract, the Supply and Offtake Agreement, that permitted these transactions despite the Pettegrows' Noncompetition Agreement. Lobster 207 also hired Warren Pettegrow ("Warren", the Pettegrow's son) as its CEO, and executed a ten-year Employment Contract with him.[1] *Id.* at 3. That contract too had an exception: it permitted Warren to continue to operate his "smack boat", the *Poseidon*, which historically had been the supply vehicle for Trenton Bridge's purchase of lobsters from Mt. Desert Island fishermen.

Lobster 207 continually underpaid Warren. It stopped a check for wages due to him in January 2019. When he refused to agree to amend his Employment Agreement to eliminate his compensation, Lobster 207 fired him in April 2019. That led to the recently concluded arbitration (the decision is pending).

**B.     Lobster 207's Original Complaint**

In December 2019, Lobster 207 brought this lawsuit against Trenton Bridge and the Pettegrows alleging ten so-called "schemes", as well as claims for racketeering and fraud. MTD Or. at 3. Lobster 207 also sued Stephen Peabody ("Peabody"), the dock manager at the Beals Jonesport Co-op ("BJ Co-Op"), one of Lobster 207's primary suppliers of lobsters. From these "schemes", Lobster 207 alleged that the Pettegrow Defendants and Peabody were liable to them pursuant to the U.S. Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, as well as a series of state common law claims, including fraud, conversion, breach of fiduciary duty, conspiracy, and breach of contract. The present Motion concerns *only* Lobster 207's RICO claims and, therefore, those are the only claims discussed herein.

As the Court will recall, Lobster 207's Complaint overwhelmingly premised its

---

[1] The Pettegrows, Warren, Trenton Bridge, and Poseidon Charters are together the "Pettegrow Defendants".

RICO claims on the theory that its sole member, the Maine Lobster Union ("MLU"), was a "labor organization" within the meaning of the Labor Management Reporting and Disclosure Act ("LMRDA"), and that Defendants had violated RICO by embezzling funds from it and/or the MLU in violation of that statute. With respect to a single "scheme" (but not the other nine), the so-called "Tubed Lobster Scheme," Lobster 207 also alleged wire fraud as a predicate act.

### C.     The Court Dismisses the Vast Majority of Lobster 207's RICO Claims

On April 20, 2020, the Pettegrow Defendants moved to partially dismiss Lobster 207's Complaint. MTD Or. at 1 and ECF No. 45. Of relevance to the present Motion, the Pettegrow Defendants argued that Lobster 207's RICO and RICO Conspiracy claims (Counts I & II) should be dismissed because: (i) neither Lobster 207 nor the MLU was a "labor organization" and, thus, the LMRDA was inapplicable; and, (ii) Lobster 207 had not adequately pled its allegations of wire fraud related to the "Tubed Lobster Scheme".[2]

The Court agreed with Defendants' argument that the LMRDA was inapplicable to Lobster 207 and the MLU. ECF No. 72 ("MTD Or."). On June 1, 2020, this Court issued a "Memorandum of Decision and Order"[3] finding "not only is the MLU not a labor organization, but by law, none of its members can be a labor organization." MTD Or. at 7. Accordingly, the Court concluded that the MLU is simply a "fish marketing organization" as organized under Maine law, *id.* at 6, and dismissed Lobster 207's LMRDA-based theory of RICO liability, thereby eliminating virtually all of the RICO claims (save for the few wire fraud allegations associated with the "Tubed Lobster Scheme").[4] MTD Or. at 5-10. The "Tubed Lobster

---

[2] The Pettegrow Defendants also raised arguments as to Lobster 207's state and common law claims.

[3] As noted in the introduction to this brief, the Memorandum of Decision and Order also addressed, and granted, Warren Pettegrow's Motion to Compel Arbitration. This is addressed in Section (D) below.

[4] The Court declined to dismiss Lobster 207's state law tort and contract claims. MTD Or. at 12-16.

Scheme" has a unique international flavor – it alleges "place[ment] of international orders for delivery of inferior 'tubed' lobsters" from a Canadian wholesaler, *id.* at 7; Am. Compl. ¶¶ 177-91 – that lends itself to pleading wire fraud. But the same could not be said for the rest of Lobster 207's alleged "schemes", each of which was and is devoid of such allegations.

Finally, the Court also granted Warren's Motion to Compel Arbitration as to Counts V (Breach of Fiduciary Duty) and VII (Breach of Contract). *Id.* Because the Court granted that motion, this dispute has since proceeded on two parallel paths: (1) the Warren Pettegrow/Lobster 207 arbitration (the "Arbitration"); and, (2) further litigation in this Court.

### D. Discovery and The Warren Pettegrow Arbitration

In the roughly one year since the Court's Order, the Parties have pursued extensive discovery.[5] So far they have produced over one hundred thousand (100,000) pages of documents and taken seventeen (17) depositions, including of all the Parties. Of particular note, on November 2, 2020, Lobster 207 received the complete phone and bank records of all of the Defendants in this litigation, which they have confirmed to this Court. *See* ECF Doc. 146 at 3.

More extensively still, Lobster 207 and Warren Pettegrow recently completed the eight-day Arbitration. The Arbitration featured claims by both sides, as Warren initiated it by filing a claim before the American Arbitration Association for more than $700,000 in unpaid wages. Lobster 207 responded by quite literally ripping the pages of its Complaint in this action and filing it, en masse, as its counterclaim in the arbitration – complete with the time stamped pages in this Court. The result was an arbitration that explored most of the issues in the present action, rather than one limited to Warren's affirmative employment claims. Moreover, at

---

[5] Additional discovery will be taken in this litigation. But Lobster 207 has had over a year to conduct whatever discovery it needed to support its wire fraud theories, and has already deposed each Defendant.

Lobster 207's insistence, the discovery thus far in the arbitration and the litigation has been identical; Lobster 207 demanded that all witnesses be deposed only once, and so understood at the time that it deposed Warren and the other Defendants it was doing so for both proceedings.

Defendants offer the foregoing detail on the history of discovery because it is directly relevant to the present Motion. In preserving Lobster 207's wire fraud claims the first time around, the Court observed that the allegations could profit from discovery:

> "[W]hen the alleged racketeering activity is wire fraud, the plaintiff must allege the acts of wire fraud with particularity, including in regard to their interstate quality," *Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997), although in some cases **leeway is provided to conduct focused discovery** to meet the particularity requirement." (emphasis added).

At present, that "focused discovery" has occurred – in spades. (Nothing is more "focused" than an eight-day evidentiary hearing.) That focus brings into particularly harsh light Lobster 207's failure to meet even the minimal pleading requirements for its wire fraud allegations with the requisite particularity (as discussed below). Lobster 207 is no longer at the beginning of this journey such that the Court should afford it pleading leeway. To the contrary, as demonstrated by the volume and quality of discovery to date, Lobster 207 knows all that it is going to know, and has not found the evidence that would allow it to properly plead RICO claims.

### E.    Lobster 207's Amended Complaint

As part of this ongoing litigation, Lobster 207 filed a Motion for Leave to Amend Complaint in this Court, which the Court granted on April 29, 2021. Dkt. Nos. 145, 181.[6] The purpose of Lobster 207's Amended Complaint is to attempt to salvage its RICO claims by: (1) reasserting its long dismissed argument that it and the MLU are each a "labor organization"

---

[6] By the same April 29, 2021 Order, the Court also granted the Pettegrow Defendants' Motion for Leave to Amend its Answer and Counterclaims and to Join the IAMAW, the MLU, and David Sullivan. *See* ECF Doc. 154.

under the LMRDA; and advancing two brand new RICO theories of liability, (2) that all of the "schemes" alleged in the original Complaint, and one new scheme (the so-called "Inventory Scheme", Am. Compl. ¶¶ 127-136) added in the Amended Complaint, now also constitute wire fraud; and, (3) that the alleged "schemes" also constitute federal money laundering.

## III.    ARGUMENT

This Motion focuses solely on Lobster 207's unsuccessful attempt to revive its RICO claims. First, none of the new allegations changes the Court's original determination that neither Lobster 207 nor the MLU is, nor can legally be, a "labor organization." (*See* Section III.B, *infra*). Second, Lobster 207's two new theories of RICO liability – wire fraud and money laundering – are likewise insufficiently pled. In a classic example of conclusory pleading, Lobster 207 does little more than list phone calls and invoices, and then labels them wire fraud and money laundering. (*See* Sections III.C and III.D, *infra*)

### A.    Standard of Review

The standard of review for this Motion to Dismiss is familiar. To state its RICO claims, Lobster 207 must plead "enough facts to state a claim to relief that is plausible on its face." MTD Or. at 4 *citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While the Court will accept factual allegations as true and consider whether the facts and inferences that may arise from them describe a plausible claim, this placid pleading standard does not apply to allegations of fraud which must state "with particularity the circumstances constituting fraud." MTD Or. at 5 *citing* Fed. R. Civ. P. 9(b). To plead civil RICO, Lobster 207 must plausibly allege that the Defendants participated in: (1) the conduct of; (2) an enterprise; (3) through a pattern of racketeering activity. *Id*.

### B.    This is a Business Dispute, Not a RICO Case, a Fact Lobster 207 Well Knows

Despite what it now pleads (and re-pleads) in the Amended Complaint, Lobster 207 knows full well that this is not a RICO case. Stripped of all of Lobster 207's collateral attacks and conclusory labeling of events as "schemes" and "fraud," this case is and always has been about the amount of money that Lobster 207 paid Trenton Bridge for lobsters. Lobster 207 contends that Trenton Bridge overcharged it, by a shockingly high amount, which Trenton Bridge and Warren supposedly concealed from the business owners. In the arbitration, however, Warren demonstrated, first, that Lobster 207's business objective was to purchase a high volume of lobsters, which is why it chose to compensate Warren (in his ten-year Employment Agreement) on the basis of the volume of lobsters he was able to *buy* as CEO on behalf of Lobster 207 (as opposed to how much Lobster 207 was able to *sell*). Second, Warren demonstrated that he fulfilled those ambitious contractual targets only because he could purchase lobsters through Trenton Bridge after one of the business's historic suppliers (the aforementioned BJ Co-op) refused to sell to the start-up that was Lobster 207. The Pettegrows will prove the same in this litigation.

Furthermore, the Pettegrows will also demonstrate in this case that Lobster 207 has known all of this. They will prove Lobster 207 knew it needed the Trenton Bridge buying station as "infrastructure" to get access to the Mt. Desert Island lobsters. The Pettegrows can very simply show Lobster 207 continued to operate with this infrastructure, uninterrupted, for two years. Even more importantly, the Pettegrows will prove key players within Lobster 207 were well aware any judge would raise eyebrows over a lawsuit brought by Lobster 207 based on this operational model, given the course of dealing it had engaged in with Trenton Bridge over those two years. Unsurprisingly, Lobster 207 is currently fighting to hide some of the evidence

the Pettegrows will use to prove these dispositive facts. *See* ECF 197, "Plaintiff's Motion to Retain Confidential – Subject to Protective Order Designation".

Against this background, Lobster 207 now attempts a hard pivot. In the Amended Complaint, for the first time, in addition to re-accusing the Pettegrow Defendants of LMRDA violations, it also accuses them of committing widespread wire fraud[7] and money laundering. Having lost one year ago its primary RICO theory, Lobster 207 now offers up three theories in the hope that one will stick. Throwing more mud against the wall does not create better claims; it just creates more infirm ones. In this regard, Lobster 207's Amended Complaint makes it even clearer that the RICO claims are misplaced and should be dismissed.

### C. The Court's Prior Ruling that Neither Lobster 207 Nor the MLU is a "Labor Organization" Remains Correct

None of the new allegations concerning Lobster 207 or the MLU (Am. Compl. ¶¶ 20-24) changes the Court's conclusion that neither is a "labor organization." MTD Or. at 6-7. If anything, the new allegations corroborate the Court's original conclusion.

"Lobster 207 is an LLC and cannot plausibly allege it is a labor organization." MTD Or. at 5. So said the Court in its April 2020 dismissal of Lobster 207's LMRDA-based RICO theory, reasoning that the essence of a labor organization is its function, not its name. *Id.* at 6. The Court went on to explain that the MLU does not "exist[] for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours or other conditions of employment…." *Id. citing* 42 U.S.C. § 402(i). Rather, it is a "fish marketing association." *Id. citing* 18 M.R.S. § 1331; *see also* Am. Compl. ¶ 20 ("The MLU is

---

[7] In its original Complaint, Lobster 207 alleged that the Defendants engaged in wire fraud only as part of the "Tubed Lobster Scheme". MTP Or. at 7-8 The Court denied Defendants' motion to dismiss the RICO claims with respect to that claim. Lobster 207 appears to have seized on that ruling and now alleges that Defendants have engaged in wire fraud with respect to every "scheme" alleged in the Amended Complaint.

… a nonprofit fish marketing association"). There is nothing in the statutory definition of a "fish marketing association" that relates to resolving labor grievances.

These deficiencies, identified by the Court over a year ago, are fatal to Lobster 207's LMRDA-based RICO theory because there is nothing that Lobster 207 can allege that will ever change these facts. Lobster 207's newly alleged Paragraph 22 confirms as much. Paragraph 22 is the only new paragraph in the Amended Complaint that specifies what the MLU does, stating that it "owns Lobster 207, a wholesale and retail business that markets and sells Maine lobsters and crabs harvested by MLU members and other holders", and that "Lobster 207's operations are run by MLU members". Am. Compl. ¶ 22. Even when given the opportunity to provide additional detail as to the MLU, Lobster 207 does not list the one thing that would make it a "labor organization", namely, that it "deal[s] with employers concerning grievances." *See* MTD Or. at 6 (citing 29 U.S.C. §402(i)). That is because neither Lobster 207 nor the MLU deals with employers concerning "labor disputes, wages, rates of pay, hours, other terms of conditions of employment" in any way comparable to a labor union. *Id.*

Nor does (or can) the Amended Complaint cure the other deficiencies the Court found in Lobster 207's arguments about the MLU. For example, the Court found that under Maine law, a "fish marketing organization" (of which Lobster 207 admits the MLU is, Am. Compl. ¶ 20) is only authorized by statute to engage in certain enumerated activities within the fishing industry. *See* MTD Or. at 6. Those activities did not include the "labor organization activity" described in LMRDA when the Court first dismissed this theory, and they certainly do not today. Further, the Court observed that the MLU's membership was limited to "natural persons", and thus by law none of its members could not be a "labor organization" for purposes of LMRDA. *Id.* at 6-7. Again, this remains unchanged.

Lobster 207's final attempt in the Amended Complaint to wedge the MLU into the LMRDA's definition of "labor organization" is through the MLU's alleged relationship with the IAMAW. Lobster 207 alleges that: (i) the MLU is "Local Lodge 207 within District 4 of the IAMAW"; (ii) the MLU's members are also IAMAW members; and, (iii) that the IAMAW organized Lobster 207 "to vertically integrate the State of Maine's union lobstermen into the retail and wholesale markets of the lobster industry." Am. Compl. ¶¶ 20-21. But once again, none of these allegations makes the MLU (or Lobster 207) a "labor organization." In fact, the Court already addressed and roundly rejected this argument by concluding, again over one year ago, that "separate membership in the IAMAW does not transform the MLU into a labor organization or make Lobster 207 the asset of a labor organization." MTD Or. at 7. Lobster 207's allegations that the MLU is a lodge of the IAMAW or that Lobster 207 was formed by the IAMAW are similarly irrelevant. Again, the essence of a labor organization is its *function*. Thus, an asset of a labor union only qualifies separately as a "labor organization" if it is "so engaged" with the resolution of labor disputes. *See* 42 U.S.C. § 402(i). Neither Lobster 207 nor the MLU is "so engaged," and Lobster 207 makes no attempt to argue otherwise.

At bottom, except for the "Union" in the MLU's name, nothing about this "fish marketing association" qualifies it or its asset, Lobster 207, as a "labor organization." The Court already ruled this way, and nothing Lobster 207 can do or has done changes that.

**D.      Lobster 207's Allegations Related to its New Wire Fraud Theory are Conclusory and Fail to Allege the Predicate Act of Wire Fraud**

Lobster 207 has also failed to adequately plead its expanded RICO wire fraud theory. Lobster 207 must plead facts – with particularity – sufficient to show: (1) Defendants engaged in a scheme to defraud it by false pretenses; (2) Defendants knowingly and willfully engaged in that scheme with intent to defraud; and, (3) the use of interstate wire communications

in furtherance of the scheme.  *See United States v. Cassiere*, 4 F.3d 1007 (1ˢᵗ Cir. 1993).

Lobster 207 does not plead these elements, and it certainly does not do so with the required particularity of Rule 9(b).  *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987).  Rule 9(b) requires Lobster 207 to plead the time, place, and *content* of the wire communications.  As the First Circuit stated in *Feinstein v. Resolution Trust Corp.*:

> It is settled law in this circuit that Fed. R. Civ. P. 9(b), which requires a party to plead fraud with particularity, extends to pleading predicate acts of mail and wire fraud under RICO.  As in any other fraud case, the pleader is required 'to go beyond a showing of fraud and state **the time, place and content** of the alleged mail and wire communications perpetrating that fraud.'

942 F.2d 34, 42 (1st Cir. 1991) (emphasis added) (citations omitted); *see also N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001).  Conclusory allegations without these details will not suffice.  *See Gott v. Simpson,* 745 F. Supp. 765, 770 (D. Me. 1990) (dismissing a claim because "[t]he allegation…is entirely conclusory, and the amended complaint is devoid of any factual asseverations, specific or otherwise, on which to base that allegation").

Armed with this heightened standard, courts within this District and within the First Circuit generally have not hesitated to dismiss claims of wire fraud (or RICO claims predicated on wire fraud) that do not allege the time, manner, or content of the relevant communications.  *See, e.g., Cutler v. Federal Deposit Ins. Corp.*, 781 F. Supp. 816, 819 (D. Me. 1992) (dismissing RICO claim that did not plead time, place, and content of the wire communications); *Caro-Bonet v. Lotus Mgmt., LLC*, 195 F. Supp. 3d 428, 433-34 (D.P.R. July 5, 2016) (dismissing mail and wire fraud claims because they contained "bald assertions"); *Innercity Recycling Serv. LLC v. SMM New Eng. Corp.*, 2014 U.S. Dist. LEXIS 140326, at *33-*34 (D.R.I. Aug. 13, 2014) (dismissing the RICO and mail fraud claim for failure to allege the time, place and content of statements); *TLH Intl. v. Au Bon Pain Franchising Corp.*, 1986 U.S.

Dist. LEXIS 17755, at *17-*18 (D. Mass. Nov. 13, 1986) (dismissing mail and wire fraud claims because the allegations of fraud are "too conclusory to satisfy the particularity requirement'").

Though heightened, satisfaction of the Rule 9(b) standard is hardly impossible. In the recent case of *Asphaltos Trade, S.A. v. Bituven Puerto Rico, LLC*, which involved allegations of wire fraud in connection with the sale of asphalt, the court distinguished between wire communications that were pled in compliance with Rule 9(b) and those that were not. 2021 U.S. Dist. LEXIS 28828, at *17-*21 (D.P.R. Feb. 16, 2021). The court concluded, there, that the plaintiffs' bare allegation that defendant sent "hundreds of emails with false invoices [for liquid asphalt] attached" over a two-year period was insufficient to plead wire fraud. *Id.* Conversely, however, the court allowed plaintiffs to proceed on their wire fraud claims related to four emails because the Complaint identified the author and recipient of the emails, the date and time of the emails, and described the content of the emails (including an explanation of why that content was part of the alleged fraud). *Id.* By way of example, one of those allegations was as follows:

> On May 19, 2017, at 5:01 pm, Matcon, Bituven, Mr. Iglesias Jr. and Mr. El Harati had Matcon staff [sic] PR Asphalt thirteen (13) invoices related to a number of sales of liquid asphalt from shipments LA9, LA10 and LA11, which charged PR Asphalt between $.13 to $.20 per gallon in excess of *Poten & Partners* prices with between $25-30 per ST in excess of shipping costs. Since the invoice prices were bundled, PR Asphalt did not notice the false charges and paid the invoices *via* wire transfer to Bituven's bank account in Banco Popular as instructed by the invoices. Those Invoices summed to over $1,500,000. *Id.*

The difference in the level and quality of pleading by the plaintiff in *Asphaltos Trade* as to the wire fraud allegations the court did not dismiss as compared to those it did dismiss is striking. Here, Lobster 207's wire fraud allegations in the Amended Complaint match the latter. They are wholly conclusory and fail to satisfy Rule 9(b)'s specificity requirement. Critically, despite extensive discovery, Lobster 207 is entirely unable to plead the *content* of any

13

of the communications on which it premises its newly found theories of wire fraud.

Instead, Lobster 207 merely includes "Schedules A-1 through E-1" in the Amended Complaint (which it labels "evidence" of wire fraud). But these schedules are just lists of phone calls made by and between the Defendants on certain dates, entirely untethered (explicitly or implicitly) to any allegations of fraud. The Schedules identify: (1) the Parties to each call, (2) the date of the call, and, (3) the duration of the call. The most the Amended Complaint does to possibly link these calls to any other allegations is to suggest that they must be related to fraud because the dates of the call are close in time to some other alleged conduct. For example, with respect to the "Phantom Lobster Scheme", Lobster 207 pleads the following:

> 94. Warren and Peabody used the wires in furtherance of the Phantom Lobster Scheme, including through a 20-minute phone conversation on November 30, 2017 (the last day of BJ Co-Op's fiscal year) and for another 38 minutes on December 3, 2017, the day before Warren submitted the fraudulent BJ Co-op invoice to Lobster 207 for payment
>
> 95. Appended hereto and incorporated by reference herein as Schedule 2 is a schedule of between Warren, using cell phone number (207) 266-1173 and [the Pettegrows, Trenton Bridge, BJ Co-op, and ] that correspond with the [allegedly] fraudulent invoices involved in the Phantom Lobster Scheme [sic].

But Lobster 207 must do more than plead the date, time, and participants in a wire communication. It must plead the *content* of these calls and *why* these calls relate to the alleged fraud. By pleading only the date and time of the calls, Lobster 207 asks the Court to assume that the subject matter of these calls must have been related to the fraud, rather than any of the number of legitimate business topics engaged in by Warren (as CEO of Lobster 207) and two of its biggest suppliers of lobster (Trenton Bridge and the BJ Co-op).

These type of incomplete, and conclusory allegations are common throughout the Amended Complaint. By way of illustration, Paragraph 14 of the Amended Complaint states:

14

> The Pettegrow Lobster Enterprise used the wires to further the aforementioned schemes through almost-daily telephone communications between Warren and Anthony, Josette and Peabody, fax transmissions and bank wires, in addition to daily email updates to Warren concerning Lobster 207 and Trenton Bridge's finances. (Am. Compl. ¶ 14).

This paragraph follows what becomes a common pattern throughout the Amended Complaint, namely, Lobster 207 offering a conclusory allegation regarding the use of the wires for every "scheme" pled in the original Complaint, as well as in a "wrap-up" section entitled "The Pettegrow Lobster Enterprise's Use of the Wires", *see* Am. Compl. ¶¶ 249-61.

Indeed, this "wrap-up" section is likewise devoid of any of the particulars Rule 9(b) requires of Lobster 207. At most, in this section Lobster 207 makes four allegations, only one of which appears to relate in any way to the wire fraud claims. First, Lobster 207 alleges that Warren spoke regularly with his parents (Anthony and Josette) and Mr. Peabody during the relevant time period. Am. Compl. ¶¶ 249-52. Again, though, Lobster 207 does not plead (or make any attempt to plead) the content of these communications, or otherwise tie them in any substantive way to the fraud alleged. Beyond that, Lobster 207's remaining three allegations in this section do not support, and indeed have no relevance to the wire fraud claims. They are that: Warren received "Daily Reports" containing information about Trenton Bridge and Lobster 207's financial status, *id.* ¶¶ 253-54; (3) Warren and/or other Defendants deactivated certain email accounts of Lobster 207 and/or Trenton Bridge employees, *id.* ¶¶ 256-57; and, that Warren lost his cellphone in a carjacking incident, *id.* ¶¶ 258-61.

The sheer number and importance of these types of incomplete/conclusory allegations by Lobster 207 in the Amended Complaint is what makes the extensive discovery the Parties have conducted to date, and the parties' conclusion of the hearings in the Warren Pettegrow arbitration, so important to the present Motion. The Parties are not in the usual

posture of a Rule 12(b)(6) motion being made at the beginning of the case when the facts have not yet been revealed.  Lobster 207's latest attempt to plead wire fraud comes more than eighteen (18) months after it filed the case, and after one full year into the discovery process.  Despite this open door into the alleged "Pettegrow Lobster Enterprise," Lobster 207 is still unable to plead, much less support with evidence, anything other than a list of telephone calls between Warren and his parents and Mr. Peabody, the contents of which are entirely speculative and unpled.

In sum, Lobster 207 offers rank speculation in place of the particular facts Rule 9(b) requires, and then asks this Court to do the heavy lifting for it by assuming that any and all phone calls between/among Defendants must have been in furtherance of the "schemes" in such a way as to sufficiently plead wire fraud.  Lobster 207's request of this Court is a bridge too far. It bears repeating that three of the alleged participants in this scheme are family members. Warren is Anthony's and Josette's son.  It cannot be enough to plead wire fraud to simply list a son's phone calls with his parents or business partners.  Lobster 207's exclusive reliance on the *existence* of such communications is improper, insufficient, and serves as a stark example of why the law requires plaintiffs to plead not only the date, time, and participants to a communication, but also the *content* as well.  Lobster 207 has utterly failed to do so.

E.     **Lobster 207 Likewise Fails to Plead the Predicate Acts of Money Laundering**

Lobster 207's second new theory of RICO liability is that the conduct alleged in the Amended Complaint somehow constitutes money laundering.  This is desperation.  What money, precisely, could be "laundered" in the transactions pled here?  The gravamen of a "money laundering" allegation is the concealment of criminally ill-gotten gains.   This dispute, however, concerns an asset sale from an established business, Trenton Bridge, to a start-up, Lobster 207.  The new business then employed Warren Pettegrow and bought lobsters from, among others, Trenton Bridge.  All of this took place openly.  Trenton Bridge sent Lobster 207

16

invoices from, unsurprisingly, Trenton Bridge. Lobster 207 paid these invoices, itself kept

careful records, and reported all transactions on a monthly basis to its lender. All of these

documents received high scrutiny in the arbitration. There was no "secret" entity, no ill-gotten

secret gains, and, thus, no money that needed to be or was laundered. Here again, Lobster 207

stretches to convert the commercial to the criminal. Common sense defies this tactic.

Consistent with this, the Amended Complaint falls woefully short of pleading the

predicate act of money laundering. The relevant portions of 18 U.S.C. 1956(a)[8] – which defines

money laundering for purposes of the Amended Complaint and this Motion – are as follows:

> (1) Whoever, knowing that the property involved in a financial
> transaction represents the proceeds of some form of unlawful
> activity, <u>conducts or attempts to conduct such a financial
> transaction which in fact involves the proceeds of specified
> unlawful activity</u>—
> (A)
> (i) <u>with the intent to promote the carrying on of specified unlawful
> activity</u>; or
> or
> (B) knowing that the transaction is designed in whole or in part—
> (i) to conceal or disguise the nature, the location, the source, the
> ownership, or the control of the proceeds of specified unlawful
> activity; or

Thus, to begin with, the statute requires that Lobster 207 plausibly allege that

Defendants "conduct[ed] or attempt[ed] to conduct a financial transaction which involves the

proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1). What constitutes a "specified

unlawful activity" is separately defined in 18 U.S.C. § 1956(c)(7). [9] Here, the only "specified

unlawful activity" alleged by Lobster 207 is that the Defendants engaged in wire fraud. As

---

[8] 18 U.S.C. 1956(a) also defines money laundering as transactions that attempt to avoid tax responsibilities
or reporting requirements under state or federal law, neither of which is relevant to this case.

[9] The statute's definition of "specified unlawful activity" makes clear how far afield the conduct described
in the Amended Complaint falls from a federal money laundering18 U.S.C. § 1956(c)(7)(B-C).

alleged in Paragraph 272 of the Amended Complaint:

> The Defendants conducted and participated in…a pattern of racketeering activity within the meaning of 18 U.S.C. 1961(1) and (5) [by]…(C)  Knowing that the property involved in their financial transactions with Lobster 207 represented the proceeds of some form of unlawful activity, namely the aforementioned schemes to defraud the Plaintiff, the Defendants violated 18 U.S.C. §§ 1956(a) & (h) and 1957(a) by <u>conducting financial transactions with Lobster 207 that in fact involved the proceeds of the specified unlawful activity of wire fraud</u> with the intent to promote the carrying on of such unlawful activity and knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of  such  unlawful activity.

Am. Compl. ¶ 272(C) (emphasis added).  But as discussed above, the wire fraud claims fail.

Additionally, Lobster 2017 pleads that the financial transactions at issue are those between Defendants and Lobster 207 itself.  Thus, as a threshold matter, Lobster 207 has to allege facts sufficient to show that Defendants engaged in one or more financial transactions with Lobster 207 involving the proceeds of wire fraud.  Of course, the financial transactions at issue between Lobster 207 and Defendants do not involve the proceeds of wire fraud, but rather consist of Lobster 207 paying Trenton Bridge or other Defendants for lobster.  *Compare with Angiodynamics, Inc. v. Clarion Med. Techs.* (holding that the plaintiff adequately pled a claim for money laundering in part because the plaintiff pled that the defendants entered into transactions with the proceeds of the alleged fraudulent conduct). 2019 U.S. Dist. LEXIS 233819, at \***45**-\*46 (D. Mass. Sept. 25, 2019).

Playing along with this theory (despite its obvious shortcomings), to support its money laundering claims Lobster 207 must further plead one of the two of types of intent set out in the statute: (1) the intent of promoting the carrying on of wire fraud ("Promotional Intent"); or (ii) the intent "to conceal or disguise the nature, the location, the source, the ownership or the proceeds" of wire fraud ("Concealment Intent").  18 U.S.C. § 1956(a)(A)(i) or (a)(B)(i).

Here is where Lobster 207's money laundering allegations go off the rails. Courts in the First Circuit have held that "Promotional Intent" may be inferred only from evidence that a person knew both that: (1) the consequences of his actions were unlawful; and, (2) the person nonetheless undertook those actions. *U.S. v. Cedeno-Perez*, 579 F.3d 54, 61 (1st Cir. 2009). Notwithstanding these elements, "[w]here the consequences of an action are commonly known, a trier of fact will often infer that the person taking the action knew what the consequences would be and acted with the purpose of bringing them about." *Regalado Cuellar v. U.S.*, 553 U.S 550, 567 n. 8 (2008). As a result, the First Circuit has held that the proper question is whether the person who acted unlawfully did so while harboring the specific *intent* of promoting or facilitating that same unlawful activity. *U.S. v. Roy*, 375 F.3d 21, 24 (1st Cir. 2004).

The Amended Complaint does not make any such allegations. Lobster 207 does not plead that the Defendants engaged in wire fraud with the specific intent to promote the specified unlawful activity of wire fraud. *See Roy*, *supra*, 375 F.3d 21, 24 (1ˢᵗ Cir. 2004). Instead, the various "schemes" alleged in the Amended Complaint allege overpayments by Lobster 207 to Trenton Bridge or others for lobster and/or other assets of Trenton Bridge. These transactions involve amounts that Lobster 207 paid because of alleged misrepresentations regarding pricing. *Id.* While the Amended Complaint may plead that Defendants made misrepresentations about pricing, it does *not* follow that the Defendants acted to promote wire fraud under 18 U.S.C. § 1343. This is hardly the stuff of money laundering.

Lobster 207 fares even worse with respect to "Concealment Intent," which is established only by pleading facts that Defendants engaged in the financial transactions with Lobster 207 to conceal or disguise the proceeds of wire fraud. 18 U.S.C. § 1956(a)(1)(B)(i). The Supreme Court has held that this element of intent requires that the defendant knows the

"purpose or plan" or the "intended plan" of the transaction is to conceal or disguise the nature, the location, the course, the ownership or the control of the proceeds of specified unlawful activity. *Regalado Cuellar v. U.S.*, 553 U.S 550, 564 (2008). The Supreme Court has further instructed that the consideration is to the "purpose" of the actions, not the manner in which the actions were carried out. *Id. See also U.S. v. Cedeno-Perez*, 579 F.3d 54, 60 (1st Cir. 2009) ("Thus, to obtain a conviction, the evidence had to show that the *purpose* of the transportation was to conceal the funds, not simply that the funds had been concealed during transportation").

Simply put, the Amended Complaint contains no allegations that Defendants engaged in transactions with Lobster 207 for the purpose of concealing or disguising "the nature, the location, the course, the ownership or the control of the proceeds" of wire fraud. Rather, as the Amended Complaint tells it, Trenton Bridge or others sent invoices that allegedly contained a price that was something other than that to which the Parties' had agreed, and Lobster 207 then paid those invoices. There are no allegations that the purpose of these transactions, in and of themselves, was to conceal the funds. *Cedeno-Perez*, *supra*, 579 F.3d 54, 60 (1st Cir. 2009). Any argument that the manner in which the transaction was conducted constituted wire fraud is irrelevant absent a showing of purposeful concealment. *Id.*

## IV.    CONCLUSION

For the foregoing reasons, the Pettegrow Defendants respectfully request that the Court dismiss the RICO claims against them, with the exception of the claim relating to the "Tubed Lobster Scheme" on which this Court has already ruled.

Date: June 7, 2021

TROUTMAN PEPPER HAMILTON SANDERS LLP
*/s/ Matthew H. Adler*
Matthew H. Adler
Mia S. Rosati
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103

Callan G. Stein
High Street Tower
125 High Street, 19th Floor
Boston, MA 02110

Robert A. Jenkin, II
Suite 400, 301 Carnegie Center
Princeton, NJ 08540
THE MAINE LIFE & LEGACY LAW FIRM
*/s/ Humphrey H.N. Johnson*
Humphrey H.N. Johnson
P. O. Box 12
Peaks Island, ME  041108
(207) 650-6905

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2021 I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Humphrey H.N. Johnson
Humphrey H.N. Johnson, Esq.

The Maine Life & Legacy Law Firm
P.O. Box 12
Peaks Island, ME  04108-0012
207.650.6905
humphrey@mainelifelaw.com

Attorney for Defendants/Counterclaim Plaintiffs Anthony D. Pettegrow, Josette G. Pettegrow, Trenton Bridge Lobster Pound, Inc., Warren B. Pettegrow, and Poseidon Charters, Inc.