UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LOBSTER 207, LLC, | ) | |
| | ) | |
|     Plaintiff and Counterclaim | ) | |
|     Defendant, | ) | |
| | ) | |
| v. | ) | 1:19-CV-00552-LEW |
| | ) | |
| WARREN B. PETTEGROW, | ) | |
| ANTHONY D. PETTEGROW, | ) | |
| JOSETTE G. PETTEGROW, | ) | |
| STEPHEN M. PEABODY, | ) | |
| POSEIDON CHARTERS INC., | ) | |
| and TRENTON BRIDGE | ) | |
| LOBSTER POUND, INC., | ) | |
| | ) | |
|     Defendants and Counter- | ) | |
|     claim Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL ASSOCIATION | ) | |
| OF MACHINISTS AND AEROSPACE | ) | |
| WORKERS, MAINE LOBSTERING | ) | |
| UNION, AND DAVID SULLIVAN, | ) | |
| | ) | |
|     Counterclaim Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

Previously, I issued a Memorandum of Decision and Order ("June Decision and

Order" – ECF 72) and Memorandum of Decision on Plaintiff's Motion for Reconsideration

(ECF 109), which together dismissed Lobster 207's RICO claims against the Pettegrow

Defendants and Stephen Peabody with the solitary exception of an alleged "tubed-lobster"

RICO scheme that was not dismissed against, specifically, the individual Pettegrow Defendants and Trenton Bridge Lobster Pound.

On May 3, 2021, Lobster 207 filed its First Amended Complaint ("FAC" – ECF 184), in which it expands its RICO allegations against Defendants to attempt to overcome deficiencies identified in the earlier orders. Primarily, this attempt involves new pleadings about call logs that, according to Lobster 207, could support a particularized finding that the individual defendants communicated with each other by wire on a near-daily basis, allegedly in order to carry out schemes against Lobster 207.

The matter is now before the Court on Stephen M. Peabody's Motion to Dismiss First Amended Complaint (ECF 219), inclusive of all claims asserted against him, and the Pettegrow Defendants[1] Renewed and Partial Motion to Dismiss Counts I and II of the Amended Complaint (ECF 220), targeting Plaintiff's RICO and RICO-conspiracy claims.

## STANDARD OF REVIEW

For purposes of a motion to dismiss, the Court accepts as true all non-conclusory factual allegations in a complaint to determine whether the allegations and the reasonable, non-speculative inferences that could be drawn from them provide a plausible basis to think the defendant could be found liable to the plaintiff on the claims asserted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011); *Sepúlveda–Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir.

---

[1] The Pettegrow Defendants are Anthony D. Petegrow, Josette G. Pettegrow, and Warren B. Pettegrow. In addition, Poseidon Charters, Inc., is an entity owned and operated by Warren Pettegrow, and Trenton Bridge Lobster Pound, Inc., is an entity owned and operated by Anthony and Josette Pettegrow.

2010).  Ordinarily, this requires a plaintiff to provide no more than "a short and plain statement of the claim showing [it] is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  But to the extent the claims under consideration here are RICO claims, 18 U.S.C. §§ 1962(c), 1964(c), based on alleged "wire fraud," *id.* § 1343, Plaintiff also "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

## PLAINTIFF'S RICO ALLEGATIONS

Plaintiff, Lobster 207, identifies eleven different "schemes" in the FAC, each of which, in its view, plausibly depicts a pattern of racketeering activity on the part of an enterprise. Plaintiff identifies the enterprise as the "Pettegrow Lobster Enterprise," by which it means Warren Peabody, as CEO of Lobster 207 and owner/operator of Poseidon Charters; Josette and Anthony Peabody, as owners/operators of the Trenton Bridge Lobster Pound; and Stephen Peabody, as manager of the Beals-Jonesport Co-op, Lobster 207's primary supplier.

Lobster 207 alleges that the individuals involved in the Pettegrow Lobster Enterprise all took advantage of Warren Pettegrow's position as CEO of Lobster 207 to defraud, embezzle, and steal from Lobster 207. Lobster 207 claims special vulnerability in this regard not only because Warren was its CEO, but because its decisions to hire Warren as its CEO, to contract as it did with Trenton Bridge, and to proceed without a direct purchase-supply relationship with the Beals-Jonesport Co-op, effectively made Trenton Bridge and Poseidon Charters (i.e., the Pettegrows) middlemen in every (or nearly every) lobster purchase made by Lobster 207 during the relevant period.

Concerning Stephen Peabody, Lobster 207's allegations are in part designed to blame Peabody for this contractual scenario – even though neither Peabody nor his employer were party to any contract with Lobster 207 – because, as alleged, Peabody represented to Lobster 207's agents, prior to Lobster 207's acquisition of Trenton Bridge's wholesale business, that the Beals-Jonesport Co-op preferred to continue delivering its wholesale lobster supply and invoices directly to Trenton Bridge, with which it had a long-standing relationship. Additionally, prior to Lobster 207's acquisition of Trenton Bridge's wholesale business, Peabody and Warren, as alleged, represented to these same agents that Trenton Bridge historically paid a 20-cent per pound premium on lobster sourced from the Beals-Jonesport Co-op, when, in fact, Trenton Bridge had only ever paid a 10-cent per pound premium to the Co-op. Lobster 207's agents accepted this representation and purchased Trenton Bridge's wholesale operation understanding that Lobster 207 would pay a 20-cent per pound premium for lobster sourced from the Co-op, knowing the Co-op would be its primary (albeit indirect) supplier.

The schemes alleged by Lobster 207 are as follows:

1.    The "**BJ Co-op Scheme**," in which the Pettegrow Lobster Enterprise charged Lobster 207 the 20-cent premium described to Lobster 207's officers before the acquisition. FAC ¶¶ 13(a), 66-77

2.    The "**Phantom Lobster Scheme**," in which the Pettegrow Lobster Enterprise submitted a false invoice for roughly 12,000 pounds of lobster to procure a roughly $55,000 payment from Lobster 207. The purpose behind the false invoice was to fund a shortfall in the Co-op's payment of an end-of-the-year, $1.40 per pound "holdback

bonus" to lobstermen who had brought their catch to the Co-op that year (2017). The Co-op's resources only enabled it to pay a $1.37 per pound bonus, and Warren had agreed to fund any shortfall because he supported the bonus to secure the business of the fishermen who delivered their catches to the Co-op and to "set the mark" for other docks and buying stations. FAC ¶ 79.

As alleged, Warren presented the invoice to Lobster 207's bookkeeper for payment and told her the invoice was for lobster that would be delivered by year's end. The bookkeeper made a notation on the invoice to that effect, and the payment issued. However, the bookkeeper also informed David Sullivan, an IAMAW representative, about the arrangement. Sullivan confronted Warren about the matter and Warren explained that the intent was to subsidize the bonus for the Co-op's fishermen and not to purchase any lobster. Sullivan objected to the payment and told Warren to recover the funds. Trenton Bridge paid the money back to Lobster 207 in January 2018. FAC ¶¶ 13(b), 78-95.

3.    The "**Recoupment Scheme**," in which Trenton Bridge, starting in January, 2018, adjusted its invoices on Co-op lobster upward by an additional 10 cents per pound to gradually "recover" the $55,000 paid back to Lobster 207. In July, 2018, having secured additional net payments of slightly more than $55,000 through this method, Trenton Bridge stopped adjusting Co-op invoices in this fashion. FAC ¶¶ 13(c), 96-106.

4.    The "**Customer Data Scheme**," in which the Pettegrows misrepresented the existence and/or value of Trenton Bridge's wholesale customer list before Lobster 207 acquired Trenton Bridge's wholesale business. Specifically, Lobster 207 alleges that most

of the customers on the list were not actually wholesale customers but brokered customers. FAC ¶¶ 13(d), 107-116.

5.    The "**Crate Scheme**," in which the Pettegrows misrepresented Trenton Bridge's inventory of lobster crates. Because Trenton Bridge did not have as many crates as the Pettegrows represented, Lobster 207 incurred the expense of leasing crates. FAC ¶¶ 13(e), 117-126.

6.    The "**Inventory Scheme**," in which Trenton Bridge failed to deliver wholesale lobster inventory existing on the date of the sale of its wholesale business. As alleged, Trenton Bridge gradually "sold" that inventory – some to Lobster 207 and some to other purchasers – and retained the proceeds of the sales. FAC ¶¶ 13(f), 127-136.

7.    The "**Poseidon Scheme**," in which the Pettegrows took advantage of an exception in Warren's non-competition agreement that allowed Warren to operate an independent smack boat provided that he sell his catch to Lobster 207 at the standard offer dock price. As alleged, the Pettegrows would purchase lobsters from MDI fishermen either directly or through the Poseidon and then misstate the origin and price to upcharge Lobster 207 for lobsters that Warren should have delivered to Lobster 207 at the dock price. As alleged, Warren also would allow Trenton Bridge to invoice Lobster 207 for certain transportation costs (as though the lobster had been delivered by a third party) even though the lobsters were transported using Lobster 207's trucks. Lobster 207 also alleges that Warren would allow the choicest lobsters to be diverted to Trenton Bridge's retail operation and to another lobster pound on MDI and would not permit workers at Lobster 207's Seal

6

Point Facility to weigh these incoming shipments, insisting that there was no need because Trenton Bridge had already weighed them. FAC ¶¶ 13(g), 137-162.

Although the alleged scheme sounds like one limited to the Pettegrow Defendants, Lobster 207 alleges that Stephen Peabody facilitated the Poseidon Scheme because he communicated with the Pettegrows by phone on relevant dates concerning the volume of incoming Co-op deliveries so that the Pettegrows could "disguise the BJ Co-op lobster as 'Poseidon' lobster and charge additional and fraudulent transportation fees." FAC ¶ 163. It is perplexing, however, why a local Poseidon sale would entail additional transportation fees compared with a shipment from the Beals-Jonesport Co-op, or cost more per pound, given the Co-op's premium and distance from Trenton. In any event, that is the allegation.

Finally, Lobster 207 alleges that an October 5, 2017 invoice from the Co-op was presented to Lobster 207 by Trenton Bridge to secure payment for lobsters even though Trenton Bridge never delivered the lobsters, and the proceeds were used to purchase bait for the Poseidon. FAC ¶¶ 172-175.

8.    The "**Mixed Lobster Scheme**" dovetailing with the Poseidon Scheme, in which the Pettegrows would misrepresent the source of lobster that came into their possession when, by contract, Warren should have processed these transactions directly between Lobster 207 and the source of supply, without allowing Trenton Bridge to serve as an intermediary wholesale purchaser and reseller. FAC ¶¶ 13(h), 177-191.

9.    The "**Dealer Up-Charge Scheme**" for, evidently, a subset of invoices that do not fit neatly in the preceding two schemes. In short, the Pettegrows allegedly directed certain sales of lobster through Trenton Bridge, allowing for a markup, even though the

dealers who supplied the lobster delivered the lobster directly to Lobster 207's Seal Point Facility intending to contract directly with Lobster 207. FAC ¶¶ 13(i), 192-209.

10.     The "**Tubed Lobster Scheme**," which scheme I previously concluded would support a RICO claim against the Pettegrow Defendants, but not Stephen Peabody. In the FAC, Lobster 207 has not attempted to hook Peabody on this scheme. I do not rehash this scheme here. FAC ¶¶ 13(j), 210-230.

11.     Finally, the "**Embezzlement Scheme**," in which Warren allegedly pocketed funds Lobster 207 announced it would pay to area docks (a 10 cent per pound increase) provided that they, in turn, increased by the same amount what they paid to fishermen for their catch (the so-called boat price). As alleged, when Warren would acquire lobster directly from fisherman, he would in many instances withhold the increased boat fee when he paid the fisherman, but would later invoice Lobster 207 as though he had paid the 10-cent increase. FAC ¶¶ 13(k), 231-237.

### Use of the Wires

Lobster 207 alleges that use of the wires was essential to the alleged schemes. Through discovery, Lobster 207 obtained logs of the daily calls placed between the Pettegrows and calls placed by or to Peabody, which logs include calls placed on the dates of the transactions that inform the alleged schemes. (The Defendants contacted one another by phone virtually every day.) Because it would be logical to infer that co-conspirators would coordinate their allegedly fraudulent activities by phone due to geographic distance, Lobster 207 asserts that there can be no other conclusion but that the many schemes are wire fraud for purposes of RICO.

8

Lobster 207 also points to activity by the Pettegrows designed to obfuscate digital records, including the termination of certain employee email accounts when the Pettegrows learned that Lobster 207 believed they had been engaged in fraudulent acts. Additionally, Warren allegedly discarded his cell phone after a litigation hold to avoid disclosure of relevant text messages. (Warren says his phone was stolen in a carjacking incident in Florida.) FAC ¶¶ 249-264. Lobster 207 also alleges that Defendants used Poseidon Charters to launder certain proceeds. FAC ¶¶ 171-176.

Concerning another, the Dealer Up-Charge Scheme, Lobster 207 alleges use of wire fund transfers to intercept the billing process that should have transpired directly between Lobster 207 and certain dealers. FAC ¶¶ 194-195.

Concerning Stephen Peabody, Lobster 207 says he "participated in the affairs of the Pettegrow Lobster Enterprise by creating fraudulent invoices" in support of the BJ Co-op Scheme, the Phantom Lobster Scheme, the Recoupment Scheme, and the Poseidon Scheme. FAC ¶ 271.

## DISCUSSION

Through their motions, the Pettegrow Defendants and Stephen Peabody argue that Lobster 207's RICO allegations are not sufficient to state a plausible claim under that statute. Stephen Peabody goes on to challenge additional claims, but the Pettegrow Defendants focus exclusively on the RICO claims. I begin with a discussion of the RICO claims, considering the arguments of each movant group in turn, and end with a discussion of the remaining tort claims challenged by Stephen Peabody.

## A.     The Racketeer Influenced and Corrupt Organizations Act

Although "wire fraud" is a predicate act that can support a RICO-based civil action for treble damages, *see* 18 U.S.C. §§ 1343, 1961(1)(B), 1962(c), 1964(c), wire fraud involves the infliction of an injury on a victim using the wires as an instrument to defraud. The Supreme Court has explained this essential characteristic of RICO fraud in the following language discussing "mail fraud," 18 U.S.C. § 1341, the analog cousin of wire fraud:

> Mail fraud … occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." § 1341. The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck v. United States*, 489 U.S. 705, 712 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information," *id.*, at 715.

*Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 647 (2008). Thus, fraudulent use of the mail is use that executes or attempts to execute on the fraudulent scheme. *Id.* The mailing must be a means of advancing the scheme against the victim; *i.e.*, "incident to an essential part of the scheme" or "a step in [the] plot." *Schmuck*, 489 U.S. at 710; *Pereira v. United States*, 347 U.S. 1, 8 (1954); *Badders v. United States*, 240 U.S. 391, 394 (1916). Scheming by mail is not the same thing as executing a scheme by mail. *See Pereira*, 347 U.S. at 8 (describing the two elements of mail fraud as (1) the scheme and (2) "the mailing of a letter, etc., for the purpose of executing the scheme"). *See also Kann v. United States*, 323 U.S. 88, 95, 65 S. Ct. 148, 151, 89 L. Ed. 88 (1944) ("The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the

mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.").

The prohibition against wire fraud is the same:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, …."

18 U.S.C. § 1343 (emphasis added). *See*, *e.g.*, *Clinton v. Sec. Benefit Life Ins. Co.*, 519 F. Supp. 3d 943, 955 (D. Kan. 2021) ("The elements of wire fraud are the same but alleging use of interstate wires to execute the scheme instead of mail.").

For present purposes, in order for Lobster 207 to state a RICO claim against Defendants based on wire fraud, it is not enough to allege that Defendants used the wires to scheme; instead the allegations must detail how Defendants used the wires to execute their scheme. *See*, *e.g.*, *Empress Casino Joliet Corp. v. Balmoral Racing Club*, *Inc*., 831 F.3d 815, 827 (7th Cir. 2016).

Although the requirement of execution-by-wire is the most salient requirement when it comes to Defendants' challenges to Lobster 207's RICO claims, there are, of course, additional elements that must be alleged to state a claim for RICO relief. Specifically, the allegations must also plausibly depict that the defendant (1) conducted the affairs of (2) an enterprise (3) through a pattern of racketeering activity. *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 528 (1st Cir. 2015); 18 U.S.C. § 1962(c). I do not belabor these elements here.

### 1. Stephen Peabody

Lobster 207 presses its RICO claim against Mr. Peabody based on a "BJ Co-op Scheme"; a "Phantom Lobster Scheme"; a "Recoupment Scheme"; and a "Poseidon Scheme." It does so because Mr. Peabody engaged in regular daily phone conversations with the other defendants when the schemes were carried out. Other than the phone calls, which would necessarily involve the use of the wires, Lobster 207 does not allege with any particularity any use of the wires.

For example, concerning the BJ Co-op Scheme, Lobster 207 contends Peabody "devised" the scheme and "prepared" invoices, but does not allege that either act utilized wires. Pl.'s Opp'n to Peabody Motion 7 (ECF 237). Lobster 207 wants the Court to assume use of the wires to transmit false invoices, based on foreseeability, but fails to allege the particulars even after discovery. *Id.* 7-8. Lobster 207 cites *Freeport Transit*, *Inc. v. McNulty*, 239 F. Supp. 2d 102 (D. Me. 2003), to support this approach. In *Freeport Transit*, the Court entertained as plausible a wire fraud that consisted of misdirecting service calls to a more expensive provider. In other words, the use of the wires to execute the alleged scheme in *Freeport Transit* was incident to execution of the scheme and specifically alleged, not merely argued as one theoretical way of conducting the affairs of an enterprise, and even in *Freeport Transit* the Court only authorized a course of discovery so that the plaintiffs could determine and plead the particulars of the misdirected calls to satisfy Rule

9. Here, even after discovery, Lobster 207 asks for an inference that invoices were wired by Peabody. That does not satisfy Rule 9's particularity requirement. [2]

Ultimately, as to the wires, Lobster 207 merely alleges that Peabody "spoke with Warren and Trenton Bridge about pricing on a near-daily basis." Pl.'s Opp'n to Peabody Motion 7. Because the only wire use alleged with particularity involves phone communications between the alleged schemers, I conclude that the BJ Co-op Scheme is not actionable against Peabody for reasons set forth above: mere use of the wires for scheming is not execution of a fraud by wire.

Likewise, the Phantom Lobster Scheme, Recoupment Scheme, and Poseidon Scheme are not actionable against Peabody as RICO claims because it is not alleged that the schemes involved the use of the wires other than to scheme.

These supposed RICO schemes are deficient in other regards, too. For example, the Phantom Lobster Scheme and Recoupment Scheme lack "continuity." *See Home Orthopedics Corp.*, 781 F.3d at 529. Additionally, Peabody's alleged role in the Recoupment and Poseidon Schemes is counterintuitive and conclusory. As alleged, the Pettegrow Defendants used information relayed by Peabody to advance their own scheme. It is not apparent how a jury could find that Peabody conducted the affairs of an enterprise,

---

[2] I assume the omission of the particulars is based on the facts and not a product of oversight. After all, it is not an automatic inference to draw that Trenton Bridge sent invoices by wire, given that it is Lobster 207's burden to allege with particularity those acts constituting wire fraud. What little information Lobster 207 provides in the FAC about the mundane matter of the transmittal of invoices is not helpful to its cause. For example, when describing the Phantom Lobster Scheme, Lobster 207 tells us that Warren Pettegrow hand-delivered the invoice in question to Lobster 207's bookkeeper. FAC ¶ 88. Similarly, concerning Peabody's involvement with invoices, Lobster 207 alleges "Peabody would … provide the invoice bearing an inflated price to the driver who picked up the lobster from BJ Co-op." FAC ¶ 72.

particularly when it comes to alleged misdeeds involving lobster inventory in the possession of the Trenton Bridge Lobster Pound. *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

None of the schemes Lobster 207 alleged in relation to Stephen Peabody entails his agreement to *use the wires* to defraud Lobster 207. Nor are there particularized allegations in the FAC about use of the wires in that fashion. Consequently, Lobster 207 fails to state a RICO claim against Stephen Peabody and Counts I and II of the FAC are DISMISSED as to Defendant Peabody.

### 2. *The Pettegrow Defendants*

Through their Motion to Dismiss, the Pettegrow Defendants challenge Lobster 207's refrain that every fraud visited upon it is actionable under RICO because it is a labor union. Pettegrow Defs.' Motion 9-11 (ECF 220). Unlike the Pettegrow Defendants, I do not fault Lobster 207 for reasserting the labor union theory in the FAC since failure to do so would amount to abandonment for purposes of appeal. *In re Jackson*, 988 F.3d 583, 592 (1st Cir. 2021). Furthermore, although my prior ruling on the issue is the law of the case, the order was interlocutory and, as such, is subject to reevaluation prior to the entry of judgment. *Nieves-Luciano v. Hernandez-Torres*, 397 F.3d 1, 4 (1st Cir. 2005).

The remainder of the Pettegrow Defendants' challenge to the RICO claims is focused on the need to plead wire fraud with particularity and the new allegations of money laundering and electronic record spoliation. Pettegrow Defs.' Motion 11-20; Pettegrow Defs.' Reply 7 (ECF 243). As for the latter, the Pettegrow Defendants argue that laundering money will not serve because the money must be derived from some other illegal activity

and, on these pleadings, that brings us back to the deficient allegations of wire fraud. Pettegrow Defs.' Motion 16-20.

    a.  <u>Wire fraud</u>

I do not revisit my prior ruling that the so-called Tubed Lobster Scheme is actionable under RICO. The question at present is whether any of the other ten schemes should be added to the RICO picture based on the new allegations concerning phone records, money laundering, and spoliation of evidence.

The problem with most of Lobster 207's RICO-based wire fraud claim is that Lobster 207 relies on intra-enterprise phone calls to supply the wire nexus rather than any wire-based execution of the alleged scheme, such as, for example, wire-based transmission of invoices. This is plain from the face of the FAC and it is only magnified in Lobster 207's Opposition, which repeatedly relies on the supposition that the existence of same-day, wire-based conversations among members of the alleged enterprise is enough to allege wire fraud with particularity. Pl.'s Opp'n to Pettegrow Defs.' Motion 1, 4-6.

For reasons already discussed, I find that the occurrence of phone communications between the Pettegrows to scheme is not the same as use of the wires to execute the scheme against Lobster 207. After all, the elements of mail and wire fraud distinguish between scheming (element 1) and execution (element 2). *Pereira*, 347 U.S. at 8. If schemers could be liable for wire fraud because they communicated by wire how to execute a scheme to defraud, then the bounds of RICO civil liability would be expansive indeed, as expansive as virtually every common law fraud. *See, e.g.*, *Schmuck*, 489 U.S. at 722–23 (Scalia, J. dissenting) (noting that "[t]he law does not establish a general federal remedy against

fraudulent conduct, with the use of the mails as the jurisdictional hook, but reaches only 'those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.' In other words, it is mail fraud, not mail and fraud, that incurs liability." (quoting *Kann*, 323 U.S. at 95)). Nothing Lobster 207 has presented to me in the way of precedent suggests this is a sensible approach.[3]

Among the several alleged schemes, and assuming each scheme is meant to describe in part a RICO scheme to defraud and not merely a common law fraud[4], Lobster 207 relies entirely on phone communications to supply the wire element for the following: the BJ Co-op Scheme, the Phantom Lobster Scheme, the Recoupment Scheme, the Customer Data Scheme, the Crate Scheme, the Inventory Scheme, the Mixed Lobster Scheme, and the Embezzlement Scheme. As to these alleged schemes, I agree with the Pettegrow Defendants that Lobster 207 has failed to state a claim for which relief may be granted under the RICO statute.

According to Lobster 207, it has more than the co-occurrence of phone communications and invoices to support the other alleged schemes. Thus, concerning the Dealer Up-Charge Scheme, Lobster 207 identifies wire-based fund transfers from Trenton Bridge to certain lobster dealers to intercept the invoice for lobster deliveries received at

---

[3] Lobster 207 also points to the Pettegrow Defendants' electronic sharing of Trenton Lobster Pound's "Daily Report Wholesale" as an act undertaken in furtherance of wire fraud. FAC ¶¶ 253; Opposition at 5-6. Like their near daily phone calls, the regular sharing of a family business report involves more communication among members of the Pettegrow family, not execution of a scheme against Lobster 207.

[4] It eludes me how the Customer Data and Crate Schemes fit into the RICO picture.

Lobster 207's Seal Point facility. These wire-based executions on an alleged scheme to defraud satisfy the particularity requirement of Rule 9. See Schedule D-1 (ECF 184-17). They also reflect a pattern of related activity associated with the alleged Pettegrow Lobster Enterprise that occurred in scores of transactions spread over six months in 2017. These are plausible allegations of a closed-continuity pattern, albeit one targeting what is arguably a solitary entity, *see Home Orthopedics Corp*., 781 F.3d at 528. Still, they can be strung together with the Tubed Lobster Scheme already addressed in my prior Order (*see* ECF 72 at 11 & n.4) to expand the picture of an open-ended scheme to defraud that closed only because the victim got wise to the fraud.

### b.   Money laundering and tax evasion

Lobster 207 also alleges that Warren Pettegrow laundered money or evaded taxes through measures that falsely characterized Poseidon Charters' involvement. FAC ¶¶ 171-176; Opposition 16-19. I find that Warren Pettegrow's disposition of allegedly ill-gotten proceeds (or tax evasion) did not in itself harm Lobster 207 in its business or property, the alleged pecuniary injury already having been inflicted, and therefore these alleged means of disposing of proceeds are not independently actionable under the RICO civil action provision. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor …."); *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1132 (9th Cir. 2020); *Hourani v. Mirtchev*, 796 F.3d 1, 11 (D.C. Cir. 2015).

Finally, Lobster 207 characterizes as a wire fraud the alleged destruction of evidence. Specifically, Lobster 207 says that Warren Pettegrow's loss or disposal of a cell

phone and his parents' deactivation of employee email accounts were attempts to conceal evidence of their fraudulent schemes. FAC ¶ 255-259. These acts, however, relate to the tubed lobster scheme, which I have already allowed to proceed as a RICO claim, and otherwise concern acts allegedly taken after Lobster 207 terminated Warren Pettegrow (including acts that allegedly transpired after Lobster 207 issued its litigation hold notice). I am not persuaded that these alleged acts served to execute any of the alleged wire frauds that preceded their occurrence.

### c.   Labor management embezzlement

Among the federal criminal prohibitions that can serve as predicates for RICO civil liability is the following provision governing labor management embezzlement:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

29 U.S.C. § 501(c). *See also* 18 U.S.C. §§ 1961(1)(C), 1962(c), 1964(c).

In my prior order on Defendants' Motions to Dismiss, I concluded that Lobster 207 could not take advantage of this provision to turn every alleged scheme into a RICO predicate because Lobster 207 is an LLC, not a labor union, and because the Maine Lobster Union (the "MLU"), the sole member of the LLC, is a "fish marketing association" created under Maine law, which law does not authorize a fish marketing association to be a labor union, 13 M.R.S. § 2231, and limits membership in the organization to natural persons, *id.* §§ 2051, 2059. I also observed, however, that Lobster 207 had not alleged facts to

substantiate its contention that the MLU is a labor organization. Mem. Dec. and Order at 7 & n.1 (ECF 72), 2020 WL 2839287 (D. Me. June 1, 2020).

This time, Lobster 207 alleges that despite being a fish marketing association, the MLU "is Local Lodge 207 within District Lodge 4 of the IAMAW," that all of the individual members who participate in the MLU "are full members of the IAMAW (District 4)," and that these same individuals operate "[a]ll aspects of Lobster 207's business." FAC ¶¶ 20-22. Lobster 207 further alleges that "the MLU advocates on behalf of its members with state and federal industry regulators and licensing officials, as well as with local docks and buying stations – from which the lobstermen earn their income – in order to ensure that its members are treated fairly and obtain the best possible price for their catch." *Id.* ¶ 24. Finally, Lobster 207 alleges that its acquisition of Trenton Bridge Lobster Pound's wholesale business was funded in part by a loan issued by the Bank of Labor, secured in part by a letter of credit issued by the IAMAW, and guaranteed by the MLU. *Id.* ¶¶ 29-30. These additional facts, according to Lobster 207, show that the MLU and, in turn, Lobster 207, are "subordinate to a national or international labor organization," *i.e.*, the IAMAW. Pl.'s Opp'n to Pettegrow Defs.' Motion 8 (ECF 238).

Lobster 207's supplemental allegations and argument do not change my mind. Lobster 207 may be a subordinate to a labor organization, but it is not engaged in employee representation, an essential component of what it means to be a labor organization.

The labor organization "subordinate" concept is drawn from the following statutory definition of "labor organization":

> "Labor organization" means a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, <u>and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization</u>, other than a State or local central body.

29 U.S.C. § 402(i) (emphasis added). The "subordinate" concept is refined in a Department of Labor regulation, such that "[l]ocal or subordinate bodies which have been chartered by a labor organization" are themselves considered labor organizations. 29 C.F.R. § 451.4(e). "This category includes … the local or subordinate body through which such employees may enjoy membership or become affiliated with the chartering organization." *Id.* Still, the subordinate must be "so engaged," meaning engaged in employee representation. *Id.* § 451.4(c), (d), (e). *See also* 29 U.S.C. § 402(i) (describing "dealing with employers concerning … terms or conditions of employment."); *cf.* 29 U.S.C. § 402(j) (defining commerce component and reiterating employee representation feature); *United States v. Morales-Rodriguez*, 467 F.3d 1, 10 (1st Cir. 2006).

The Labor Management Relations Act defines an employee in a manner that, not surprisingly, excludes "any individual having the status of an independent contractor." 29 U.S.C. § 152(3). It does so because Congress overruled Supreme Court precedent that had given the employer/employee concepts exceedingly broad interpretation. *Donovan v. Agnew*, 712 F.2d 1509, 1513-14 (1st Cir. 1983). As between employee and independent contractor, deciding the appropriate label entails application of agency principles. *N.L.R.B. v. Amber Delivery Serv.*, *Inc.*, 651 F.2d 57, 60-61 (1st Cir. 1981).

"What matters," says Lobster 207, "is that the MLU's membership makes its living in the lobster industry, and the MLU advocates for its members in connection with a wide variety of labor disputes that arise in the arena of that employment." Pl.'s Opp'n to Pettegrow Defs.' Motion 12. However, what matters in the view of Congress is whether Lobster 207 engages in *employee* representation like a labor organization.

In relation to buying stations and docks, I do not see how the individual lobstermen and sternmen members of the MLU could reasonably be regarded as "employees." Certainly, the docks and buying stations would be surprised to learn they might be regarded as the employers of lobstermen. It is a natural fit, however, to classify the MLU's members as independent contractors.[5] Consequently, although the MLU is subordinate to the IAMAW and advocates for its members when it comes to the price docks and buying stations pay for lobster, doing so does not make it a labor organization. Similarly, the provision of representation to lobstermen in the context of fishery regulation does not make the MLU a labor organization.

Lobster 207 may vindicate its position in the long trawl. However, I am not persuaded that self-employed lobstermen (and their sternmen) united to form a fish marketing association are engaged in the art of representing employees apropos labor relations with employers. Consequently, and as a matter of law, I conclude that the labor

---

[5] There are sternmen members of the MLU and the IAMAW who are employed by vessel-owning lobstermen, who are also members of the MLU and the IAMAW. However, the MLU does not represent sternmen in labor negotiations with the lobstermen who employ them.

management embezzlement provision cannot supply a predicate for Lobster 207's RICO claims.

## B.    Tort Claims Against Stephen Peabody

Lobster 207 also advances Maine law tort claims against Stephen Peabody. These lie in fraud (Count III), conversion (Count IV), civil conspiracy (Count VI), and unjust enrichment / constructive trust (Count IX). Peabody, evidently, considers his challenges to the RICO wire fraud claims to do double duty as challenges to the common law fraud claims. Peabody also requests the dismissal of the conversion and unjust enrichment claims because there is no allegation that he was ever in possession of Lobster 207's property or realized any financial benefit from any of the alleged schemes. Peabody Motion at 19-20. Finally, if these tort claims are dismissed, Peabody requests that he be dismissed from the civil conspiracy claim for want of any viable underlying tort claim against him. *Id.* at 20.

### 1.  *Fraud and civil conspiracy*

The fraud allegations against Peabody are scheme-specific: the BJ Co-op Scheme; the Phantom Lobster Scheme; the Recoupment Scheme; and the Poseidon Scheme. Fraud requires a showing (1) that the other party made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing him to act in reliance upon it, and (5) he justifiably relied upon the representation as true and acted upon it to his damage. *Darling v. W. Thrift & Loan,* 600 F. Supp. 2d 189, 216 (D. Me. 2009) (citing *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me.1992).

Lobster 207's allegations concerning the BJ Co-op Scheme satisfy the elements of the common law test, which elements do not include a requirement that Peabody was personally enriched by his alleged false representation. As for the element of justifiable reliance, it would seem that Peabody may have a good closing argument on this score because Lobster 207's overseers (the Lobster 207 agents who agreed to this particular arrangement) could have reviewed Lobster 207's business records to determine the truth or falsity of the representation at issue, before buying the business or anytime thereafter. Nevertheless, it is at least one plausible inference that the misrepresentation would induce some measure of reliance and injury.

Similarly, the Phantom Lobster Scheme involves the kind of circumstances that plausibly would result in reliance and injury. It begs the question, however, whether Lobster 207 was ever duped in this regard by Peabody, since the invoice was promptly flagged by Lobster 207's bookkeeper and the money repaid in short order. Because the alleged scheme was consummated, I conclude that the issues revolving around reliance and injury should be weighed by the factfinder rather than cited as legal obstacles that preclude the claim.

Inferences are strained, however, when it comes to Peabody's alleged involvement in the Recoupment Scheme and the Poseidon Scheme. As alleged, the Recoupment Scheme was carried out by the Pettegrows to recoup the funds paid to BJ Co-op to make good on the holdback bonus. For this scheme, it is not apparent what false representation Peabody made or participated in. As alleged, BJ Co-op invoiced Trenton Bridge for lobster shipments and Trenton Bridge then marked up the bill in its own invoices to gradually claw

back from Lobster 207 the money it allegedly should never have obtained from Lobster 207 in the first place.[6] I see no plausible basis to infer that Peabody was a participant in the so-called Recoupment Scheme.

Finally, the particulars of the Poseidon Scheme are nebulous at best when it comes to sketching out Peabody's involvement. I see no basis in the alleged facts to find it plausible that Peabody participated in a scheme to defraud Lobster 207 by use of the Poseidon. As alleged, the Pettegrows manipulated inventories of lobster from a variety of sources to achieve markup based on the Poseidon's ability to sell lobster to Lobster 207. The allegations are entirely conjectural when it comes to depicting Peabody's participation.

In summary, the fraud claim in Count III will not be dismissed as to Peabody, but its parameters are narrowed to the BJ Co-op and Phantom Lobster Schemes. Likewise, I will not dismiss Count VI (civil conspiracy) against Peabody, although Lobster 207's utilization of the civil conspiracy pleading convention to set out a separate count may be hollow in the final analysis. *See Spyderco*, *Inc. v. Kevin*, *Inc.*, No. 2:17-CV-309-DBH, 2017 WL 6375965, at *3 (D. Me. Dec. 12, 2017) (directing the parties to engage in further briefing where "the civil conspiracy count does not seem to do any work").

### 2. *Conversion*

Mr. Peabody reasonably argues that he cannot be liable for conversion because there was no Lobster 207 property he allegedly converted. Peabody Motion to Dismiss at 19-20.

---

[6] I recognize there likely will be a dispute whether Warren Pettegrow reasonably agreed to commit Lobster 207's resources to help fund the holdback bonus for fishermen who brought their catch to the BJ Co-op. For present purposes I am only indulging Lobster 207's allegation of fraud.

"The gist of conversion is the invasion of a party's possession or right to possession at the time of the alleged conversion." *General Motors Acceptance Corp. v. Anacone*, 160 Me. 53, 82, 197 A.2d 506, 524 (1964). Based on the allegations, there is no plausible scenario in which Peabody exercised dominion over any Lobster 207 property. Count IV will be dismissed as to Peabody.

### 3. Unjust enrichment / constructive trust

Finally, Mr. Peabody argues he cannot be a defendant on an unjust enrichment claim or placed under a constructive trust because there are no allegations that plausibly depict any personal enrichment. Peabody Motion to Dismiss at 19-20.

A constructive trust is an equitable instrument designed to unwind fiduciary malfeasance or the unlawful acquisition and retention of property by means of fraud or undue influence. *Gaulin v. Jones*, 481 A.2d 166, 168 (Me. 1984). It has no application to Peabody that I can see because it is not apparent that he retains any property or plausibly would be subject to pay Lobster 207 a money damage award based in equity unless Lobster 207 is first successful with its fraud theories, which already afford the money damage remedy pursuant to law.

Unjust enrichment also misses the mark. The elements of the claim are (1) conferral of a benefit on the other party; (2) the other party's appreciation or knowledge of the benefit; and (3) circumstances that make retention of the benefit inequitable without payment. *Tucci v. City of Biddeford*, 2005 ME 7, ¶ 14, 864 A.2d 185, 189. The allegations do not depict the conferral of any benefit on Peabody. Unlike the claim of fraud, which can proceed regardless of Peabody's realization of any personal benefit, the claim of unjust

enrichment requires the conferral of a benefit that Peabody has retained. That is not apparent from the allegations. Count IX will be dismissed as to Peabody.

## Conclusion

Stephen Peabody's Motion to Dismiss First Amended Complaint (ECF 219) is GRANTED IN PART and DENIED IN PART. The claims asserted in Counts I, II, IV, and IX are DISMISSED as to Defendant Peabody. Counts III (fraud) and VI (civil conspiracy) will proceed against him, though these claims are confined to certain alleged schemes, as described above.

The Pettegrow Defendants' Renewed and Partial Motion to Dismiss Counts I and II of the First Amended Complaint (ECF 220) is GRANTED IN PART and DENIED IN PART. The RICO claims will proceed against Warren, Anthony, and Josette Pettegrow, and Trenton Bridge Lobster Pound, Inc., but are limited to the Tubed Lobster and Dealer Upcharge Schemes. The RICO claims are dismissed as to Poseidon Charters because its connection with the actionable RICO schemes is not particularized. All Pettegrow Defendants, including Poseidon Charters, remain subject to other claims in the FAC, including claims of fraud.

**SO ORDERED.**

Dated this 22nd day of November, 2021.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE