## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| LOBSTER 207, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.  1:19-cv-00552-LEW |
| | ) | |
| WARREN B. PETTEGROW et al., | ) | |
| | ) | |
| Defendants. | ) | |

## STEPHEN M. PEABODY'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

Preliminary Statement ................................................................................................... 1

Factual Background ....................................................................................................... 3

Argument ..................................................................................................................... 10

I.        PEABODY IS ENTITLED TO SUMMARY JUDGMENT ON THE REMAINING LIMITED FRAUD CLAIM ................................................................................. 11

        A.      Peabody Has Not Knowingly Made Any False Statements to Lobster 207 ......... 12

        B.      Lobster 207 Could not Reasonably Have Relied on Any Misrepresentation About Trenton Bridge's Historical Lobster Pricing .............................................. 16

        C.      Peabody Did not Proximately Cause Lobster 207 to "Overpay" for Lobsters ..... 19

II.       THE FRAUD CLAIM BASED UPON THE "PHANTOM LOBSTER SCHEME" FAILS AS A MATTER OF LAW ................................................................................... 21

III.     THE CONSPIRACY CLAIM AGAINST PEABODY FAILS FOR LACK OF AN UNDERLYING TORT ................................................................................................ 22

CONCLUSION ............................................................................................................ 23

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Defendant Stephen M. Peabody ("Peabody"), by his counsel Pollack Solomon Duffy LLP, respectfully moves this Court for summary judgment on all remaining claims against him in this matter.

### Preliminary Statement

In the November 22, 2021 Order (ECF 262), the Court dismissed all RICO-based claims (Counts I & II), the state law conversion claim (Count IV), and the state law unjust enrichment/constructive trust claim (Count IX) against Peabody. As the Court anticipated when allowing a common law fraud and a conspiracy claim, limited to only the so called "BJ Co-op Scheme" and the "Phantom Lobster Scheme," to squeak by the motion, a full evidentiary record now warrants summary judgment in favor of Peabody on those remaining claims.

As detailed below, the record fails to support Lobster 207, LLC's ("Lobster 207") allegation in its First Amended Complaint that Peabody made any misrepresentation to anyone regarding a 20 cent "premium" over a "standard offer dock price," particularly in light of Lobster 207's consistent admissions that Peabody never used the words "premium" or "standard offer dock price," which did not exist in the lobster industry prior to Lobster 207's purchase of Defendant Trenton Bridge Lobster Pound, Inc.'s ("Trenton Bridge") wholesale lobster business. In fact, the only pricing comparison that Lobster 207's witnesses recall Peabody making is with respect to A.C., Inc., a competing dock from whom Trenton Bridge had *never purchased* lobsters. No evidence exists that any such comparison was false.

Even if Peabody's alleged statements could be construed as broader price comparisons, as the Court predicted Lobster 207 could not have reasonably relied on any alleged misrepresentations by Peabody as to historical pricing of lobsters when choosing to buy lobsters from Peabody's employer Beals-Jonesport Co-op, Inc. ("BJ Co-op") through Trenton Bridge as

an intermediary, because Lobster 207 could have reviewed Trenton Bridge's business records to determine the truth or falsity of the representation at issue, before buying the business or anytime thereafter. (*See* ECF 262 at 23). In fact, the record confirms that Lobster 207 and its bankers had unfettered and actual access to Trenton Bridge's pricing data before and after the transaction.

Lobster 207 cannot satisfy other elements of common law fraud. First, the record demonstrates that even if Peabody made a comparison of historical pricing to other docks that had sold to Trenton Bridge, such statements are aggressive negotiating between a buyer and seller, which cannot form the basis of fraud under Maine law. Second, Peabody could not have knowingly or recklessly made any false statements about pricing because he did not have actual knowledge of what other docks (i.e. his employer's competitors) charged Trenton Bridge for lobsters at any given time and at all times he understood and believed that the Trenton Bridge and Lobster 207 individuals with whom he was speaking had superior knowledge to him as to their own business.

Third, any statements regarding historic pricing could not have proximately caused Lobster 207 damages because BJ Co-op had no obligation to continue to sell lobsters to Lobster 207 after the acquisition regardless of the price, which fluctuated based on market conditions.

With respect to the so-called Phantom Lobster Scheme, Lobster 207 has admitted that it did not suffer any damages from that alleged scheme and was in fact "made whole" by Trenton Bridge. In addition, Peabody never concealed the invoice underlying that scheme and Lobster 207 was never "duped in this regard by Peabody, since the invoice was promptly flagged by Lobster 207's bookkeeper and the money repaid in short order." (*See* ECF 262 at 23).

Finally, because the conspiracy claim in Count VI is predicated entirely on the common law fraud claim in Count III (as limited by the Court), Peabody is entitled to summary judgment on that claim because civil conspiracy is not recognized in Maine as an independent tort.

**Factual Background**

***Peabody's Employment as Dock Manager of Non-Party BJ Co-op***

At relevant times, Peabody has been employed as the Dock Manager of BJ Co-op. Stephen M. Peabody's Statement of Undisputed Material Facts ("SOF"), ¶ 1. BJ Co-op is a premium lobster dock that provides high quality services and premium pricing to its fishermen members and provides consistent high volume and high-quality lobster inventory to its wholesale clients. *Id.* ¶ 2. BJ Co-op's dock provides top quality lobster bait at lowest prices to its fishermen, provides access to well-staffed and experienced dock worker team, three baiting stations, and three sets of scales, which expedites the baiting and unloading process. *Id.* ¶ 3. Unlike smaller docks, BJ Co-op is capable of efficiently handing 4 to 5 million pounds of lobsters in any given year, can efficiently handle transactions with up to three boats at the same time, and can accommodate large delivery trucks. BJ Co-op's lobster holding areas are also equipped with cooling technology that provides an optimal environment for the live lobster that nearly eliminates inventory shrinkage. *Id.* ¶ 4. Lobster 207 refers to BJ Co-op as an "innocent third party" in relation to this case. *Id.* ¶ 8.

Peabody has been employed as dock manager for BJ Co-op for more than 40 years, but is not an officer, owner, or a director. *Id.* ¶¶ 5-6. At all times, Peabody has acted in the best interests of BJ Co-op and its fishermen, including to get the best price he can for lobsters, manage the dock, and get supplies, fuel and bait for the fishermen. *Id.* ¶ 7.

Peabody's compensation from BJ Co-op has consisted of annual salary and an annual bonus of approximately $15,000 (gross), which were materially the same during the years that the alleged schemes occurred as compared to prior years. *Id.* ¶¶ 10-11. In addition to his regular salary and bonus, Peabody (as well as other BJ Co-op employees) had received overtime pay for working on Sundays, which was labelled as "EXTRA" pay in the BJ Co-op payroll records. *Id.* ¶ 12.

Peabody's compensation has never been tied to any sales levels, lobster prices or poundage, fishermen performance, "holdback" or rebate payments made to fishermen, markup levels or so called "premiums" that Trenton Bridge had paid for BJ Co-op's lobsters. *Id.* ¶¶ 13, 73. Despite Lobster 207's efforts to get Peabody fired from BJ Co-op, he remains employed as the dock manager to this day. *Id.* ¶ 14.

***Lobster 207 Had Actual Knowledge of Trenton Bridge's Historical Lobster Pricing in Connection with its Purchase of Trenton Bridge's Wholesale Lobster Business***

On or about March 24, 2017, Trenton Bridge and Lobster 207 closed on a transaction by which Trenton Bridge sold its lobster wholesale business to Lobster 207. *Id.* ¶ 20. Prior to March 2017, BJ Co-op and Trenton Bridge had a long-standing commercial relationship of over thirty-years, through which BJ Co-op sold approximately 85% of its lobsters to Trenton Bridge, totaling approximately between 2 and 3 million pounds of lobsters per year. *Id.* ¶¶ 15-16. Anthony and Josette Pettegrow were the owners of Trenton Bridge. *Id.* ¶ 17.

Peabody understood and believed that for years prior to March 2017, Trenton Bridge had paid a higher dock price to BJ Co-op than Trenton Bridge paid to other sellers of lobster, anywhere between $.05 and $.25 per pound more. *Id.* ¶ 18. Lobster 207 does not dispute that for years prior to March 2017, Trenton Bridge had paid a higher dock price to BJ Co-op than it paid to other sellers of lobster to BJ Co-op. *Id.* ¶ 19.

Prior to the acquisition, representatives of Lobster 207 had several years of discussions with the Pettegrows regarding the various sources of Trenton Bridge's lobsters and knew the sources where Lobster 207 was purchasing lobsters, including BJ Co-op and Mount Desert Island fishermen. *Id.* ¶ 21. During due diligence in connection with Lobster 207's acquisition, Trenton Bridge provided to Lobster 207 all information that it had requested about its business. *Id.* ¶ 24. Lobster 207 has not claimed that any information that Trenton Bridge provided to it during due

diligence about lobster pricing was inaccurate or false. *Id.* ¶ 25. Prior to the closing of the acquisition and prior to Peabody having made any of the alleged statements regarding historical lobster pricing between Trenton Bridge and BJ Co-op, multiple representatives of Lobster 207 and the financiers at Lobster 207's lender, the Bank of Labor, had reviewed Trenton Bridge's books to actually evaluate what Trenton Bridge was paying different docks for lobsters. *Id.* ¶ 26. Prior to closing, Lobster 207 used Trenton Bridge historical information to put together financial projections that it provided to its financier Bank of Labor. *Id.* ¶ 27. After the closing and during the entire time that Lobster 207, through Trenton Bridge, continued buying lobster from BJ Co-op, Lobster 207 had unfettered access to pricing invoice level data regarding Trenton Bridge's historical lobster sales. *Id.* ¶ 28.

Peabody was not involved in the acquisition transaction, was not aware of the impending acquisition and never made any statements or representations to anyone at Lobster 207 related to its negotiations with Trenton Bridge, including regarding any lobster pricing, purported "premium" payments or the levels of markups over the boat price that had been historically paid by Trenton Bridge to BJ Co-op. *Id.* ¶¶ 22, 30, 31. Lobster 207 did not rely on any statements by Peabody before buying Trenton Bridge's wholesale lobster business. *Id.* ¶ 35.

Lobster 207 got no assurances, warranties or representations that Trenton Bridge's vendor relationships, including with BJ Co-op would continue into the future nor received assurances as to future pricing, which fluctuated based on market conditions. *Id.* ¶ 32. Lobster 207 acknowledges that if BJ Co-op did not want to sell lobsters to Lobster 207, it had every right not to. *Id.* ¶ 33.

The acquisition was first announced at a March 27, 2017 meeting of BJ Co-op membership, where BJ Co-op members, various representatives of Lobster 207 (Warren Pettegrow, David Sullivan, Joel Pitcher), and a representative of Trenton Bridge (Anthony Pettegrow), were in

attendance. *Id.* ¶ 29. At this meeting, representatives of Lobster 207 and Trenton Bridge spoke to BJ Co-op members regarding the acquisition and their views of the benefits that the acquisition would bestow on the Maine lobster fishing community. *Id.* ¶ 37. In response to questions about pricing raised by the Co-op members at the meeting, Warren Pettegrow told BJ Co-op membership that Trenton Bridge would serve as an intermediary for lobster sales from BJ Co-op to Lobster 207 and would pay BJ Co-op a markup that would match whatever Albert Carver (a/k/a A.C., Inc., primary competitor of BJ Co-op) would pay. *Id.* ¶ 38. Nobody said at this meeting that Trenton Bridge historically paid BJ Co-op a 20 cent markup over the boat price that it had paid to other docks. *Id.* Following the acquisition, the Pettegrows' son Warren Pettegrow – previously the head of Trenton Bridge's wholesale business – became employed as Lobster 207's CEO. *Id.* ¶ 40.

BJ Co-op continued selling lobsters directly to Trenton Bridge. *Id.* ¶ 39. Neither BJ Co-op nor Peabody personally ever had a contractual or business relationship with Lobster 207 directly. *Id.* Lobster 207 admits that no evidence exists that Peabody was involved in or even had knowledge of any of the post-closing transactions between Trenton Bridge and Lobster 207. *Id.* ¶ 41.

### *The Record Does Not Support Existence of a "BJ Co-op Scheme"*

The Complaint vaguely alleges a so called "BJ Co-op Scheme," whereby Peabody and others allegedly caused Lobster 207 to overpay BJ Co-op for lobsters during the time period between May 30, 2017 and April 18, 2019, by misrepresenting ***after the closing of the sale*** that Trenton Bridge had historically paid BJ Co-op a 20 cent per pound "premium" over "the standard offer dock price" for BJ Co-op's lobsters. (ECF 184 at ¶¶ 66-77). The Complaint vaguely defines the term "standard offer dock price" as generally is the price per-pound that a wholesaler such as Lobster 207 or Trenton Bridge announces it will pay all docks or co-ops on that day for lobster." *Id.* ¶ 58. The term "standard offer dock price" did not exist in the lobster industry prior to the

6

acquisition, however, and was not used in any discussions involving Peabody. SOF ¶ 44. Peabody did not use the word "premium" in any discussions with Lobster 207 representatives concerning the alleged 20 cent mark up. *Id.* ¶ 45. Accordingly, Peabody did not make any representations or misrepresentations to anyone about any "premium" over any "standard offer dock price." *Id.* ¶ 46.

In one or two alleged conversations on March 27, 2017, which was the first time that any Lobster 207 representative, including Joel Pitcher and David Sullivan met or spoke with Peabody, Lobster 207 claims that Peabody had vaguely stated that BJ Co-op had received 20 cents "more" or "extra." *Id.* ¶¶ 47-48. None of the recipients of this alleged statement testified that Peabody compared BJ Co-op pricing to that of any other specific dock from whom Trenton Bridge had historically purchased lobster. *Id.* ¶ 48. Nor did Peabody specify over what time period the 20 cents "more" or "extra" per pound payments were made. *Id.* ¶ 51.

Instead, the ***only*** specific dock that Lobster 207 witnesses could recall Peabody comparing BJ Co-op's price to was A.C., Inc. (a/k/a Albert Carver), from whom Trenton Bridge ***did not*** historically buy any lobster. *See* SOF ¶ 49, Exhibit 7 (J. Pitcher Tr.) at 156:18-159:01; Exhibit 3 (6/10/22 Lobster 207 30(b)(6) Tr.) at 11:09-11:17 ("Peabody said that he receives a $0.20 premium above all other docks, ***i.e. Albert Carver***, that's his competition." (emphasis added)); *see also* Exhibit 3 (6/10/22 Lobster 207 30(b)(6) Tr.) at 14:02-14:11; 33:18-34:21; 37:18-38:03 ("When we were leaving that meeting because the question came up that Albert Carver went to -- I think to $1.45, that Stevie's $0.20 was going to go up $0.20 from there…."); Exhibit 12 (3/8/21 D. Sullivan Tr.) at 60:14-62:13 ("Q. Okay. With respect to this sentence that I just read in, and specifically, the words the price that other comparable docks received prior to the closing, what docks? A. This was specifically AC, Inc. which was the competition for Stevie Peabody and Albert Carver. It's a fight that's gone on for at least 30 years. … ***In Stevie's mind, there is no other dock***.

His goal in life is to beat out Albert Carver at AC, Inc." (emphasis added)).

Assuming for purposes of this motion that Peabody stated that BJ Co-op had received 20 cents more per pound than A.C., Inc. in comparable transactions, the record contains no evidence of A.C., Inc. pricing and therefore no evidence that such a statement was false. *Id.* ¶ 50.

To the extent that the factual record could somehow be construed to make Peabody's statement of BJ Co-op getting "more" or "extra" to more broadly compare BJ Co-op to others who sold lobsters to Trenton Bridge prior to March 2017, Peabody could not have knowingly falsified such information because he did not have personal knowledge of the wholesale lobster prices charged to Trenton Bridge by other docks. *Id.* ¶ 55. While Peabody was generally aware of what other dock managers told him about their pricing, he never knew if such statements were accurate or false and in fact believed and understood that BJ Co-op had received 20 cents per pound more at certain times, including more than others who sold lobsters to Trenton Bridge. *Id.* ¶¶ 53, 55. Indeed, it is undisputed that Warren Pettegrow called Peabody prior to the March 27, 2017 BJ Co-op membership meeting and told him by phone that BJ Co-op was going to get paid $1.60 over the boat price, which was 20 cents more than MDI fishermen. *Id.* ¶ 60.

As for historical pricing between Trenton Bridge and docks other than BJ Co-op, there is no evidence in the record to support an assertion that Peabody knew such information. Lobster 207 cannot rely on David Sullivan's vague speculation that Peabody had "faith" in Trenton Bridge, that Peabody and Trenton Bridge had worked together for 30 years and that Sullivan did not believe that Peabody and Trenton Bridge would lie to each other. *Id.* ¶ 57. During discussions when the alleged representations about historical pricing were made, Lobster 207 representatives did not even ask Peabody how he knew what other docks, including A.C., Inc. and his employer's other competitors, were charging Trenton Bridge for lobsters. *Id.* ¶ 56.

Consistent with its unfettered access to Trenton Bridge's historical pricing, Lobster 207 has admitted that after the acquisition it did not actually rely on any statements by Peabody with respect to pricing, but at most had to "take stock" of what Peabody said because they were trying to earn his trust as the BJ Co-op dock manager. *Id.* ¶ 54. Moreover, even Lobster 207's 30(b)(6) designee "wouldn't say" that BJ Co-op "never" got 20 cents per pound more than others. *Id.* ¶ 52. Peabody's alleged statements regarding historical pricing were therefore neither false nor were made with knowledge of falsity, including because Peabody did not have actual knowledge of what other docks had been charging Trenton Bridge for lobsters. *Id.* ¶ 58.

Moreover, Lobster 207 admits that Warren Pettegrow, when acting on Lobster 207's behalf, would have known historic pricing between Trenton Bridge and BJ Co-op. *Id.* ¶ 61. Far from any type of fraud or collusion, Warren Pettegrow and Peabody would fight over pricing negotiations during the business relationship following the acquisition. *Id.* ¶ 62.

### *Lobster 207 Has Not Suffered Any Damages from the Immaterial "Phantom Lobster" Scheme*

Lobster 207 alleges a so called "Phantom Lobster Scheme" whereby Warren allegedly conspired with and caused Peabody to submit to Trenton Bridge one BJ Co-op invoice in the amount of $55,269 (less than ½ percent of revenue received by BJ Co-op from Trenton Bridge in 2017) for lobsters that were never intended to be delivered in order to fully fund a $1.40 "holdback" or "rebate" to BJ Co-op's lobster fishermen at the end of the season. (*See* ECF 184 at ¶¶ 78-95). At pertinent times, many docks at the end of the year paid such a holdback or rebate to their fishermen. SOF ¶ 66. The rebate is competitive and in 2017, Peabody understood that the payments being made to the fishermen of other lobster docks on the Maine coast would be $1.40 per pound of lobster. Peabody believed based on discussions with various individuals about year-end pricing and quality, that Trenton Bridge and Lobster 207 knew about and shared an interest in BJ Co-op

matching that amount to maintain goodwill with the fishermen. *Id.* ¶¶ 67-68. The entirety of the $55,269 payment went to BJ Co-op fishermen, many of whom where Lobster 207 Union members and none to Peabody personally. *Id.* ¶¶ 71-72.

The record contains no evidence that Warren and Peabody had a meeting of the minds or somehow "conspired" with respect to the $55,269 invoice and in fact reflects a disagreement between Peabody and Warren on how that transaction came to be. *Id.* ¶ 74.

In any event, Lobster 207 was neither deceived nor damaged by the $55,269 invoice at issue, which was promptly flagged by Lobster 207's bookkeeper. Lobster 207 admits that it was "made whole" and therefore not injured by the "Phantom Lobster Scheme" because Lobster 207 was promptly repaid the $55,269 by Trenton Bridge. *Id.* ¶¶ 75-76.

### Peabody Has Not Been Personally Enriched by Any of the Alleged Schemes

Finally, Peabody was not personally enriched from any of the conduct alleged in this lawsuit. Not a single allegation, fact or document in the record reflects Peabody personally receiving any financial or other benefit on the account of any events alleged here. *Id.* ¶ 77-85.

## Argument

A party seeking summary judgment must present portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact. *Irobe v. United States Dep't of Agric.*, 890 F.3d 371, 377 (1st Cir. 2018); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate when the referenced record evidence indicates no genuine issue of material fact that is in dispute, and, accordingly, the moving party is entitled to judgment as a matter of law. *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825.

Once the moving party has made that showing, the burden shifts to the nonmoving party,

who must, "**with respect to each issue on which she would bear the burden of proof at trial**, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010) (emphasis added). As a general rule, that requires the production of evidence that is "significant[ly] probative." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Such a showing "requires more than the frenzied brandishing of a cardboard sword." *Calvi v. Knox Cnty.*, 470 F.3d 422, 426 (1st Cir. 2006). The nonmovant must point to materials of evidentiary quality and such materials must frame an issue of fact that is "more than merely colorable." *See Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 853 (1st Cir. 2016); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-50 (1st Cir. 1990).

With respect to concepts such as motive or intent, summary judgment is appropriate if the non-moving party rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." *Vives v. Fajardo,* 472 F.3d 19, 21 (1st Cir. 2007) (quoting *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir. 2003)) (internal citations omitted). The test is not whether some "metaphysical" dispute exists, but whether the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, if not, "there is no 'genuine issue for trial.'" *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## I.   PEABODY IS ENTITLED TO SUMMARY JUDGMENT ON THE REMAINING LIMITED FRAUD CLAIM.

Despite several years of scorched earth discovery, Lobster 207 has failed to adduce any evidence, much less clear and convincing evidence, to establish the requisite elements of fraud against Peabody in relation to the alleged BJ Co-op Scheme and Phantom Lobster Scheme. Under Maine law, the essential elements of fraud are (1) that a party made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing another party to act in reliance upon it; and (5) the other party

justifiably relied upon the representation as true and acted upon it to its damage. *See Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640, 653–54; *Me. Eye Care Assocs. P.A. v. Gorman,* 2008 ME 36, ¶ 12, 942 A.2d 707, 711. Proximate causation is a required element of the tort. *Miller Hydro Group v. Popovitch*, 851 F. Supp. 7, 15 (D. Me. 1994) (granting summary judgment on a fraud claim in absence of any showing of proximate cause).

All elements of fraud must be demonstrated by clear and convincing evidence. *See Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280, 1286–87; *Diversified Foods, Inc. v. First Nat. Bank of Boston,* 605 A.2d 609, 615 (Me. 1992) (upholding summary judgment on misrepresentation claims); *Butler v. Poulin,* 500 A.2d 257, 260 & n. 5 (Me. 1985) (requiring plaintiff to establish elements of fraud by clear and convincing evidence to avoid directed verdict). The evidence must show that the existence of fraud is "highly probable." *Francis v. Stinson,* 2000 ME 173, ¶ 39, 760 A.2d 209, 217. Statements that "are little more than bland generalities" are not the sort of representations that constitute actionable fraud under Maine law. *See Ambrose v. New England Ass'n of Sch. & Colleges, Inc.*, 252 F.3d 488, 497 (1st Cir. 2001).

**A. Peabody Has Not Knowingly Made Any False Statements to Lobster 207.**

As an initial matter, summary judgment must enter for Peabody because, on this record, no reasonable jury could find that Peabody made any false statement to anyone at Lobster 207. As detailed above, the crux of Lobster 207's fraud claim against Peabody is that during one or two March 27, 2017 meetings outside of a BJ Co-op membership meeting, Peabody vaguely told Joel Pitcher and David Sullivan that his employer BJ Co-op had historically received from Trenton Bridge 20 cents "over" or "extra" per pound of lobster. (ECF 184 at ¶¶ 66-77). As Lobster 207's witnesses consistently testified when asked about what Peabody said, Peabody did not use the words "premium" or "standard offer dock price" that the Complaint alleges, but rather vaguely

compared BJ Co-op lobster prices over an unspecified time period to only one dock – A.C., Inc. – a competitor of BJ Co-op with whom Trenton Bridge *did not even do business*. Even if a false comparison to A.C., Inc. could somehow be actionable in the context of this lawsuit, A.C., Inc.'s lobster pricing is not a part of the record and is entirely immaterial to the business relationship among Trenton Bridge, Lobster 207 and BJ Co-op. In other words, Lobster 207 cannot produce any evidence that Peabody's alleged comparison or prices between BJ Co-op and A.C., Inc. was false. For that reason alone, summary judgment must enter on that aspect of the fraud claim.

To the extent that Lobster 207 could somehow manufacture a question of fact as to what other docks Peabody was talking about in comparison when making the vague 20 cents "over" or "extra" statement, the fraud claim still fails because the record is devoid of evidence that Peabody knew other docks' pricing or intended to deceive anyone, and because statements about future pricing in the context of arms-length price negotiations are not actionable under Maine law.

First, as detailed above, it is undisputed that Peabody did not have actual personal knowledge of the wholesale lobster prices charged to Trenton Bridge by other docks and was always under the assumption that representatives of Trenton Bridge and Lobster 207 had superior information to him about their own business. *See* SOF ¶¶ 53-59. To succeed on a fraud claim, Lobster 207 must present clear and convincing evidence that Peabody "had knowledge of the falsity of [his] representations." *Wuestenberg v. Rancourt*, 2020 ME 25, ¶ 11, 226 A.3d 227, 230 (defendant's insistence that his statements were true or lack of understanding of the statement held sufficient to uphold denial of fraud claim); *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992) (even if statements were false, summary judgment was proper where there was no evidence that statements were made with knowledge of falsity or reckless disregard of truth or falsity).

There are simply no facts in the record to support Lobster 207's claim that Peabody knew

what Trenton Bridge had been paying other docks historically and misrepresented that information. Lobster 207 has even admitted that it did not actually rely on any statements by Peabody with respect to pricing, but at most had to "take stock" of what Peabody said because they were trying to earn his trust as the BJ Co-op dock manager. *Id.* ¶ 54. Moreover, even Lobster 207's Fed. R. Civ. P. 30(b)(6) designee "wouldn't say" that BJ Co-op "never" got 20 cents per pound more than others. *Id.* ¶ 52. Peabody's alleged statements regarding historical pricing were therefore neither false nor were made with knowledge of falsity because Peabody did not have actual knowledge of what other docks had been charging Trenton Bridge for lobsters. *Id.* ¶ 58. To the contrary, Peabody understood and believed when discussing lobster pricing that representatives of Lobster 207 and Trenton Bridge had actual superior knowledge to Peabody about their own business affairs. *Id.* ¶ 59; *see Bartner v. Carter*, 405 A.2d 194, 204–05 (Me. 1979) (a party having a good faith belief in the truth of their representation could not have acted in reckless disregard of whether it was true or false). Consistent with Peabody's belief and understanding, Lobster 207 admits that Warren Pettegrow, when acting on Lobster 207's behalf, would have known historic pricing between Trenton Bridge and BJ Co-op, which explains why Lobster 207 did not rely on Peabody's pricing puffery, but merely had to "take stock" of what Peabody said, whatever that means. *Id.* ¶¶ 54, 61.

Second, it is black letter law in Maine that a statement made by a seller in the course of negotiating or estimating a price is "dealer's talk" and cannot be actionable as fraud even if wrong. *Kearney v. J.P. King Auction Co., Inc.*, 265 F.3d 27, 37 (1st Cir. 2001) (false statements about the value of plaintiff's land and anticipated results of an auction were not actionable fraud under Maine law); *Eaton v. Sontag*, 387 A.2d 33, 37-38 (Me. 1978) (stating that  misrepresentations as to value and quality of land made by the vendor, even though made with fraudulent intent, are not actionable as "dealer's talk"); *Palmer v. Bell*, 85 Me. 352 (1893) (vendor's misrepresentation that

14

there was no "trouble" regarding a right of way over land sold to vendee not actionable where vendee could have ascertained truth or falsity of representation by contacting owner of the easement); *Packgen v. BP Expl. & Prod., Inc.*, 957 F. Supp. 2d 58, 85 (D. Me. 2013), *aff'd sub nom. Packgen v. BP Expl., Inc.*, 754 F.3d 61 (1st Cir. 2014) (even if an expression of intention regarding future business was false when made, the general rule in Maine is that "the breach of a promise to do something in the future will not support an action of deceit, even though there may have been a preconceived intention not to perform.").

Here, Peabody was at all times acting in the best interests of his employer BJ Co-op and its fishermen members when trying to negotiate the highest price for lobsters. There is no dispute that BJ Co-op in fact always received a higher price for its lobsters given the higher quality product and low shrinkage rates. Thus, even if Peabody had engaged in aggressive price negotiations by overstating the increase in price that he believed BJ Co-op should or did get, such statements are not actionable fraud as a matter of Maine law. *See Uncle Henry's Inc. v. Plaut Consulting Co., Inc.*, 399 F.3d 33, 43 (1st Cir. 2005) (website developer's alleged misrepresentations regarding capabilities, intentions and development project were non-actionable statements of opinion, promises of future performance, or mere "puffing" under Maine law, and were not rendered actionable on ground that customer was "at the mercy" of developer where customer was a sophisticated business entity and was represented by experienced counsel who investigated the proposed transaction at great length); *Sargent v. Sargent*, 677 A.2d 528, 529 (Me. 1996) (summary judgment affirmed on fraud claim arising from a divorce negotiation where wife who was represented by "aggressive and highly experienced counsel" could not rely on husband's misrepresentation regarding worth of the marital estate); *see also Pildes v. Banchik,* No. 90 C 0908, 1991 WL 2498, at *3 (N.D. Ill. Jan. 8, 1991) (claim that defendant sold materials "at highly inflated

15

prices" was not a basis for fraud where value of materials was a result of negotiations). As the *Pildes* court aptly explained:

> Even though there might be a "price range at which dealers would generally sell", Complaint at ¶ 8, the law does not find fraud where a seller merely extracts a price higher than the top of that range. ***A seller seeks the best price a buyer is willing to pay***. This is not actionable.

*Pildes*, 1991 WL 2498, at *3 (emphasis added).

Finally, the record contains no evidence that Peabody made any statements to anyone with an intent to deceive. In addition to the uncontroverted testimony that Peabody did not have knowledge regarding Trenton Bridge's dealings with other vendors and his concurrent belief that Trenton Bridge and Lobster 207 did in fact have that knowledge, the record is undisputed that Peabody did not personally benefit from any of the transactions alleged in this case. *See* SOF ¶¶ 77-85; *see Packgen*, 957 F. Supp. at 87 (that defendant "had nothing to gain" from the alleged fraud supported granting summary judgment on the fraud claim).

Accordingly, Peabody is entitled to summary judgment with respect to the alleged "BJ Co-op Scheme" because no reasonable jury could find that Peabody intentionally and knowingly made any false statement of fact regarding lobster pricing.

### B. Lobster 207 Could not Reasonably Have Relied on Any Misrepresentation About Trenton Bridge's Historical Lobster Pricing.

Lobster 207 does not claim that Peabody's alleged statements on March 27, 2017 induced it into buying Trenton Bridge's wholesale business or to enter into any type of a contract with BJ Co-op, but vaguely alleges that it "justifiably relied on the Defendants' statements and omissions in paying each of the Trenton Bridge invoices" for lobsters sourced from the BJ Co-op between May 2017 and April 2019. (ECF 184 at ¶¶ 74, 292). The undisputed record, however, demonstrates that Lobster 207 did not actually rely on any such statement and, if it did, such reliance was

unreasonable as a matter of law because Lobster 207 had actual and superior knowledge over Peabody regarding historical transactions of the company that it had already purchased.

First, consistent with its unfettered access to Trenton Bridge's historical pricing, Lobster 207 has admitted that subsequent to the acquisition it did not actually rely on any statements by Peabody with respect to pricing, but at most had to "take stock" of what Peabody said because they were trying to earn his trust as the BJ Co-op dock manager. SOF ¶ 54, Exhibit 3 at 79:16-80:1; *see also id.*, Exhibit 12 at 62:14-62:18 ("Q. Okay. So were you relying on Stephen Peabody, his statement as to what dock was comparable to BJ Co-op? A. No…"). That admission alone causes the fraud claim to fail as a matter of law.

Second, as detailed above, there is no dispute that by the time that Lobster 207 had acquired Trenton Bridge's wholesale lobster business and started making the complained-of payments for lobsters, Lobster 207 had enjoyed years of unfettered access to Trenton Bridge's financial records and pricing information, both in due diligence and as the new owners of the business, which renders any reliance on a vague pricing comparison by Peabody unreasonable as a matter of law. *See* SOF ¶¶ 26-28, 54-55, 61.

To prevail on a claim of fraud, the plaintiff must prove by clear and convincing evidence reasonable reliance on the representations of the party alleged to have committed the fraud. *Barr*, 2012 ME 108 at ¶¶ 16-17; *Francis*, 2000 ME 173 at ¶ 42 (where transaction documents disclosed the financial well-being of the company, the falsity of any representations that the company was doing poorly, or that bankruptcy was likely, became obvious and reliance on those representations is not reasonable as a matter of law). As the Maine Supreme Court explained,

> The person who claims to have been defrauded must have **no reasonable opportunity to verify the truth or falsity of the representation. Where the party has an opportunity to learn the facts he has no right to rely on representations, the truth of which he has equal means of ascertaining or by the exercise of**

**reasonable diligence could have ascertained.** One who has opportunity for ascertaining the truth cannot rely on the statement of one who is not a fiduciary.

*Coffin v. Dodge*, 146 Me. 3, 6, 76 A.2d 541, 543 (1950) (emphasis added). In *Coffin,* plaintiff sued an auto dealer who falsely told him that another auto dealer could not deliver a truck on time, thereby inducing plaintiff into paying a deposit to the defendant dealer for another truck. *Id.* The Court held that reliance on such a statement could not be reasonable as a matter of law because plaintiff "could have easily ascertained the true facts … if he had used any diligence, or if he desired to." *Id.* at 544. *See also Rared Manchester NH, LLC v. Rite Aid of New Hampshire, Inc.*, 693 F.3d 48, 55 (1st Cir. 2012) ("When, however, the undisclosed fact is known all along to the allegedly defrauded party, or should have been obvious to him, an action for fraud will not lie."); *Photias v. Graham*, 14 F. Supp. 2d 126, 132–33 (D. Me. 1998) (under Maine law, "Plaintiff may not justifiably rely on a fraudulent misrepresentation if he knows it is false or its falsity is obvious to him."); *Kezer v. Mark Stimson Assocs.,* 1999 ME 184, ¶ 26, 742 A.2d 898, 905 (where plaintiffs had learned about DEP involvement and water test before they closed on the property, reliance on concealment of such information was unreasonable as a matter of law); *Export Lobster Co. v. Bay State Lobster Co.,* 1994 WL 902930, at *4-5 (Mass. Super. Ct. 1994) (plaintiff could not reasonably rely on defendant's statements regarding financial stability of a company where plaintiff's financial advisor had reviewed company financial statements during negotiations that showed that the company had suffered recurring losses).

As detailed above, it is undisputed that Lobster 207 had actual knowledge of the various sources of Trenton Bridge's lobsters, including BJ Co-op and Mount Desert Island fishermen; that Trenton Bridge provided to Lobster 207 all information in due diligence that it had requested about its business, which Lobster 207 has not challenged as inaccurate or false; that multiple representatives of Lobster 207 and the financiers at Lobster 207's lender, the Bank of Labor, had

reviewed Trenton Bridge's books to actually evaluate what Trenton Bridge was paying different docks for lobsters; and that prior to closing, Lobster 207 used Trenton Bridge historical information to put together financial projections that it provided to its financier Bank of Labor. SOF ¶¶ 24-28, 59, 61. Moreover, after the closing of the acquisition and during the entire time that the purported BJ Co-op Scheme took place, Lobster 207 had unfettered access to pricing invoice level data regarding Trenton Bridge's historical lobster sales. *Id.* ¶ 28.

Peabody is thus entitled to summary judgment on the "BJ Co-op Scheme" because Lobster 207 cannot establish that it justifiably relied on Peabody's vague pricing comparison even if such a comparison were actionable. *See Ambrose v. New England Ass'n of Sch. & Colleges, Inc.*, 252 F.3d 488, 497 (1st Cir. 2001) (granting summary judgment on a fraud claim and observing that the vaguer a term is, and the more meanings it reasonably can convey, the less likely it is to be actionable) (citing *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997)).

### C.  Peabody Did not Proximately Cause Lobster 207 to "Overpay" for Lobsters.

Even if Lobster 207 could create a question of fact with respect to other elements of fraud in relation to the alleged BJ Co-op Scheme, it cannot show with clear and convincing evidence that Peabody proximately caused Lobster 207 to overpay for lobsters under the circumstances. Lobster 207 does not contend that anything Peabody said induced it into the acquisition transaction. Instead, Lobster 207 vaguely claims that Peabody's statement about pricing after the closing caused it to pay Trenton Bridge an inflated price for lobsters sourced from BJ Co-op's fishermen, many of whom were Lobster 207 members.

It is undisputed, however, that Peabody's alleged statements did not cause Lobster 207 to enter into any contractual or other commercial relationship with Peabody personally; that BJ Co-op had no obligation to sell to Lobster 207 and Lobster 207 had no obligation to buy from BJ Co-

op; and that after acquiring Trenton Bridge's business Lobster 207 did not get any assurances, warranties or representations that Trenton Bridge's vendor relationships, including with BJ Co-op would continue into the future nor received any assurances about prices, which fluctuate depending on the market. *See* SOF ¶¶ 32-36. Indeed, Lobster 207 acknowledged that if BJ Co-op did not want to sell lobsters to Lobster 207, it had every right not to and that Peabody, as the dock manager, had no control over whether fishermen chose to sell their lobsters to Lobster 207. *Id.* ¶¶ 32-33. Far from any obligation to act in the interests of Lobster 207, the record reflects that it was Peabody's job to get the best price possible for BJ Co-op fishermen and that he did that job even to the point of having "fights" with Warren Pettegrow in connection with price negotiations. For example, when asked about one exchange between him and Warren Pettegrow in August 2018, when the BJ Co-op Scheme was supposedly in full swing, Lobster 207's David Sullivan testified:

> Q. Okay. So what is your recollection of what this conversation is referring to?
> A. Just the fights between Warren and Stevie over money. ***Stevie always wanting more money for lobster, and Warren just fed up with it***. And I think we were all fed up with it at that point.
> Q. So at this point in 2018, in August of 2018, Warren is still Lobster 207's CEO, correct?
> A. Yes.
> Q. And this conversation refers to Warren negotiating lobster prices with Mr. Peabody on behalf of Lobster 207, correct?
> A. Yes.
> Q. So is it fair that at least as I -- well, as you relay in this conversation that ***you're describing Mr. Pettegrow trying to negotiate better pricing for Lobster 207, and Mr. Peabody trying to negotiate a higher price for the B-J Co-Op; is that a fair description of what's happening here?***
> ***A. That's fair, yes.***
> Q. Okay. At least from what I'm seeing here, you're not describing any agreement or collusion between Mr. Peabody and Mr. Pettegrow to pay higher prices to the B-J Co-Op, correct?
> A. ***No. That's Stevie wanting the price to go up at his dock***.

SOF ¶ 62 & Exhibit 3 at 42:1-43:1 (emphasis added).

In other words, no reasonable jury could find that anything that Peabody might have said

to Lobster 207 about Trenton Bridge's historic lobster pricing with BJ Co-op proximately caused Lobster 207 to buy lobsters at any particular price, where neither side had any contractual obligation to do so or any assurances that such business would continue or would continue at any particular price, and where lobster prices would fluctuate daily. To the contrary, far from fraud or collusion, the record reflects an at-times contentious vendor-buyer relationship where neither side was bound to sell to the other and where each side was trying to negotiate the best price.

Thus, summary judgment is also warranted because none of Peabody's alleged statements proximately caused Lobster 207 to overpay for BJ Co-op's lobsters.

## II.   THE FRAUD CLAIM BASED UPON THE "PHANTOM LOBSTER SCHEME" FAILS AS A MATTER OF LAW.

Summary judgment must enter for Peabody on the alleged "Phantom Lobster Scheme" because Lobster 207 was neither duped by nor suffered any harm from that alleged scheme. It is fundamental that damages are a necessary element of a fraud claim. *Jourdain v. Dineen,* 527 A.2d 1304, 1307 (Me. 1987) ("pecuniary loss is an essential element of a fraud action"); *J.S. McCarthy Co. v. Brausse Diecutting & Converting Equip., Inc.*, 2005 WL 946318, at *7 (D. Me. Apr. 22, 2005), *report and recommendation adopted*, , 2005 WL 1411895 (D. Me. June 14, 2005) (granting summary judgment on fraud claim for lack of clear and convincing evidence that the alleged misrepresentation caused any injury to the plaintiff).

Here, it is undisputed that Lobster 207 was repaid by Trenton Bridge the $55,269 for lobsters that Lobster 207 alleges were never intended to be delivered and, admittedly, was "made whole." SOF ¶¶ 75-76. Summary judgment should enter for that reason alone.

In addition, as the Court correctly predicted in ruling on Peabody's motion to dismiss, the factual record confirms that, even if Peabody made some type of a representation or omission with respect to the $55,269 (Invoice #6636), Lobster 207 cannot sustain a fraud claim because in fact it

was never "duped in this regard by Peabody, since the invoice was promptly flagged by Lobster 207's bookkeeper and the money repaid in short order." (*See* ECF 262 at 23); SOF ¶ 75-76. Indeed, Peabody believed that Trenton Bridge and Lobster 207 knew about and shared an interest in BJ Co-op being in a position to make that payment to the fishermen to maintain goodwill, and that everyone would have observed the amount as consistent with industry norms. SOF ¶ 68.

Accordingly, Peabody is entitled to summary judgment on the "Phantom Lobster Scheme."

## III.    THE CONSPIRACY CLAIM AGAINST PEABODY FAILS FOR LACK OF AN UNDERLYING TORT.

Finally, Peabody is entitled to summary judgment on the Maine common law conspiracy claim in Count VI because civil conspiracy is not recognized in Maine as an independent tort. *See Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 176 (D. Me. 2007), *aff'd*, 528 F.3d 94 (1st Cir. 2008). In Maine, "a civil conspiracy claim requires proof of the commission of an underlying tort." *Marr v. Maine Dept. of Human Services*, 215 F. Supp. 2d 261, 273 (D. Me. 2002); *Cohen v. Bowdoin*, 288 A.2d 106, 110 (Me. 1972) ("this Court has explicitly decided as general law that 'conspiracy' fails as the basis for the imposition of civil liability absent the actual commission of some independently recognized tort; and when such separate tort has been committed, it is that tort, and not the fact of combination, which is the foundation of the civil liability"); *Forbis v. City of Portland*, 270 F. Supp. 2d 57, 61 (D. Me. 2003) ("In Maine, there is no separate cause of action for civil conspiracy; it is only a way of obtaining vicarious liability against someone who did not himself perform the tortious act."); *Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 8, 708 A.2d 283, 286 (absent the actual commission of some independently recognized tort, a claim for civil liability for conspiracy fails).

Accordingly, because Lobster 207 has failed to allege an actionable tort against Peabody, summary judgment must enter on Count VI of the First Amended Complaint.

**CONCLUSION**

Based on the foregoing, Stephen Peabody respectfully requests that the Court enter summary judgment in his favor on all remaining claims against him in the First Amended Complaint.

Dated:  August 24, 2022                                   Respectfully submitted,

/s/Phillip Rakhunov
Barry S. Pollack (*Pro Hac Vice*)
Phillip Rakhunov (*Pro Hac Vice*)
Lauren Riddle (*Pro Hac Vice*)
POLLACK SOLOMON DUFFY LLP
101 Huntington Avenue, Suite 530
Boston, MA 02199
(617) 439-9800
prakhunov@psdfirm.com

Donald F. Brown
LAW OFFICES OF DONALD F. BROWN
424 South Main Street
Brewer, ME 04412
(207) 989-3030
don@donbrownlaw.com

*Attorneys for Defendant Stephen M. Peabody*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2022, a true copy of the above-document, filed through the ECF system, will be served electronically through the ECF system on the registered participants as identified on the Notice of Electronic Filing.

/s/Phillip Rakhunov