UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| LOBSTER 207, LLC, | ) |
| Plaintiff | ) ) ) |
| v. | ) No. 1:19-CV-00552-LEW ) |
| WARREN B. PETTEGROW, et al., | ) ) |
| Defendants | ) ) |

### ORDER ON PETTEGROW DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The matter is before the Court on the Pettegrow Defendants' Motion for Partial Summary Judgment (ECF No. 338). Through their motion, the Pettegrow Defendants seek the dismissal of the remaining RICO theories, as well as certain non-RICO "schemes" alleged in Lobster 207's Amended Complaint.

## BACKGROUND

The reader's familiarity with the nature and history of the case is assumed and the background statement, therefore, focuses on matters material to the legal issues pressed in the motion. In keeping with summary judgment practice, this background statement sets forth the facts in the light most favorable to the non-movant, meaning that genuinely disputed factual issues have been resolved in favor of Lobster 207.

### The APA

Lobster 207's acquisition of the Trenton Bridge wholesale lobster business was the product of an Asset Purchase Agreement ("APA"). Among the assets conveyed at the

1

closing were "hard assets," "inventory," "goodwill," "customer data," and a "covenant not to compete":

> (a) <u>Hard Assets</u>. All of the equipment, machinery, furniture, tools, supplies and fixtures located at Lamoine or used primarily by or in the Wholesale Business, including without limitation the assets described in the Asset List attached as Exhibit A.
>
> (b) <u>Inventory</u>.  Stock in trade (including lobsters held in the pound at Lamoine and those constituting work in process of the Wholesale Business), unbranded packaging and other supplies in inventory as of the beginning of business on the Closing Date (as defined below) which shall include wholesale customer orders as of the Closing Date (the "Inventory"), subject to the last sentence of Section 1.4.
>
> (c) <u>Goodwill</u>.  The goodwill of the Wholesale Business, including wholesale customer lists, non-branded business brochures (if any) and any other items constituting any part of the goodwill of the Wholesale Business.
>
> (d) <u>Customer Data</u>.  Databases, customer lists, sales records, contact information, all as related to or used in connection with the Wholesale Business. Seller shall provide Customer Data in its ordinary Quickbooks or other format to facilitate importing the data into Purchaser's software.
>
> (e) <u>Covenant not to Compete</u>.  The undertaking of Seller and its shareholders not to compete with the Wholesale Business, which is the subject of a Contract between Purchaser and Seller, Anthony D. Pettegrow and Josette Pettegrow.

APA § 1.1.  In reference to "hard assets,' the APA incorporated an Exhibit A.  Among other assets identified on Exhibit A was a line item for approximately 6,200 lobster crates. The representation that Trenton Bridge possessed 6,200 crates informs Lobster 207's alleged "lobster crate" scheme.  In reference to "inventory," the APA identifies "stock in trade," an asset comprised chiefly of lobsters destined for the wholesale market.  The promise to convey lobster inventory and certain other stock in trade informs Lobster 207's alleged "inventory" scheme.  In reference to "customer data," the APA identifies a certain

"customer lists." The promise to convey one or more wholesale customer lists informs Lobster 207's alleged "customer list" scheme.

The APA includes a section that itemizes "Representations and Warranties." APA § 2. Among these is the representation and warranty that "Seller has good and marketable title to all of the Purchased Assets" and that "Seller uses the Hard Assets in its conduct of the Wholesale Business." APA § 2.1(c). The parties to the APA agreed "that [these] representations and warranties [would] survive the closing for a period of two years." APA § 2.4.

The APA also includes an Indemnification Section that limits the Seller's duty to indemnify the Purchaser for:

> (a) Any damage or deficiency resulting from any material misrepresentation, breach of warranty, or non-fulfillment of any agreement on the part of Seller under this Agreement, and
>
> (b) All suits, proceedings, demands, assessments, judgments, costs and expenses (including reasonable attorneys' fees) related to the foregoing.

*Id.* § 4.2. Specifically, the limitation states that indemnification for these categories "shall not extend to consequential damages," and that "[a]ny claim under the paragraph 4.2 must be made in writing and delivered to Seller within two years from the Closing Date." *Id.*

### The Supply and Offtake Agreement

In addition to purchasing the Trenton Bridge wholesale business and hiring Warren Pettegrow to serve as Lobster 207's CEO, Lobster 207 entered into a Supply and Offtake Agreement ("SOA") with both Trenton Bridge and Warren concerning Trenton Bridge's ongoing operation of a lobster buying station and Warren's operation of a local smack

boat.[1]  In the Agreement, Lobster 207 agreed to buy from Trenton Bridge all lobster that Trenton Bridge did not use in its retail operation, and Trenton Bridge agreed to sell all such lobster to Lobster 207, "at the then-current Standard Offer dock price as announced by 207." SOA ¶ 1.  Similarly, Lobster 207 agreed to buy from Warren the lobster he collected with his smack boat, and Warren agreed to sell to Lobster 207 all of the same, "at the then-current Standard Offer dock price as announced by 207."  SOA ¶ 2.  In effect, to the extent they obtained lobster to pass through to Lobster 207, Trenton Bridge and Warren would be compensated at the dock rate, not the boat rate.

### The Noncompetition Agreement

Separately, Anthony and Josette Pettegrow and their Trenton Bridge Lobster Pound executed a Noncompetition Agreement ("NCA").  The NCA's recitals recognize that Lobster 207 "would carry on the lobster wholesale business formerly conducted by Trenton," and that Trenton would "continue to conduct [a] retail business and dining operation located on the Bar Harbor Road in Trenton, Maine."  NCA at 1.  Among other promises recited in the NCA, the Trenton Bridge parties acknowledged that they would no longer sell lobster wholesale, that the "line between wholesale and retail customers cannot always be readily determined," and that they would "decline orders from known Wholesale Customers including those listed on Exhibit A [to the NCA]."  *Id.* § 2(b). The NCA Exhibit A is the customer list that informs Lobster 207's "customer list" scheme.  Anthony and

---

[1] Trenton Bridge continued to operate as a retail business following the sale of its wholesale business and therefore continued to purchase lobsters to serve its local customers.  Prior to the closing, Warren owned and operated a smack boat, which he sometimes used to buy lobster from other boats.

4

Josette Pettegrow also agreed not to "compete, directly or indirectly, or . . . have any material direct or indirect financial interest, . . . in any business in competition with the Wholesale Business of 207." *Id.* at 3.

### The March 27, 2017 Meeting

Only in March 2017 did Lobster 207 begin informing area sources of lobster supply about its acquisition of the Trenton Bridge wholesale business. Some fishermen, including members of the BJ Co-op, were not pleased by the news. This mattered to Lobster 207 because the BJ Co-op was the primary source of lobster for the Trenton Bridge wholesale business that Lobster 207 purchased. To ease the transition, Lobster 207 would eventually announce to area dock representatives that it would pay "$1.40 over boat," an increase from the prevailing $1.25 rate most recently paid to docks, then bump it to $1.45 after a competitor matched $1.40. But before this occurred—before even the March 24, 2017, closing—Warren and Anthony Pettegrow broke the news of the acquisition to the BJ Co-op's Board of Directors.

During their initial meeting with the BJ Co-op's Board, Warren and Anthony represented that Trenton Bridge was not going anywhere, and that the BJ Co-op could continue to sell wholesale to Trenton Bridge as it always had and that Trenton Bridge would pass the purchases through to Lobster 207. Later in March, at a second BJ Co-op board meeting, also before the closing, Warren Pettegrow told Stephen Peabody, the Co-

op's dock manager, that Lobster 207 would pay a 20-cent premium[2] ($1.60 over boat"), exclusively to the BJ Co-op.

No Lobster 207 corporate representatives were present at either of the BJ Co-op board meetings other than Warren (Lobster 207's soon-to-be CEO), but based on David Sullivan's deposition testimony[3], he understood that news of the purchase of Trenton Bridge's wholesale business was not received well by the BJ Co-op.[4]

On March 27, 2017, a few days after the closing, Sullivan attended a meeting of the BJ Co-op's general membership, where he would publicly announce Lobster 207's purchase of Trenton Bridge's wholesale business. Prior to the meeting, Sullivan, Anthony and Warren Pettegrow, Joel Pitcher (a local union representative) and Stephen Peabody gathered around outdoors and spoke. Peabody informed Sullivan that the Co-op was not excited about working with Lobster 207.

Sullivan's deposition testimony was as follows:

> We had not met Stevie prior to that night to really talk to. The Union purchasing Trenton Bridge was kind of a big secret in the industry. We weren't allowed to talk about it with anybody. So when Trenton Bridge informed Stevie Peabody that they were selling the wholesale division to Lobster 207, and the Union, our Local 207, Stevie was very upset. He didn't know us. He'd never met me, personally. He did not like Rock Alley who was the president of Lobster 207 or Local 207, sorry. Did not like Rock

---

[2] In their papers the parties quarrel over the use of the term "premium." Evidently, Warren did not actually use the word premium when speaking with Peabody. I use the term based on its ordinary meaning, not taking sides in counsel's dispute over words.

[3] Mr. Sullivan was Lobster 207's Rule 30(b)(6) designee. He identifies himself as a union representative or official.

[4] Presumably Sullivan learned this from Anthony or Warren, but this is not clear. He did testify, however, that he understood that Trenton Bridge had informed Peabody of the purchase prior to the March 27, 2017, meeting.

> Alley at all. Didn't want him anywhere near his wharf. Didn't know us. Didn't trust us. He was very upset. He felt like he was blindsided because the Pettegrows didn't tell him either. We didn't tell our fishermen that it was Trenton Bridge that we were looking at purchasing, the wholesale division. So it was a surprise to him and I understood that. Wanted to be accommodating, wanted to hear his concerns.
>
> . . . .
>
> But we met there in the back and Stevie said, Well I don't know you. I don't trust you. I don't believe in you. How do I know your money's good? Warren and Cubby [Anthony] and Joel, we all tried to talk to him about, you know, we had a line of credit. You know, it should have been plenty large enough for what we needed to do. And he said he would not deal directly with us. He was going to deal with Trenton Bridge because he didn't trust us. I told him right then and there, we weren't there to make waves. He was -- BJ Co-Op was a huge part of why we purchased Trenton Bridge wholesale because that was their biggest buying station. It was a very well-known dock up and down the coast of Maine, and that was part of why we purchased them. So we tried to reassure him that we were good people trying to do good things, and we were not here to stir things up or bring things down. We were just trying to work with him, work with the Pettegrows. Warren was going to be our CEO, so nothing was going to change.

Lobster 207 30(b)(6) Dep. at 219-21(ECF No. 381-14).

At some point in this conversation, Anthony (a/k/a "Cubby") proposed that transactions continue to be routed through Trenton Bridge and that Trenton Bridge would not make any money on those transactions. Peabody expressed agreement with that arrangement but stated that the Co-op would need to continue receiving a 20-cent per pound increase over Albert Carver's dock (a primary competitor). According to Sullivan, Warren stated words to the effect that paying a higher price to the BJ Co-op was in keeping with past practice. According to Pitcher, both Anthony and Warren agreed that was the case. Mr. Sullivan agreed to the arrangement, both as to price and Trenton Bridge's go-between status in transactions with the BJ Co-op.

7

Mr. Sullivan understood that Mr. Peabody was stating an expectation about how pricing for BJ Co-op lobster would be going forward. Mr. Sullivan recalled: "His words, he gets 20 cents more than Albert Carver. So whatever Albert had, he was going to get 20 cents more so that he would get his dividend at the end of the year." Lobster 207 30(b)(6) at 223. Prior to this meeting, although principals involved in the creation of Lobster 207 and the purchase of Trenton Bridge's wholesale operation had reviewed balance sheets, income statements, and the like, they never had access to dock-specific information related to the prices Trenton Bridge historically paid for lobster. The Pettegrows had withheld this information pending the closing and none of the principals within Lobster 207 bothered to verify the information in the days after the closing.

Lobster 207 contends that the demand for a 20-cent premium was not in keeping with past transactions between Trenton Bridge and the BJ Co-op, citing record references demonstrating transactions in which the BJ Co-op was paid 10 cents more per pound than other docks. The record contains evidence that Trenton Bridge paid the BJ Co-op anything from an extra nickel to an extra quarter per pound.[5]

A review of the record suggests to me that the available evidence might support alternative findings on this issue (whether a 20-cent increase for the BJ Co-op was relatively common or an infrequent occurrence). The Pettegrow Defendants have not

---

[5] The arbitrator stated that he "credit[ed] the testimony of David Sullivan that after Warren Pettegrow was terminated he learned that prior to the sale of its wholesale business Trenton Bridge had not paid BJs a premium of 20¢ a pound, but usually 10¢." Award at 8 (ECF No. 381-24). As explained in my recent Order on Plaintiff's Motion for Partial Summary Judgment (ECF No. 417), the arbitrator's jurisdiction was limited to Warren Pettegrow's employment contract.

8

directed me to evidence that Trenton Bridge had a firm policy of paying a 20-cent increase in its transactions with the BJ Co-op.

These matters inform Lobster 207's "BJ Co-op" scheme.

### 10-Cent Per Pound Increase

Beginning in the summer of 2018, Lobster 207 announced that it would pay a 10-cent increase to docks and buying stations on the understanding that the docks and buying stations would pay the money forward by increasing the boat price they paid to fishermen by the same 10 cents per pound. Lobster 207 states that this was one-hundred percent Warren Pettegrow's idea. Subsequently, when it came to the purchase of lobster from MDI fishermen, purchases Warren oversaw and Trenton Bridge invoiced, the premium was not passed along to the fishermen. These matters, and evidently others, inform Lobster 207's allegations related to the "embezzlement scheme."[6]

### DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Through their summary judgment motion, the Pettegrow Defendants seek the dismissal of the remaining claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 – 1968 ("RICO"), and further curtailment of Lobster

---

[6] Lobster 207's statements also speak to other price increases that would appear to be material to various claims, such as the fiduciary claim and the two breach of contract claims. I do not recount these other assertions because the current fact statement is sufficient for purposes of ruling on the pending motion's challenge to the embezzlement scheme.

207's list of alleged schemes based principally but not exclusively on the economic loss doctrine.

**A.     RICO**

Defendants argue that the RICO claim should be dismissed because "[t]he factual and legal development of this lawsuit now leave it undisputed . . . that L207 cannot establish a 'distinct' RICO 'enterprise.'" Defs.' Mot. at 44. I disagree. Because the circumstances continue to involve Warren Pettegrow's exercise of authority over Lobster 207, a corporate entity, and because that corporate entity is distinct from the Pettegrow family and the Trenton Bridge Lobster Pound, the alleged enterprise is something more than just the defendants by another name. *See Cedric Kushner Promotions*, *Ltd. v. King*, 533 U.S. 158, 162 (2001) ("[T]he person[s] and the victim, or the person[s] and the tool, are different entities, not the same."). *See also id.* at 164 ("RICO . . . protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it.").

**B.     Claims for Economic Losses**

Three of the schemes related in Lobster 207's amended complaint run up against the indemnification limitation described in the background section of this order. Those schemes involve lobster crates, customer data, and lobster inventory, all of which were assets subject to the APA. As alleged, Trenton Bridge possessed nowhere near 6,200 lobster crates at the closing; its customer list included customers who require the use of a broker (despite a representation to the contrary, according to Lobster 207[7]); and the manner

---

[7] Mr. Sullivan's representation is that Warren Pettegrow told him that the list "was comprised only of customers he did business with directly and had personal relationships with." Pl.'s Resp. Stmt. ¶ 70. Of

by which lobster inventory was conveyed involved some alleged double invoicing and inventory diversion after the closing.

Defendants argue that Lobster 207 failed to assert the alleged schemes as part of its breach of contract claim and that Lobster 207 failed in this regard because it recognized that any such claim would be time barred under the terms of the parties' APA. Mot. at 11-12. Defendants further argue that the alleged schemes cannot support Lobster 207's fraud claim or any other tort claim because the allegations raise pure questions of contract performance. *Id.* at 6-10.

Although Lobster 207 asserts a claim for breach of contract (Count VIII) against Anthony Pettegrow, Josette Pettegrow, and Trenton Bridge, it does so only with respect to the NCA and SOA, not the APA. This limitation on the reach of Count VIII is plain from a reading of the Amended Complaint. Am. Comp. ¶¶ 322-330. Evidently, Lobster 207 concluded that it lacked a legal basis to pursue a contract claim under the APA, presumably because of the indemnification limitations it agreed to in that document.

The question then becomes whether Lobster 207 should be able to evade the indemnification limitations by resorting to fraud and other tort theories. Defendants argue that Lobster 207 is not permitted to do so as a matter of law, by operation of the economic loss doctrine. Mot. at 6-11. Lobster 207 responds that the doctrine should be limited to

---

course, a wholesale business can transact directly with and have a personal relationship with a customer for which a broker's fee must be paid. Mr. Sullivan's assertion that he "thought everybody on this list was . . . Trenton Bridge's customer" does not tend to establish what Warren or anybody else told him. Pl.'s Add'l Stmt. ¶ 15. What Warren may have done after the closing in relation to the payment of commissions also does not tend to establish what he said beforehand related to brokered versus non-brokered sales. *Id.* ¶¶ 22-23.

product liability cases and that, regardless, the doctrine does not reach claims of fraud in the inducement.  Opp'n at 13-15.

In my initial treatment of the issue at the motion to dismiss stage, I rejected the broad-brush application of the economic loss doctrine, noting that the tort claims incorporated "schemes that post-date [the] retention of Warren Pettegrow as . . . CEO [and] involve the alleged breach of Warren's duty of care and loyalty to Lobster 207." Mem. Dec. and Order on Defs.' Mots. To Dismiss at 12-15 (ECF No. 72).  I reserved for summary judgment treatment the issue whether some of Lobster 207's alleged schemes "are exclusively contractual matters." *Id.* at 15.

At this juncture, given Defendants' more targeted use of the doctrine, I am persuaded that the doctrine has application here.  Judge Hornby recounted the evolution of the economic loss doctrine in Maine in *Fletch's Sandblasting & Painting, Inc. v. Fay, Spofford, & Thorndike LLC*, No. 2:15-cv-76-DBH, 2019 WL 847731 (D. Me. Feb. 21, 2019).  There, he applied the doctrine to a claim of misrepresentation arising out of a contract for engineering and design services.  *Id.* *1.  He observed that although the doctrine was injected into Maine law in a case involving a defective product, *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267, 269 (Me. 1995), the doctrine logically extended to a claim arising from a service contract in which the plaintiff had "the opportunity to negotiate the terms of its subcontract . . . and thereby establish its risks and liability on the construction project," and in which the facts did not

involve personal injury or property damage, only an alleged failure of a performance obligation arising under a contract. *Fletch's Sandblasting*, 2019 WL 847731, at *3. [8]

I agree with Judge Hornby (and other judges of this Court) that the Maine Supreme Judicial Court would recognize the doctrine in cases other than those premised on product warranties. I also find that this case is a good case for its application specifically in regard to Lobster 207's tort claims associated with obligations arising out of the APA. I also agree with Judge Levy that a claimant's ability to generate an issue of intentional misrepresentation will not prevent application of the doctrine where "the misrepresentation only goes to the quality or quantity of the goods promised in the contract." *Am. Aerial Services, Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 111 (D. Me. 2014) (quoting *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 876 (9th Cir. 2007) (citing *All–Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865–66 (7th Cir. 1999) ("Where there are well-developed contractual remedies . . . there is no need to provide tort remedies for misrepresentation"))).[9]

Based on the economic loss doctrine, I conclude that the customer list scheme and the lobster crate scheme are not actionable as tort claims. Both the customer list and the

---

[8] *See also Maine Rubber Int'l v. Environmental Mgmt. Grp., Inc.*, 298 F. Supp.2d 133, 134, 137-38 (D. Me. 2004) ("These were two commercial entities able to bargain over the terms of their agreement, and they entered into a written contract to govern their relationship. There was no risk of harm either to people or to other property. The critical issue here . . . is value and quality of what was purchased. Following *Peachtree*, I conclude that there is no reason not to leave [the plaintiff and the defendant] to their bargain." (footnote omitted)).

[9] Judge Singal and Magistrate Judge Nivision also applied the doctrine in the context of a motion to dismiss in a case involving the alleged failure of performance under a construction contract, including a claim of misrepresentation, in *Schmid Pipeline Const., Inc. v. Summit Nat. Gas of Maine, Inc.*, No. 1:13-cv-464-GZS, 2014 WL 3600437 (D. Me. July 22, 2014).

lobster crates were assets itemized in the APA. Lobster 207's allegations about a "customer list scheme" and a "lobster crate scheme" are merely attempts to dress up as tort claims its failure to receive the benefit of its bargain. And to the extent these allegations rely on alleged misrepresentations, "the misrepresentation only goes to the quality or quantity of the goods promised in the contract." *Am. Aerial Services*, 39 F. Supp. 3d at 111. These claims fall squarely within the economic loss rule.

The "inventory scheme," though similar, has components that deserve a different conclusion. As alleged, the inventory scheme primarily is concerned with the transfer of Trenton Bridge's wholesale lobster inventory on the date of the closing. Am. Compl. ¶¶ 13(f), 127-136. Lobster 207 alleges that Trenton Bridge "diverted or failed to deliver" lobster purchased through the closing. *Id.* ¶ 13(f). The mere "failure to deliver" lobster would succumb to the economic loss rule just like the failure to supply the customer list and lobster crates Lobster 207 was expecting. A claim for failure to deliver is simply a claim for non-fulfillment or non-performance of an aspect of the APA. Thus, to the extent the Amended Complaint suggests a claim for failure to deliver $383,952.81 worth of lobster, that claim is precluded by the economic loss doctrine.

But the alleged diversion of purchased property to third-party sales and the alleged double billing of Lobster 207 for lobster inventory and certain office supplies and packing materials that Lobster 207 had already purchased in the closing, *see* Am. Compl. ¶¶ 131-136, entail misconduct beyond mere nonperformance or nonfulfillment of the APA.[10] For

---

[10] Evidently, some conduct associated with lobster inventory also informs Count VIII alleging breach of the Noncompetition Agreement. Am. Compl. ¶ 134.

14

this reason, I conclude that the inventory scheme survives application of the economic loss doctrine insofar as it seeks to recover for alleged conversion and/or unjust enrichment.

## C. Remaining Schematics

Finally, Defendants challenge Lobster 207's so-called embezzlement scheme and BJ Co-op scheme. Defendants argue the embezzlement allegations are vague and nonsensical as "fraud" allegations, and that the testimony of the witnesses concerning the BJ Co-op scheme does not raise a genuine issue for trial. Mot. at 4, 34-42.

### 1. *Embezzlement*

The embezzlement issue begins with a controversy over the pleadings. Specifically, after obtaining leave to file the amended complaint attached to its motion to amend, Lobster 207 filed a revised version of the amended complaint that changed the wording of paragraph 233 under the embezzlement heading.[11] The proposed amended complaint alleged:

> In July of 2018, <u>Lobster 207 informed Warren that he</u> was to announce a Standard Offer dock price that was $0.10 per pound higher than previously set, with the condition that each of Lobster 207's fishermen-members would receive that additional $0.10 per pound as part of the boat price. This increase was to go into effect on or about July 30, 2018.

Proposed Am. Compl. ¶ 233 (ECF No. 146-1). The amended complaint Lobster 207 filed alleged:

> 233. In July of 2018, <u>Warren was to announce</u> a Standard Offer dock price that was $0.10 per pound higher than previously set, with the condition that each of Lobster 207's fishermen-members would receive that additional $0.10 per pound as part of the boat price. This increase was to go into effect on or about July 30, 2018.

---

[11] Needless to say, this is bad practice.

Am. Compl. ¶ 233 (ECF No. 184).

The gist of the embezzlement contention is that Warren Pettegrow, beginning in the summer of 2018 and continuing into the early winter of 2019, arranged for a 10-cent-per-pound bonus to be paid to "fishermen-members" who delivered their catch to participating docks, Am. Compl. ¶ 233, but then "embezzled a significant portion of it." *Id.* ¶ 236. However, Lobster 207 shoehorns in a more traditional fraud allegation by alleging that Warren "falsely represented to Lobster 207 that he was paying the additional [ten cents] to all its members" and that Lobster 207 "justifiably relied" on the same. *Id.* ¶¶ 236-37.

Defendants argue that the difference between the two versions of paragraph 233 is dispositive to any claim of fraud because the original allegation did "not state who actually set the increased price," and consequently the allegation failed to establish that whoever authorized it "receive the misrepresentation and justifiably relied on it." Mot. at 34. This all tracks the traditional elements of a fraud claim, which include a false statement made to induce or prevent action in reliance, resulting in reliance that was justified by the circumstances. *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 26, 818 A.2d 995, 1003. But it is all a bunch of stuff and nonsense—on both sides.

Lobster 207's thematic insistence on shoehorning in misrepresentation and reliance allegations serves no real purpose here; it's overkill. Warren Pettegrow was CEO of Lobster 207 and as such was in the position to institute the increase and, allegedly, embezzle some portion of it. If proven, it matters little who said what to whom because the alleged conduct is actionable anyway, and a fair reading of the amended complaint—

16

with either version of paragraph 233—warrants an inference that a claim is alleged adequately for purposes of Count III.

"Embezzlement is the fraudulent conversion of the property of another by one who is already in lawful possession of it. Thus, to amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent." *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010) (cleaned up). *See also United States v. Young*, 955 F.2d 99, 102-103 (1st Cir. 1992). Though the "civil tort of embezzlement primarily arises in the bankruptcy context," *National Lampoon Inc. v. Durham*, No. 1:13-cv-1094, 2017 WL 2930572 (S.D. Ind. July 10, 2017), I am comfortable finding that the Maine Supreme Judicial Court would permit a civil claim involving embezzlement to proceed under a fraud heading—most likely as a species of "constructive fraud."[12] Other appropriate headings would be conversion (set out in Count IV), breach of fiduciary duty (Count V), and unjust enrichment (Count IX).[13]

2. ***BJ Co-op Scheme***

The allegations that inform the BJ Co-op scheme are based on the March 27, 2017, discussion described above. Lobster 207 alleged that Warren and Anthony intentionally

---

[12] "Constructive fraud occurs when the grantor transfers property to the grantee, who promises or agrees to hold the property for the benefit of the grantor or a third party, and the grantor is induced to act through reliance on a relationship of trust which may be founded on moral, social, or personal, as well as legal duties." *Baizley v. Baizley*, 1999 ME 115, ¶ 7, 734 A.2d 1117, 1119 (internal quotation marks omitted). The unjust enrichment count also serves (Count IX). A constructive trust "is appropriate where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Id.* at 1118, ¶ 6 (internal quotation marks omitted).

[13] I also reject Defendants' contention that Lobster 207 lacks standing to recover money allegedly embezzled from its coffers. Mot. at 37-38. In addition to the alleged misappropriation of its funds, the misconduct, if proven, would have deprived Lobster 207 of the goodwill the extra payment was meant to generate. These are particularlized harms traceable to the alleged misconduct that are amenable to judicial redress. *Laufer v. Acheson Hotels, LLC*, 50 F.4th 259, 266 (1st Cir. 2022).

misrepresented to Sullivan that Trenton Bridge had historically paid a 20-cent premium, that Sullivan relied on the truth of the statement, and that Lobster 207 unnecessarily paid a 20-cent premium going forward. Lobster 207 also alleges that Warren and Anthony cooked up a scheme with Stephen Peabody to overstate the BJ Co-op's opposition to Lobster 207's entry into the market so that Sullivan would authorize Trenton Bridge to act as middleman for lobster transactions between Lobster 207 and the BJ Co-op. Am. Compl. ¶¶ 68-70.

Defendants argue the BJ Co-op scheme is not supported by the evidence because nobody represented to David Sullivan that Trenton Bridge historically paid the BJ Co-op a 20-cent bonus relative to a "standard offer dock price." They also argue that the record does not support a finding of fraud on the part of Anthony Pettegrow, who said nothing during the meeting with Mr. Sullivan. Mot. at 38-42. Although the reference to the "standard offer dock price" in paragraph 76 of the Amended Complaint is a fly in the ointment (because, in fact, nobody said anything about a standard offer dock price), I do not see why it would preclude the jury from weighing the significance of the March 27 representations when considering whether Warren, as CEO of Lobster 207, and Anthony, as a principal of Trenton Bridge subject to the NCA, conducted themselves in a dishonest manner detrimental to the commercial interest of Lobster 207.

## CONCLUSION

The Pettegrow Defendants' Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART. The so-called Customer Data Scheme and Lobster Crate Scheme are declared non-actionable, as is a portion of the so-called Inventory

18

Scheme, as set forth above. This ruling does not result in the dismissal of any Counts, only a limitation.

**SO ORDERED.**

Dated this 13th day of December, 2022.

                                                /s/ Lance E. Walker
                                                UNITED STATES DISTRICT JUDGE