UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| LOBSTER 207, LLC, | ) |
| Plaintiff | ) ) ) |
| v. | ) No. 1:19-CV-00552-LEW |
| WARREN B. PETTEGROW, *et al.*, | ) ) ) |
| Defendants | ) ) |

## ORDER ON STEPHEN PEABODY'S
## MOTION FOR SUMMARY JUDGMENT

The matter is before the Court on Defendant Stephen Peabody's Motion for Summary Judgment (ECF No. 337). Through his motion, Mr. Peabody requests that judgment enter on his behalf on Plaintiff Lobster 207's fraud and civil conspiracy claims.

## BACKGROUND

The reader's familiarity with the nature and history of the case is assumed and the background statement, therefore, focuses on factual matters material to the legal issues pressed in the motion. In keeping with summary judgment practice, this background statement sets forth the facts in the light most favorable to the non-movant, meaning that genuinely disputed factual issues (of which there are many) are resolved in favor of Lobster 207.

### A. Preclosing Understandings

In the lead up to the March 24, 2017 closing of Lobster 207's purchase of Trenton Bridge's wholesale business, Anthony and Warren Pettegrow attended a March 8, 2017,

meeting of the Board of Directors of the Beals-Jonesport Cooperative ("BJ Co-op") to break the news of the impending transaction. The relationship between Trenton Bridge and the BJ Co-op was a longstanding and essential component of Lobster 207's wholesale business plan. The relationship also was important to the Co-op, which sold much of its inventory to Trenton Bridge. Warren Pettegrow was the only person with direct ties to Lobster 207 present at the meeting, though he was not yet its CEO.[1]

The record does not provide a definitive barometer of the general attitude of the Co-op's Board or its members but suffice it to say that the announcement was not universally welcome and angered many. Stephen Peabody, the Co-op's dock manager who had a good working relationship with the Pettegrows, had occasion to hear the news ahead of the board meeting and was unhappy with the news, evidently due to personal dislike of someone involved with either the Maine Lobstering Union—Lobster 207's sole member—or the MLU's union overseer (or both). In any event, at some point on the date of the board meeting, Anthony and Warren announced that Trenton Bridge would remain a going concern (it was only selling its wholesale business, not its retail business), and that the BJ Co-op could continue to sell to and be paid by Trenton Bridge, which would then pass the lobster through to Lobster 207. In making this offer, Warren, the as-yet-not-fully-minted CEO of Lobster 207, was out over his skates, as he had not cleared the proposal with David Sullivan or anyone else at the helm of the Lobster 207 LLC.[2]

---

[1] Warren had executed the contract making him CEO, but evidently the effective date was the closing, which did not occur until March 24, 2017.

[2] In the Amended Complaint, Lobster 207 describes Mr. Sullivan as the Grand Lodge representative of the International Association of Machinists and Aerospace Workers. Am. Compl. ¶ 90. The pleadings

Lobster 207 contends that Warren and Anthony were not merely trying to be proactive to ensure a smooth transition, but actually were conspiring to ensure that Trenton Bridge would remain the Co-op's buyer for self-dealing purposes. Lobster 207 also contends that Stephen Peabody was a co-conspirator in the effort. The basis for this contention is that Peabody met with Warren in advance of the board meeting and favored the idea of the BJ Co-op continuing to sell directly to Trenton Bridge. Pl.'s Add'l Stmt. ¶ 27. In other words, because Peabody met and spoke to Anthony and Warren, Lobster 207 wants the factfinder to infer that Peabody conspired with them to maintain the Co-op's relationship with Trenton Bridge not simply in the interest of the BJ Co-op, but also for whatever unlawful ends the Pettegrow Defendants might be able to achieve through the arrangement.

Anthony and Warren subsequently attended a second meeting of the BJ Co-op's Board, on March 15, 2017. Once again, they met with Stephen Peabody ahead of the meeting. Lobster 207 contends that Warren, this time, told Peabody that he would have Lobster 207 pay the Co-op a 20-cent per pound premium for its wholesale lobster, and the two agreed that this should not be shared with the Board at the meeting or otherwise announced publicly.

---

elsewhere identify the Maine Lobstering Union as a division of the IAMAW. *Id.* ¶ 1. The MLU is the sole member of Lobster 207 LLC. In effect, the union exercises some manner of control over the MLU. The MLU, in turn, operates "all aspects of Lobster 207's business." *Id.* ¶ 212. Mr. Sullivan's exact role within the MLU and Lobster 207 is not clear from the record presented in connection with the motion, but it appears to be accepted that he had the authority to directly supervise Warren Pettegrow's activities as Lobster 207's CEO.

### B.  Peabody's March 27, 2017, Representations

On March 27, 2017, David Sullivan and Joel Pitcher, officers within the MLU, attended the meeting of the general membership of BJ Co-op, planning to make a formal announcement to the BJ Co-op membership concerning Lobster 207's entry into the market. Shortly before the meeting opened, they stood outdoors and had a conversation with Peabody and Anthony and Warren Pettegrow. In a companion order on the Pettegrow Defendants' Motion for Partial Summary Judgment, I have provided a more granular account of what was said that day.

For present purposes, suffice it to say that the jury would be permitted to find that Peabody told Sullivan and Pitcher that there was a lack of trust in the people and money behind Lobster 207 and for that reason Peabody did not want to sell directly to Lobster 207; that the BJ Co-op would sell lobster to Lobster 207 through Trenton Bridge, provided that Lobster 207/Trenton Bridge paid 20 cents more per pound for co-op lobster than the rate a primary competitor dock charged for its lobsters (in effect, 20 cents more than other docks would expect); and that Trenton Bridge had historically paid the BJ Co-op such an increase/premium for its lobster. A jury could also find that Peabody's demand for a premium price was consistent with past practice, but the request for an extra 20 cents per pound exaggerated past practice by, on average, 10 cents per pound. While Peabody was announcing his terms or immediately afterward, Anthony and Warren commented (in effect) that what Peabody said would work and was an accurate statement of past practice.

As for Peabody's subjective state of mind on March 27, 2017, a jury could find that Peabody understood that he was increasing the price for which BJ Co-op would sell lobster

to Lobster 207 under circumstances that gave the Co-op a bargaining advantage. Peabody also had reason to expect that Anthony and Warren Pettegrow would back him up on his price demand because Warren had already offered to pay an extra 20 cents and Anthony and Warren had already expressed a willingness to continue Trenton Bridge's relationship with the Co-op during their first meetings with the BJ Co-op's Board earlier that month.

Upon hearing Peabody's terms, David Sullivan expressed his willingness to proceed with that arrangement, not knowing that Peabody, Anthony and Warren had already arrived at the price or that Peabody had overstated the extent of the price premium Trenton Bridge had customarily paid, and expecting that Warren, Lobster 207's new CEO, would set him straight if anything Peabody said was inaccurate or disadvantageous to Lobster 207. Sullivan also went along with the proposal that the BJ Co-op continue to sell to Trenton Bridge and that Trenton Bridge would pass lobster purchases through to Lobster 207, understanding that Trenton Bridge would not profit from the arrangement based on Anthony's representation to that effect.

### C.    The Rebate Invoice

It is a relatively common practice for docks and buying stations to withhold a certain amount of money when purchasing lobsters from fishermen and to set the money aside to pay a "holdback bonus" or "rebate" to the fishermen at the end of the season. In the interest of attracting and maintaining business, the BJ Co-op wanted to pay a holdback bonus to its members that would be slightly above what other docks were paying. In the winter of 2017, Peabody and Warren Pettegrow discussed the matter and agreed that it was in their company's respective interest to have Lobster 207 pay $55,269 to make up a shortfall in

the BJ Co-op's holdback revenues so that it would be able to meet the $1.40 per pound targeted rebate.[3]

To record the transfer on the books, Peabody made out an invoice to Trenton Bridge for 138 ninety-pound crates of lobster, representing a value of $55,269. Peabody had no intention of actually supplying lobster, understanding for his own part that use of the invoice was simply a device to fund the rebate. Upon receipt of the Co-op's invoice, Trenton Bridge invoiced Lobster 207 in the same manner. Sometime in December 2017, Warren presented the invoice to Lobster 207's bookkeeper, who brought it to the attention of Mr. Sullivan, but not before the invoice was paid. Sullivan objected to the arrangement and instructed Warren to unwind the payment. Warren then arranged for Trenton Bridge to reimburse the funds to Lobster 207, which it did, in January 2018.

As a result of these transfers, the BJ Co-op retained the funds it received and paid out the full $1.40-per-pound rebate to its members, but Trenton Bridge was now out $55,269. Due to Trenton Bridge's January 2018 payment to Lobster 207, Lobster 207 was made whole (temporarily).

Lobster 207 dubs the events surrounding the BJ Co-op's 2017 rebate the "Phantom Lobster Scheme."

---

[3] Lobster 207 had purchased roughly $11 million worth of lobster supplied by the BJ Co-op's membership, but by season's end the BJ Co-op only had sufficient funds in the holdback account to pay a $1.37 rebate. Setting the standard for the area for holdback bonus would tend to attract fishermen to the BJ Co-op's dock, whose inventory Lobster 207 heavily relied on in its business model. Lobster 207 itself observes (when convenient) that many of the BJ Co-op's members were non-union-members opposed to selling to Lobster 207 because of the extra revenue realized by unionized fishermen. Pls.' Opposing Stmt. ¶ 71.

But the financial adjustments did not end there. Warren required Peabody to repay the $55,269 to Trenton Bridge by deducting ten cents per pound from future lobster sales until the amount was repaid. Peabody complied and for a time Trenton Bridge received invoices from the BJ Co-op that were discounted by ten cents. But because this arrangement was designed to enable the BJ Co-op to repay Trenton Bridge, Trenton Bridge did not pass through the ten-cent discount to Lobster 207. While this arrangement was evidently adopted as an arguably reasonable means of adjusting the monetary imbalance between Trenton Bridge and the BJ Co-op, this approach resulted in bookkeeping that meant Trenton Bridge was not passing through to Lobster 207 the price it paid the BJ Co-op. There was a ten-cent-per-pound discrepancy.

Lobster 207 dubs this development the "Recoupment Scheme." In my Order on Defendants' Motions to Dismiss Plaintiff's First Amended Complaint, at 23-24 (ECF No. 262), I dismissed the Recoupment Scheme as against Peabody.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, even if the non-moving party demonstrates the existence of evidence that can overcome the moving party's record representations, it will not be enough to preclude summary judgment if the resulting facts, viewed in the light most favorable to the non-moving party, do not permit a reasonable factfinder to resolve the associated legal issue in favor of the non-movant. *IDS Prop. Cas. Ins. Co. v. Gov't Employees Ins. Co., Inc.*, 985 F.3d 41, 52 (1st Cir. 2021); *Mulvihill v. Top-Flite Golf Co.*,

7

335 F.3d 15, 19 (1st Cir. 2003). Nor can the non-movant overcome a summary judgment motion if essential elements of its proof depend on "improbable inferences, acrimonious invective, or rank speculation." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010).

Lobster 207 seeks to keep Stephen Peabody in this litigation based on allegations of fraud and civil conspiracy. Unlike either Anthony or Warren Pettegrow, Peabody did not owe Lobster 207 any duty based on contract or employment status. In his dealings with Lobster 207, Peabody remained free to pursue, exclusively, the interest of his employer, the BJ Co-op. Still, he was subject to common law duties; in particular, he could not lawfully subject Lobster 207 to harm by means of fraud or knowingly conspire with Anthony and/or Warren to defraud Lobster 207.

"A defendant is liable for fraud or deceit if he (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage." *Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979). The elements of fraud must be proved by clear and convincing evidence. *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of New York*, 2002 ME 127, ¶ 26, 818 A.2d 995, 1003. That standard requires the plaintiff to instill in the factfinder "an abiding conviction" that it is "highly probable" (not merely more probable than not) that its factual contentions are true. *Taylor v. Commissioner of Mental Health*, 481 A.2d 139, 153 (Me. 1984).

Lobster 207 also asserts against Peabody a "civil conspiracy" claim. In Maine, the law of civil conspiracy is a means of imposing vicarious liability on one party based on the

unlawful act of another or others, *McNally v. Mokarzel*, 386 A.2d 744, 748 (Me. 1978), but it must be shown that an "agreement or combination" existed between or among them to cause the alleged harm. *Franklin v. Erickson*, 128 Me. 181, 146 A. 437, 438 (1929). "'[C]onspiracy' fails as the basis for the imposition of civil liability absent the actual commission of some independently recognized tort; and when such separate tort has been committed, it is that tort, and not the fact of combination, which is the foundation of the civil liability." *Cohen v. Bowdoin*, 288 A.2d 106, 110 (Me. 1972).

### A.  Lobster-trading

Lobster 207 asserts that Peabody engaged in fraud on March 27, 2017, when he represented that Trenton Bridge historically had paid the BJ Co-op 20 cents more per pound for lobster than it paid to other area docks and buying stations. Lobster 207 also alleges that Peabody and the two Pettegrows jointly conspired to instill this misconception in Sullivan and Pitcher to Lobster 207's harm. Lobster 207 also goes so far as to contend that Peabody's desire to have the BJ Co-op continue to deal directly with Trenton Bridge was jointly fabricated in the interest of harming Lobster 207 for their mutual benefit.

#### 1.   Dealer talk related to price terms

Assuming that the jury resolved the disputed facts the way I have outlined them above, it would be easy for the jury to regard Peabody's conduct on March 27, 2017, as the crustacean version of horse-trading, but the question is whether the facts would allow it to find by clear and convincing evidence that Peabody is liable for fraud, either directly or vicariously.

9

Given the record, a jury could find (but would not have to find) that Peabody knew that he was making a false representation about a historical fact concerning the amount of the increase Trenton Bridge had paid to the BJ Co-op for its lobsters, and that he did so in an effort to make his demand for an increased price appear to be in keeping with tradition. While such findings appear to tick off the first four elements of the fraud standard, they also raise a legal concern as to whether the jury permissibly could consider Peabody's representation about past pricing as a fraudulent inducement under Maine law, given that Peabody was demanding a price for future, unsettled transactions and nothing he said would have mislead anybody concerning the actual value or quality of the product to be sold.

Peabody makes such an argument, asserting that "statements about future pricing in the context of arms-length price negotiations are not actionable under Maine law." Mot. at 13. According to Peabody, statements by a seller about price amount to non-actionable "dealer's talk." *Id.* at 14. Lobster 207 does not disagree with that description of the law, but argues that this case is different because Lobster 207 raised a genuine issue whether Peabody misrepresented historical facts about the pricing relationship between Trenton Bridge and the BJ Co-op. Opp'n at 18-19.

Maine common law recognizes that in transactions involving the sale of property, dealer's talk, puffery, and similar overstatements of the value and quality of property on offer are non-actionable statements. *Eaton v. Sontag*, 387 A.2d 33, 37-38 (1978). This rule has been stated rather emphatically, to the extent that "statements of the vendor as to [the] value [of property], *or the price which he has given or been offered for it*, are so

10

commonly made by those having property to sell in order to enhance its value, that any purchaser who confides in them is considered as too careless of his own interests to be entitled to relief, even if the statements are false and intended to deceive." *Clark v. Morrill*, 128 Me. 79, 145 A. 744, 745 (1929) (emphasis added).[4]

The circumstances of this case, even viewed in the light most favorable to Lobster 207, run up against the line established by the longstanding dealer-price-talk rule.  After all, the alleged statement that induced the alleged harm (increased payments for lobster purchases) was a false statement to a new buyer concerning the rate paid by another in the past, not a false statement concerning the product or any presently existing intentions regarding contemplated future transactions.  Still, the factfinder would be justified to find that the representation was false and concerned a historical fact related to the specific wholesale business Lobster 207 had just purchased, and at that time both Peabody and the Pettegrows were in a much better position to assess the truth than was Sullivan.

---

[4] By comparison, misrepresentations concerning the productive capabilities of the property on offer (e.g., how productive property has been in prior years) have long been deemed actionable because such misrepresentations are not mere puffery but instead involve actual facts concerning the intrinsic value of the property purchased. *Martin v. Jordan*, 60 Me. 531, 534 (1872) (observing that "affirmations with respect to [land's] past profits or productiveness, will support . . . a claim").  This is why it is important to note here that there was no false representation about the product on offer, only about the nature of a prior pricing arrangement that did not dictate the terms of future transactions. There is an equally long-established legal principle that "representations of the vendor in regard to the price he paid . . ., are not actionable." *Id.* at 533. *See also Shine v. Dodge*, 130 Me. 440, 157 A. 318, 319 (1931), *overruled on other grounds by Cianchette v. Cianchette*, 2019 ME 87, 209 A.3d 745 ("Deceit is a specific term, and imports a false and fraudulent representation, which must not only influence the buyer's judgment in making the purchase, but also must relate to a fact which directly affects the value of the property sold."). In *Cianchette*, the Maine Supreme Judicial Court overruled in part its *Shine* precedent, updating Maine misrepresentation law by adopting the statement of the law found in the Restatement (Second) of Torts §§ 525 & 530 that misrepresentations about future intentions can be actionable. *Cianchette*, 209 A.3d at 752-53.  Here, the alleged misrepresentation did not concern future intentions, but a past pricing relationship. *Cianchette* did not overturn the dealer-talk pricing rule.  Nor has Lobster 207 cited other authority that did.

Viewed from another angle, however, the problem is not merely a problem of dealer's talk, but also a problem of inducement. The representation at issue did not close out a transaction or otherwise bind the respective parties to anything that could not be revised. Future adjustments in the vendor-vendee relationship were possible precisely because there was no contract. From all that appears in the record, the BJ Co-op was not contractually bound to sell Lobster 207 any lobster at all, let alone at any given price, but had an interest in doing so given that it had for many years sold Trenton Bridge much of its inventories. The absence of any binding agreement has some tendency to undercut a showing of a fraudulent inducement respecting price, and instead to invigorate the impression that Peabody was engaged in dealer's talk related to the terms of sale, a subject that Lobster 207 and the BJ Co-op might return to in the context of each and every future sale.

The claim against Peabody also encounters difficulty with the fifth element of the fraud standard calling for proof of justifiable reliance. *Letellier*, 400 A.2d at 376. Peabody argues that Lobster 207 (*i.e.*, Sullivan) did not, in fact, rely on Peabody's representations and that, in any event, it was foolish for him to do so given that Sullivan could have demanded access to the business records of the newly purchased wholesale business, whereas Peabody lacked access to such data.[5] Mot. at 16-19.

---

[5] I have credited Lobster 207's assertion that it did not have access to the data before the purchase closed. For that reason I limit Peabody's argument to what Sullivan might have accessed after the sale had he found the motivation to investigate.

There are statements in Maine precedent that caution against casual acceptance of representations concerning facts that one has a ready means of investigating. For example: "Where the party has an opportunity to learn the facts he has no right to rely on representations, the truth of which he has equal means of ascertaining or by the exercise of reasonable diligence could have ascertained." *Coffin v. Dodge*, 146 Me. 3, 6, 76 A.2d 541, 543 (1950). However, the Maine Supreme Judicial Court abandoned the old verification rule in *Letellier*, 400 A.2d at 375. The modern rule is that "[a] plaintiff may justifiably rely on the fraudulent misrepresentation of a defendant . . . without investigating the truth or falsity of the representation." *Id.* at 376. *See also Drilling & Blasting Rock Specialists, Inc. v. Rheaume*, 2016 ME 131, 147 A.3d 824, 830 n.3 ("Maine law has long recognized that a plaintiff's negligence is no defense to a defendant's fraud."). In the end, in matters of reliance, a plaintiff must only persuade the factfinder by evidence that he justifiably relied to his damage. *Letellier*, 400 A.2d at 376. As a consequence, ordinarily a plaintiff can survive a summary judgment challenge premised on the absence of justifiable reliance even though the record would permit the jury to find a lack of care on his part.

The record in this case is a bit muddy when it comes to judging what kind of conclusion the factfinder could draw about Sullivan's supposed reliance on Peabody's representation about historical practice. At his deposition, Sullivan acknowledged that he did not perceive Peabody as somebody he should be relying on, but rather anticipated that Warren Pettegrow would set him straight if Peabody's statements were off the mark:

> Q   Okay. So were you relying on Stephen Peabody, his statement as to what dock was comparable to BJ Co-op?

> A   No, I was relying on Warren Pettegrow, the person that we hired as our CEO to give me the correct information and to make sure we were not being misled.

Pl.'s Resp. Stmt. ¶ 54 (ECF No. 378), citing Sullivan Dep. at 62 (ECF No. 337-14). Sullivan's testimony tends to reinforce the idea that an objective, reasonable person in his position would have understood that Peabody was setting terms to govern a future course of dealing, not inducing Sullivan to refrain from acting in the interest of Lobster 207 or the MLU membership.

Lobster 207 acknowledges this characteristic of the exchange when it argues that "the nature of Mr. Peabody's last-minute, take-it-or-leave-it declaration did not lend itself to scrutiny." Opp'n at 20 (ECF No. 377). Perhaps. Lobster 207 places significance, in part, on the timing of Peabody's statements, because Sullivan was about to go before the general membership of the BJ Co-op to announce that Lobster 207 had acquired the wholesale business of Trenton Bridge. Opp'n at 20. But that announcement would not prevent Sullivan or any other person with authority over Lobster 207 from insisting upon harder bargaining with the BJ Co-op over the price of lobster. Lobster 207 simply fails to elucidate why timing was of any special significance. Sullivan also contends that he felt he had no bargaining position because Peabody expressed his terms in a "take-it-or-leave-it" manner. Opp'n at 20. But, again, the take-it-or-leave-it nature of the communication simply calls into question timing. Lobster 207 appears to expect the factfinder to perpetually excuse Sullivan's complacency throughout the entire relevant time, all due to the supposed force of Peabody's take-it-or-leave-it demeanor. Certainly the factfinder can infer, just as Sullivan must have, that Peabody was making a price demand to secure the

14

BJ Co-op's supply. And the factfinder should come to appreciate, as Sullivan eventually did, that the price of lobster is a constant subject of negotiation between buyers and sellers.

Lobster 207 itself states in its responsive statement of fact that there were ongoing price negotiations with the BJ Co-op, but that they were made difficult because "Dave Sullivan and others were relying on Warren's expertise," *i.e.*, not on Peabody. Pl.'s Resp. Stmt. ¶ 61. Sullivan has also testified that Peabody was "always wanting more money for lobster," that it was fair to say that Peabody consistently was "trying to negotiate a higher price for the BJ Co-op," and that the subject of price going forward was a consistently contested subject. Def's. Stmt. ¶ 62 & Sullivan Dep. at 42-43 (ECF No. 337-5). Although the 20-cent increase held steady throughout the relevant time, there is nothing in the record to persuade the factfinder that the 20-cent increase was impregnable. After all, it was never tested. One very appealing inferential finding is, consequently, that Sullivan reasonably considered it wise to let the 20-cent premium lie, indefinitely, to avoid alienating the primary lobster source upon which Lobster 207 depended for its success.

But the presence of strong inferences that might be drawn against a claimant is not dispositive in the summary judgment context. I review here a paper record without the benefit of hearing word one from the cast. Based on my review, I am certainly left with a concern that Lobster 207 was a bit overzealous in its narration of schemes and has overreached when it comes to Mr. Peabody. On the other hand, the factfinder might entertain the conspiratorial narrative when it comes to the past-pricing-practice issue and conclude that the March 27, 2017, conversation—if it occurred the way Sullivan and Pitcher represent it did—inflicted a pecuniary harm on a new entrée to the market based

15

on a material misrepresentation of a past business practice involving a critically important customer, and that it was justifiable for Lobster 207's overseers to rely on the representation for some amount of time despite the absence of any evidence of a binding commitment in matters of price. And while justifiable reliance would be a real problem for Lobster 207 if Peabody were the only defendant, Lobster 207 can also support its case with Anthony and Warren's alleged seconding of Peabody's alleged misrepresentation, thanks to Maine civil conspiracy law. And because the record shows that Peabody and Warren agreed on price between themselves, there is an agreement or combination in the record that Lobster 207 can point to in support of its reliance on civil conspiracy law. A misrepresentation about historical price practices is worse than mere dealer's talk when it comes from Warren and his failure to fulfill his fiduciary duty to Lobster 207 also alters the reliance inquiry.

For these reasons, Peabody's request for summary judgment against the past (price) practice component of the "BJ Co-op Scheme" is DENIED.

### 2. Trenton Bridge's middleman position

Although Peabody's challenge to the historical price practice component remains standing based on a precarious combination of facts and law, the same is not true of Lobster 207's bid to hold Peabody liable in fraud for whatever other harm it can prove it suffered as a consequence of agreeing to have the BJ Co-op continue to conduct wholesale transactions with Trenton Bridge.

As to Peabody, this component of the BJ Co-op Scheme is cockamamie because the factfinder could not reasonably find that Peabody misrepresented a material fact or was

16

complicit by agreement for some harm proximately caused to Lobster 207 based on either Trenton Bridge's ability to separately invoice Lobster 207 or Warren's divided loyalties. Maine's civil conspiracy law offers an interesting hook in the context of the misrepresentation about past business practices, but it does not suffice to make Peabody the guarantor of all of Trenton Bridge's or the Pettegrows' dealings with Lobster 207.

Accordingly, Peabody's request for summary judgment against fraud and conspiracy liability arising generally from Trenton Bridge's middleman position is GRANTED.

### B. The "Phantom Lobster" Invoice

Lobster 207 claims that Peabody engaged in fraud when he presented Trenton Bridge with a BJ Co-op invoice for lobster that was really meant to fund the payment of a holdback bonus to the members of the BJ Co-op, without delivering any lobster.

The record reveals that Peabody and Warren Pettegrow arranged for the BJ Co-op to invoice Trenton Bridge for a sale of lobster, which invoice was meant to achieve a payment sufficient to fund the remaining fraction of the BJ Co-op's holdback or rebate target. Peabody saw it was an investment in goodwill; Warren evidently saw it as a loan. Regardless, Lobster 207's bookkeeper promptly raised the red flag and the matter was rectified by Trenton Bridge's repayment to Lobster 207. I fail to see how the factfinder could impose fraud liability on Peabody, chiefly due to the lack of harm, but also given that Peabody did not mislead anyone.

Lobster 207 also persists in the notion that Peabody should be held liable for Trenton Bridge's subsequent adjustment of invoices so that Lobster 207 would wind up paying for

17

some or all of the rebate in the end. But there is no substantial basis in either the allegations or the summary judgment record to assess liability against Peabody for any follow-on invoice adjustments. Such adjustments (assuming they occurred) necessarily were carried out by agents of Trenton Bridge, not Peabody. Furthermore, there is no evidence to find (directly or circumstantially) that Peabody's "agreement or combination" was necessary or material or otherwise contributed to any follow-on accounting or invoicing misdeeds that resulted in harm to Lobster 207.

Therefore, Peabody's request for summary judgment against fraud and civil conspiracy claims associated with the so-called Phantom Lobster Scheme is GRANTED.

## CONCLUSION

Stephen Peabody's Motion for Summary Judgment (ECF No. 337) is GRANTED IN PART AND DENIED IN PART. Count III and VI will remain viable as to Mr. Peabody, but solely with regard to the matter of the alleged misrepresentation concerning Trenton Bridge and Lobster 207's historical price practice.

**SO ORDERED.**

Dated this 20th day of December, 2022.

      /s/ Lance E. Walker
      UNITED STATES DISTRICT JUDGE