UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LOBSTER 207, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:19-cv-00552-LEW |
| | ) | |
| WARREN B. PETTEGROW, et al., | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON MOTION TO SUPPLEMENT THE RECORD,
ORDER ON REQUEST TO HOLD AND ANSWER,
AND RECOMMENDED DECISION AFTER DISCLOSURE HEARING[1]**

Plaintiff, a lobster wholesaler, alleges Defendants, who consist of Warren Pettegrow, his parents, and two affiliated business entities, diverted Plaintiff's profits through several self-dealing schemes.  (Amended Complaint, ECF No. 184.)  After confirming an arbitration award in favor of Plaintiff and against Defendant Warren Pettegrow (hereinafter "Defendant"), the Court entered judgment in the amount of $1,020,000 on Plaintiff's breach of fiduciary duty and breach of contract claims. (Judgment, ECF No. 278.)  As part of Plaintiff's effort to enforce the judgment, Plaintiff initiated a disclosure hearing in accordance with Maine law, which is incorporated into this proceeding through Federal Rule of Civil Procedure 69.

---

[1] Pursuant to 28 U.S.C. § 636, a Magistrate Judge may enter orders on certain pretrial matters.  Because the enforcement of a money judgment is a postjudgment matter, a recommended decision is appropriate as to the disposition of Defendant Warren Pettegrow's property.  *See e.g., Helfman v. GE Grp. Life Assur. Co.*, No. 2:06-cv-13528, 2011 WL 1457740, at *1 n.1 (Mar. 15, 2011).  The motion to supplement the record and the request for authorization to direct third parties to hold and answer are analogous to pretrial matters on which magistrate judges issue orders subject to objection and review by a district judge.

Following a multi-day evidentiary hearing, Plaintiff moved to introduce additional evidence.  (Motion to Supplement the Record, ECF No. 443).  Plaintiff also seeks: (1) authorization to command third parties to hold and answer as to the assets of Defendant that are reasonably likely to be in their possession or control, and (2) an order requiring Defendant to turn over certain assets in satisfaction of the judgment and turn over other assets for sale.  (Motion for Relief, ECF No. 450.)

After consideration of the record and the parties' arguments, I grant the motion to supplement the record, I authorize Plaintiff to serve several third parties with a command to hold and answer, and I recommend the Court order Defendant to turn over certain funds to Plaintiff and to turn over other assets for sale.

## PROCEDURAL AND LEGAL BACKGROUND

As part of his response to Plaintiff's complaint, Defendant asked the Court to order the parties to litigate Plaintiff's contract and fiduciary duty claims in arbitration pursuant to the terms of the Defendant's employment agreement with Plaintiff; the Court granted the motion.  (Motion to Compel Arbitration, ECF No. 44; Order, ECF No. 72.)  An arbitrator found in favor of Plaintiff and against Defendant and awarded $1,021,000 in damages.  (Arbitration Decision, ECF No. 242-4.)  The Court confirmed the arbitration award and entered judgment on the two relevant claims.  (Order Concerning Arbitration Award, ECF No. 269; Judgment, ECF No. 278.)  During the pendency of this case, the Court has dismissed some of Plaintiff's other claims and resolved certain issues at summary judgment; other claims await trial.

Plaintiff subsequently obtained from the court a writ of execution on the judgment. (Writ of Execution, ECF No. 290.)  A writ of execution is the traditional and standard method of enforcing a money judgment.  *See* Fed. R. Civ. P. 69(a)(1).  It "is the formal document issued by a court that authorizes a [law enforcement] officer to levy upon the property of a judgment debtor and sell such property to satisfy a judgment debtor's debt." 30 Am. Jur. 2d Executions § 61; see also, 14 M.R.S.A. §§ 4651 et seq (general provisions on writs of execution and execution liens).  "The levy of a writ of execution . . . is the process whereby a [law enforcement] official . . . seizes or brings within his or her control a judgment debtor's property for the purposes of satisfying a judgment."  *Id.* § 167; *see also*, *Equity Portfolio, LLC, Ltd. v. Schriever*, 2002 ME 104, ¶ 2, 799 A.2d 1236, 1237 ("a writ of execution . . . permits the county sheriff to seize and sell the debtor's property"); 14 M.R.S.A. §§ 4751 (provisions governing officers' sales of nonexempt property).

Pursuant to Federal Rule of Civil Procedure 69, "[t]he procedure on execution— and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69(a)(1); *see also*, *Whitfield v. Municipality Of Fajardo*, 564 F.3d 40, 43 (1st Cir. 2009) ("Under this rule, state law governs not only the parties' substantive rights but also the procedure to be followed").  The rule also allows for discovery in aid of the judgment or execution using either the federal discovery rules or according to "the procedure of the state where the court is located."  Fed. R. Civ. P. 69(a)(2).

In addition to the traditional collection method of execution and levy, many states have enacted statutes providing for additional postjudgment procedures with various titles, including "supplementary proceedings," "special proceedings," "turnover proceedings," and "citation proceedings."   30 Am. Jur. 2d Executions § 463.  The state statutes are generally designed to provide an inquiry into the judgment debtor's ability to pay and to provide a means of reaching certain assets or property which may be "beyond the reach of ordinary execution."  *Id.* § 469; *see also*, 14 M.R.S.A § 3120 ("The purpose of this chapter is to provide an efficient procedure for the enforcement of money judgments.  It is not an exclusive procedure and may be utilized with any other available procedure").

Under Maine's alternative judgment enforcement statute, a judgment creditor is authorized to serve a disclosure subpoena, 14 M.R.S.A. §§ 3122, 3123, for a disclosure hearing to determine the judgment debtor's ability to pay, *id.* § 3125(1).  Following the hearing, a court can issue an order or a combination of orders requiring the judgment debtor to pay installments, *id.* § 3126, turn over nonexempt property, *id.* § 3131(1), turn over nonexempt property for sale, *id.* § 3131(2), or create a lien on certain nonexempt property, *id.* § 3132.  A court can also order a third-party to garnish the judgment debtor's wages, *id.* § 3127-B, or turn over and sell property in the third party's control in which property the judgment debtor has an interest, *id.* § 3127-A.

Plaintiff requested a disclosure hearing pursuant to Maine law, (Letter, ECF No. 323; Disclosure Subpoenas, ECF Nos. 325), and Plaintiff filed a motion for an order requiring a bank to turn over certain funds.  (Motion to Enforce Writ of Execution, ECF No. 330.)  Defendant argued that the Court must hold a disclosure hearing before issuing a

turnover order under Maine law and that Florida's law governed which property is exempt from execution because Defendant was now a resident of Florida. (Response to Motion to Enforce Writ of Execution, ECF No. 348.)

In connection with the disclosure hearing and in accordance with the governing statute, Plaintiff served witness subpoenas on Defendants Anthony and Josette Pettegrow to testify at the hearing. Anthony and Josette Pettegrow sought to quash the subpoenas. (Motion to Quash, ECF No. 351.) Because Plaintiff had not yet served Defendant with a disclosure subpoena, Plaintiff withdrew the witness subpoenas and requested a continuance of the disclosure hearing. (Response to Motion to Quash, ECF No. 356; Order, ECF No. 360.) Plaintiff made numerous unsuccessful attempts to serve a disclosure subpoena on Defendant at his Maine address and at a suspected Florida address. Plaintiff then filed a motion to serve the disclosure subpoena by means other than in-hand. (Motion for Leave to Serve Disclosure Subpoena by Alternate Means, ECF No. 373.) Plaintiff later served Defendant's spouse, Monica Pettegrow, at the Florida address and the motion for alternative service became moot. (Disclosure Subpoena, ECF No. 386; Order, ECF No. 406.)

Defendant filed a motion to quash the disclosure subpoena, arguing that because the subpoena commanded him to appear at a hearing in Bangor, Maine, it did not comply with the geographical limitations of Federal Rule of Civil Procedure 45, the rule that governs the issuance of subpoenas. (Motion to Quash, ECF No. 375.) Defendant asserted that "[as] a result of non-compete clauses in my prior employment contract with L207 and the commencement of this litigation, I was unable to work in the lobster industry in the State

of Maine, and I therefore relocated to Florida in or about August of 2021." (Affidavit ¶ 2, ECF No. 375-1.) Defendant claimed to be "currently a resident of Florida and work in Florida," and "[a]lthough I continue to own passive interests in real estate in Maine, I do not regularly conduct business in the State of Maine," and "have not visited the State of Maine since August of 2021." (*Id.* ¶¶ 3, 6.)

Defendant subsequently moved to appear for the disclosure hearing remotely by videoconference or for the Court to transfer the proceeding to the Southern District of Florida. (Motion to Appear Specially or to Transfer Proceeding, ECF No. 399.) Defendant argued that "[i]t is a hardship . . . to appear in person in Maine, as it requires him to take time off work, arrange for childcare, and fly to Maine," and that the enforcement proceedings belonged in Florida, as reflected by the fact that Plaintiff had initiated a proceeding there to obtain writs of garnishment against banks in Florida. (*Id.* at 1, 3, 8.) Plaintiff opposed the motion. Plaintiff was concerned that if Defendant were to appear remotely, Plaintiff would be unable to review and use effectively the documents Defendant was required to produce at the disclosure hearing. (Response to Motion to Appear Specially or Transfer Proceeding, ECF No. 400.)

At a hearing on the motions, the parties agreed (1) to use postjudgment discovery to alleviate some of the concerns about document production and use during the hearing and (2) that Defendant could appear for the disclosure hearing by videoconference. (*See* Motion Hearing, ECF No. 405; Procedural Order, ECF No. 406.) Defendant agreed to waive any challenge he might have to the Court's personal jurisdiction over him for the proceeding and any argument he might have to the Court's authority to order the turn-over

or sale of any of his assets located in Maine.  (*Id*.)  Defendant preserved his right to challenge the Court's authority to issue enforcement orders as to his assets in Florida.  (*Id*.)

As the date of the disclosure hearing neared, the parties disagreed as to the proper scope of the disclosure hearing.  (Conference of Counsel, ECF No. 413; Procedural Order, ECF No. 414.)  Defendants argued that Plaintiff should not be permitted to inquire into the assets maintained or transferred by any business entity in which Defendant had an interest.  (Memoranda, ECF Nos. 419, 421.)  Plaintiff asserted that inquiry into the assets of Defendant's business entities was probative of Defendant's ability to satisfy the judgment, especially if the evidence revealed evidence of fraudulent conveyances.  (Memorandum, ECF No. 420.)  Consistent with the prior procedural order, (ECF No. 406), I permitted inquiry into the assets of Defendant's business entities but reserved final ruling, until after the hearing and post-hearing briefing, on the availability of the entities' assets to satisfy the judgment and on Plaintiff's ability to void a fraudulent transfer in this proceeding.

Defendant appeared by videoconference for a disclosure hearing over two days.[2] (Disclosure Hearing, ECF Nos. 426, 436; Transcript Vol. I at 16–33, ECF No. 439; Transcript Vol. II at 6–166, ECF No. 440.)  Plaintiff also called as witnesses Defendant's accountant, (Transcript Vol. I at 9–16), and Josette Pettegrow.  (*Id*. at 33–52.)  Following the hearing, the Court established deadlines for the parties to clarify their remaining

---

[2] The first day of the hearing ended earlier than anticipated due to technical difficulties with the remote audio connection.

objections, to submit additional evidence for the Court's consideration, and to file written arguments. (Transcript Vol II at 180–89; Procedural Order, ECF No. 437.)

### REMAINING OBJECTIONS AND MOTION TO SUPPLEMENT THE RECORD

During the hearing, Defendant objected to many exhibits on relevance and foundation grounds. I admitted the evidence while preserving Defendant's ability to argue in writing at the conclusion of the hearing that certain evidence is irrelevant under the Maine disclosure statute. (Transcript Vol. II at 180–182.)

I also acknowledged that Defendant had concerns as to the foundation for some exhibits and initially expressed an inclination to seek to exclude certain evidence, such as a Pettegrow family ledger, unless Plaintiff could establish a sufficient foundation for the exhibits. *Id.* at 81–84, 181. Because the documents were evidently produced by Defendant's accountant, and because for purposes of efficiency and time management, the accountant described the documents generally or as a group, and because the parties did not have the opportunity to review all the documents as presented by the accountant at the hearing, I allowed the parties to address any foundation arguments in their post-hearing briefing with the understanding that if I concluded that there were foundation issues as to certain documents, Plaintiff would be permitted to recall witnesses at a later date to attempt to establish a proper foundation. (*Id.* at 181, 183–85.)

Defendant withdrew his objections to eighteen exhibits but did not waive or abandon his other objections as to thirteen other exhibits. (Notice, ECF No. 444; Response to Motion for Relief at 3–5, ECF No. 456.) Defendant, however, did not cite any evidence that questioned the authenticity of the individual documents for which he maintained his

8

objection.  Instead, Defendant argues generally that Plaintiff failed to establish that the documents are within the business records hearsay exception.  A review of the testimony and the disputed exhibits reveals that the exhibits are business records, public documents, or not hearsay because they were not offered for the truth of the matter asserted but for another purpose, such as showing knowledge or motive for other actions.  Furthermore, I am persuaded that it is inappropriate to countenance repeated general foundation and hearsay objections in the context of a postjudgment hearing that is designed to be a summary proceeding and in which the judgment debtor, on penalty of contempt, has the affirmative burden to disclose his assets and produce for the Court's consideration records probative of his ability to pay. The summary process, which provides for the production of documents at the hearing, does not appear to require that a judgment creditor, reviewing for the first time financial documents that a judgment debtor possessed, establish the foundation for the documents.  For instance, a judgment debtor would not know whom to call as witnesses to establish the foundation.

Given that (1) Defendant repeatedly stated that he relied on his spouse and on his accountant to maintain his business records and prepare his financial and tax filings, (2) the accountant testified that the exhibits were derived from those business and tax records, (3) the record lacks any evidence to suggest that the documents are not what they purport to be, (4) there are no evident hearsay issues for at least some of the documents, and (5) the value and transfers of Defendant's business entities are relevant within the broad standards applicable to disclosure hearings and subsequent orders, *see infra*, I overrule Defendant's objections to the remaining disputed exhibits.

Plaintiff seeks to admit into evidence a title abstract showing that a business entity that employs Defendant and is owned by his spouse purchased a yacht after the Court entered judgment in favor of Plaintiff.  (Motion to Supplement the Record, ECF No. 443.) Because the Court's procedural order expressly provided an opportunity for parties to submit additional evidence, because Plaintiff filed the motion before the relevant deadline in the procedural order, and for the reasons discussed regarding other public records to which Defendant objected, I will admit the exhibit.

Plaintiff submitted several exhibits with its motion for relief: an email from defense counsel, a UCC filing statement from a judgment lien, and copies of Plaintiff's efforts to record the judgment in various Maine county registers, (ECF Nos. 450-1, 450-2, 450-3). Plaintiff also referred to the previously filed transcript of Defendant's postjudgment deposition. (Deposition, ECF No 411-4.)  Defendant characterizes the filings as untimely requests to supplement the record.  Given that many of the documents are publicly recorded documents of which the Court could take judicial notice and given that the deposition was previously filed and consists of Defendant's own statements,[3] Defendant cannot reasonably claim unfair surprise or prejudice particularly considering the narrow purposes for which Plaintiff referred to the documents.  I overrule Defendant's objection to the Plaintiff's reliance on and the Court's consideration of the documents and deposition testimony.

---

[3] The transcript was previously filed in the case. The prior conferences and the Court's procedural order placed Defendant on notice that the transcript might be relevant to and cited in connection with Plaintiff's request for postjudgment relief.  (*See, e.g.*, Procedural Order ¶ 3, ECF No. 406.) The deposition transcript was originally filed under seal in connection with a discovery dispute, but because Plaintiff now offers it as an exhibit, the document will be unsealed.

**FINDINGS OF FACT**

I find and propose the Court find in connection the recommended decision the following facts:

1.  Defendant is the sole owner of Poseidon Charters, Inc.  Poseidon Charters has a 48-foot smackboat, the *Poseidon*, freezers, a loan payable by Acadia Sea Farms in the approximate amount of $150,000, and a loan payable by Allie Cat, LLC, in the approximate amount of $1,100.

2.  Defendant is the sole owner of Acadia Sea Farms, Inc.  Acadia Sea Farms owns a boat trailer, a 22-foot Boston Whaler, a 30-foot Slayer Skiff, oyster equipment, rights to 10% profits from an oyster farm, and a loan payable by Allie Cat, LLC, of approximately $75,000.

3.  Defendant has a 10% ownership interest in Winter Harbor Marine, Inc., a 1% interest in Anchor Avenue, LLC, and a 33% ownership interest in Pettegrow Properties, LLC.  Pettegrow Properties is the lessor of property that generates approximately $60,000 in revenue annually.

4.  Defendant formed Allie Cat, LLC in April 2019, just after his employment with Plaintiff was being terminated and litigation with Plaintiff became likely.  In May 2019, Poseidon Charters sold a 37-foot Freeman Boatworks catamaran named *Alliecat* to Allie Cat, LLC for $1.  In June 2019, Defendant's spouse replaced him as the sole member of Allie Cat, LLC.

5.  Defendant was a long-time Maine resident before and at the start of this case, but Defendant testified that he moved to Florida in August 2021.  He now lives in a Florida home owned by his parents.

6.  Defendant asserted that he stopped earning income from his solely owned companies and from his parents' business around August 2021.  Defendant or his solely owned companies received more than $300,000 in revenue in 2021.

7.  Since August 2021, Allie Cat, LLC employs Defendant as the captain of the *Alliecat*.  Defendant recently began receiving income from Allie Cat, LLC, and expects to earn approximately $150 per charter.  Defendant expects to conduct an average of ten charters per month.

8.  Defendant is the beneficiary of a family trust that can make distributions for Defendant's health, education, maintenance, and support.  Defendant testified that he has not received disbursements from the trust and is financially reliant on his wife's income.

9.  Defendant sold an F-250 truck and an F-350 truck owned by him or his companies and turned over approximately $80,000 in proceeds to his attorney as a retainer in or around August 2022.

10. Defendant is the sole owner of undeveloped property in Tomhegan Township in Somerset County, Maine.

11. Defendant has a 25% ownership interest in real property in Wesley, Maine.

12. Defendant owns or has interest in multiple financial accounts.  The accounts include:  a  health  savings  account  at  Bar  Harbor  Bank  &  Trust  with  an

approximate value of $45,000; a Fidelity brokerage account with Means Investing with an approximate value of $21,000 (5245);[4] a Royal Alliance brokerage account with an approximate value of $525 (2284); a certificate of deposit at TD Bank with an approximate value of $17,500 (5615); a checking account at TD Bank with an approximate value of $650; a Bar Harbor Bank & Trust Account (3227); a savings account at Bar Harbor Bank & Trust with an approximate value of $315 (3434) in which Defendant has at least a one-half interest; Bar Harbor Bank & Trust Account (5678); a checking account with Bar Harbor Bank & Trust (1537) with an approximate value of $4,200, in which Defendant has at least a one-half interest; a savings account with Bangor Savings Bank (7122) with an approximate value of $4,200, in which Defendant has at least a one-half interest; a savings account with Bar Harbor Bank & Trust (2479) with an approximate value of $250, in which Defendant has at least a one-half interest; a savings account with Bar Harbor Bank & Trust (2495) with an approximate value of $695, in which Defendant has at least a one-half interest; a First Horizon Bank Account (8895) with an approximate value of $590, in which Defendant has at least a one-half interest.

13. Defendant owns six retirement accounts (five IRA accounts and one 401K account) with a total value of approximately $275,000.

---

[4] The parenthetical references are to the last four digits of the account numbers.

14. Defendant owns three motor vehicles: a 2017 Jeep Rubicon Wrangler; a 1998

   Harley Davidson motorcycle; and a 2018 Polaris 4 x 4 side by side.

15. Defendant owns fishing tackle, five firearms, a watch, and a gun safe.

## DISCUSSION

Defendant raises several challenges and objections to the scope of postjudgment proceedings based on jurisdictional principles. To satisfy the requirements of due process, "[a] court must have jurisdiction not only over the subject matter of the suit, but also over the person or property to whom or which the court's [ruling] will extend." *FleetBoston Fin. Corp. v. FleetBostonFinancial.com*, 138 F. Supp. 2d 121, 129 (D. Mass. 2001); *see also*, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999); *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 453 (2004).

With Defendant's challenges, before determining which, if any, postjudgment enforcement orders are appropriate, the Court must first determine (1) whether the Court has territorial jurisdiction (either *in personam* or *in rem*) to issue the orders Plaintiff requests, (2) whether the federal rules and the Maine statute intersect in a way that prevents Plaintiff from accessing in this forum Defendant's assets located outside Maine,[5] and (3)

---

[5] As described above, Defendant has argued that, because Maine supplementary proceedings are initiated by the service of a "disclosure subpoena" on the judgment debtor, Defendant could not be commanded to appear in the District of Maine under Federal Rules of Civil Procedure 69 and 45. (Motion to Quash, ECF No. 375; Motion to Appear Specially or to Transfer Proceeding, ECF No. 399). After being served with the disclosure subpoena, Defendant consented to appear at the disclosure hearing while reserving his objections to any consideration of his property located in Florida. Defendant did not dispute that this Court had the authority to dispose of his property located in Maine, which is consistent with the principles of *in rem* jurisdiction. Defendant did not explicitly reiterate in his latest filings all his previous arguments or authority regarding Rule 45 and the service of a subpoena on a person who moved out of state during the pendency of the case. Defendant did argue, however, that if Plaintiff refused to withdraw its requests for relief as to property located outside of Maine, it would negate Defendant's consent and raise again all of

whether the Court in a disclosure hearing may consider Plaintiff's alter ego, reverse veil piercing, or fraudulent transfer claims or arguments.

## A.     Jurisdiction over Defendant

Defendant consented to his appearance at the disclosure hearing because he conceded that the Court has the authority to issue orders regarding property located in Maine.  Defendant continues to object, however, to any order directed to property located outside Maine, such as Defendant's assets in Florida.  Plaintiff maintains that under the state statute and according to federal jurisdictional principles, the Court can issue an order that impacts property located outside Maine.

Courts have long recognized that their authority is generally constrained by the "territorial limits of the sovereign" that creates them, but that principle "cashed out differently based on the object of the court's attention."  *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2033-34 (2023).  "An action *in rem* . . . could be brought only in the jurisdiction where the property was located," while "an *in personam* suit" could be brought where "the defendant could be found," *id.* at 2034, which meant that "a person could not be subjected to the jurisdiction of a court unless [the person] actually was served with process within a

---

Defendant's "jurisdictional questions" about the Court's ability to hold "*any* disclosure proceeding." (Response at 3 (emphasis in original).)  Defendant requested further briefing on those issues.  (*Id.* at 3.)  Given Defendant's assertion and because Defendant has previously cited Rules 69 and 45 in support of his "jurisdictional" objections to the disclosure proceeding, I have considered Defendant's objections and address them herein.  In other words, as recently discussed with the parties, I considered the parties to have reserved the opportunity to present their previous arguments or new arguments about the Court's authority to address certain property within their briefs following the disclosure hearing.  (Conference of Counsel, ECF No. 492.)  I do not believe further briefing is necessary as the parties have had adequate opportunity to present their arguments here and through the series of prior filings and conferences.

court's territory or consented to the court's jurisdiction." Wright & Miller, 4 Fed. Prac. & Proc. Civ. § 1064.

After the landmark case of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), the Supreme Court recognized a more expansive constitutional limit on courts' territorial authority based on a person's "contacts" with the forum state, which has generated "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). If the contacts of a person or entity are so continuous and systematic that they are "essentially at home in the forum state," general jurisdiction permits the forum's courts to hear all claims against that person or entity without violating the Due Process Clause. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). If a person or entity has minimum contacts with the forum, the Due Process Clause allows a court to exercise specific personal jurisdiction over that person to the extent that the events which generate a suit "arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017) (internal modification omitted).

Defendant's argument regarding Plaintiff's property located outside Maine is only pertinent to the extent that it addresses the limits of *in rem* jurisdiction. In this case, regardless of whether the Court has *in rem* jurisdiction, the Court plainly has personal jurisdiction over Defendant. Because the contracts were formed in and the conduct resulting in the judgment occurred in Maine, at a minimum, the Court has specific personal jurisdiction over Defendant. Furthermore, because Defendant was domiciled in Maine for

years prior to the commencement of the underlying claim, during the arbitration hearing, and in the month the arbitration decision was issued, the Court also has general personal jurisdiction over Defendant.  *See Noonan v. Winston Co.*, 135 F.3d 85, 95 (1st Cir. 1998) ("the central fact remains that the time the complaint is filed is the time at which the plaintiff urges the court to assert its authority over the defendant"); *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) ("Minimum contacts must exist either at the time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit"); *Tenefrancia v. Robinson Exp. & Imp. Corp.*, 921 F.2d 556, 558 (4th Cir. 1990) (noting that courts have rejected the conclusion that a defendant can thwart personal jurisdiction by withdrawing from a state after a cause of action arose).

The law distinguishes between the ability of a court to exert direct authority over property located beyond the sovereign's borders and the ability of a court to indirectly impact the disposition of property located beyond the sovereign's borders by exerting authority over a person who possesses the right to control the extraterritorial property.  *See* Restatement (Second) of Conflict of Laws § 53 (1971) ("A state has power to exercise judicial jurisdiction to order a person, who is subject to its judicial jurisdiction, to do an act, or to refrain from doing an act, in another state"); S. Nathan Park, *Equity Extraterritoriality*, 28 Duke J. Comp. & Int'l L. 99, 113–17 (2017) (discussing cases going back to *Pennoyer v. Neff*, 95 U.S. 714, 723 (1877), and older English cases).  Plaintiff's request for installment payments or a turnover order of Defendant's Florida property would represent an example of the latter type of judicial action.

The traditional method of levy of execution is territorially bounded, which is why judgment creditors are permitted to register judgments in the courts of other states and obtain writs of execution for property in other states. *See* 28 U.S.C. § 1963; Restatement (Second) of Judgments Ch. 2 Intro. Note (1982) (noting that execution is effectuated by executive officials acting within a specific territorial reach).  When considering alternative postjudgment enforcement statutes lacking a textual territorial limitation on the scope of turnover orders, however, courts have rejected the argument that enforcing courts with personal jurisdiction over a judgment debtor can only issue orders concerning the judgment's debtor's property located within the borders of the forum state. *See Gagan v. Monroe*, 269 F.3d 871, 874, 877 (7th Cir. 2001) (noting that the Northern District of Indiana could not employ levy of execution against property located outside of Indiana but approving of a turnover order of the Arizona resident's property located in Arizona because "[t]he court had jurisdiction over [the judgment debtor] and unquestionably had the authority to enter such an order against him" under Indiana's supplementary proceeding law); *DiAthegen, LLC v. Phyton Biotech, Inc.*, No. A-12-CV-1146-LY, 2013 WL 12116146, at *2 (W.D. Tex. Sept. 11, 2013) ("Assets of a judgment debtor that are located in whole or in part outside of the state of Texas, including property in foreign countries, are properly subject to turnover"); *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 539, 911 N.E.2d 825, 829 (2009) (noting that attachment suits are based on *in rem* jurisdiction and therefore cannot proceed against property outside the state, but courts can order a person to turn over money or property in another state or country because it is "well established that having acquired jurisdiction of the person, the court can compel observance

18

of its decrees by proceedings *in personam* against the owner within the jurisdiction"). The Maine statute does not pose a bar to an order directing a judgment debtor to turn over the debtor's property outside the state provided the Court has personal jurisdiction over the judgment debtor.

Defendant essentially contends the Court lacks personal jurisdiction over him because a supplementary proceeding in Maine constitutes an entirely new, separate case. Defendant, however, cites no cases directly supporting the argument. While courts, depending on the context, have reached different conclusions as to whether a supplementary proceeding is distinct from the underlying proceeding,[6] the weight of authority in this context is contrary to Defendant's argument, at least as it relates to similar state statutes and personal jurisdiction during supplementary proceedings within the court that issued the judgment. *See Mem'l Hosp. of Martinsville v. D'Oro*, No. 4:10MC00001, 2011 WL 2679593, at *2 (W.D. Va. July 8, 2011) (noting that "[m]any states consider garnishment proceedings to be an ancillary event within the same action out of which the judgment arose" and that even though Virginia law considers garnishment to be "a separate proceeding entirely," the two types of proceedings are "so closely related that, having established personal jurisdiction over the debtor for the purposes of the judgment, there is no need to re-establish personal jurisdiction for the purposes of enforcement"); *Est. of*

---

[6] *Compare Bank Markazi v. Peterson*, 578 U.S. 212, 232–33 (2016) ("the judgment-execution claims brought pursuant to Federal Rule of Civil Procedure 69 were not independent of the original actions for damages") *with U.S.I. Properties Corp. v. M.D. Const. Co.*, 230 F.3d 489, 500 n.10 (1st Cir. 2000) (noting in the context of cases analyzing subject matter jurisdiction in supplementary proceedings that "[t]he simple fact that the supplemental proceeding is brought as part of the same case does not relieve the court from independent consideration of its authority to address the specific claims").

*Bremer v. Walker*, 187 Wash. App. 450, 456, 348 P.3d 1245, 1248 (2015) ("the trial court retains personal jurisdiction over the parties to that action for purposes of those supplemental proceedings"); *Bank Ctr. First v. Kostelecky*, 2000 ND 84, ¶ 3, 609 N.W.2d 721, 721 (reasoning that "service of post-judgment discovery documents under N.D.R.Civ.P. 69 does not begin a new action, but instead is a continuation of the original action on a judgment" and holding that "the trial court gained personal jurisdiction over [the judgment debtor] through the proper service of the summons and complaint and did not lose its jurisdiction over him when the judgment was entered"); *Elkhart Co-op. Equity Exch. v. Hicks*, 16 Kan. App. 2d 336, 339, 823 P.2d 223, 225 (1991) (holding that "a hearing in aid of execution of a judgment is not a new and separate proceeding, but merely a continuation of the underlying action" and that "forcing a judgment creditor to reestablish jurisdiction over the judgment debtor before the debtor's examination would accomplish nothing and waste valuable judicial resources" as long as the notice provided was sufficient); Restatement (Second) of Conflict of Laws § 26 (1971) ("If a state obtains judicial jurisdiction over a party to an action, the jurisdiction continues throughout all subsequent proceedings which arise out of the original cause of action. Reasonable notice and reasonable opportunity to be heard must be given the party at each new step in the proceeding"); *see also, Wayman v. Southard*, 23 U.S. 1, 23, 6 L. Ed. 253 (1825) ("The jurisdiction of a Court is not exhausted by the rendition of its judgment, but continues until that judgment shall be satisfied").

**B.**     **Maine's Disclosure Statute and Federal Rule 45**

Defendant, based on Federal Rule of Civil Procedure 45, evidently maintains his previously asserted challenge to the Court's ability to hold a disclosure hearing in Maine while considering or addressing his property in Florida after he became a Florida resident. Rule 45 specifies that a subpoena may only command "a person to attend trial, hearing, or deposition" (A) "within 100 miles of where the person resides, is employed, or regularly transacts business in person," or (B) "within the state where the person resides, is employed or regularly transacts business" if the person is a party or an individual attending a trial who would not incur substantial expense. Fed. R. Civ. P. 45(c)(1). Defendant argued that Plaintiff could not use a disclosure subpoena pursuant to the Maine statute to command Defendant to appear at a disclosure hearing in the District of Maine because the other Federal Rules of Civil Procedure should be considered federal statutes for purposes of Rule 69, which instructs federal district courts to apply state rules in supplementary proceedings but specifies that "a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a)(1); (Motion to Quash, ECF No. 375; Motion to Appear Specially or to Transfer Proceeding, ECF No. 399).

The Tenth Circuit and the Second Circuit have concluded that the other Federal Rules of Civil Procedure are within the "federal statute" exception of Rule 69(a)(1), *see Oklahoma Radio Assocs. v. F.D.I.C.*, 969 F.2d 940, 942 (10th Cir. 1992) ("Because the Federal Rules of Civil Procedure have the force and effect of a federal statute, those rules, rather than Oklahoma law, will govern service of the motion for a deficiency judgment"); *Schneider v. Nat'l R.R. Passenger Corp.*, 72 F.3d 17, 19 (2d Cir. 1995) ("This term includes

21

the Federal Rules of Civil Procedure, since they have the force and effect of federal statutes"), but the Sixth Circuit has held that they do not.  *See Apostolic Pentecostal Church v. Colbert*, 169 F.3d 409, 414 (6th Cir. 1999) (reasoning that "the Federal Rules are not a statute" and noting that it would risk "render[ing] Rule 69(a) meaningless" if every federal procedural rule overrode state rules).  The Ninth Circuit teaches that the other federal rules generally should be regarded as federal statutes within the meaning of Rule 69(a), *Off. Depot Inc. v. Zuccarini*, 596 F.3d 696, 701 (9th Cir. 2010), but generalized federal rules not specifically addressing judgment enforcement do not necessarily supplant state rules that specifically concern enforcement of judgments.  *See Hilao v. Est. of Marcos*, 95 F.3d 848, 853 (9th Cir. 1996).  The Seventh Circuit has likewise recognized that a federal rule of civil procedure controls when it is strictly relevant, but the Seventh Circuit interprets "this general principle narrowly" to mean only the rules specifically aimed at execution control in supplementary proceedings, rather than all the federal rules of procedure.  *Kelley v. Stevanovich*, 40 F.4th 779, 786 (7th Cir. 2022).

Courts have also recognized that the choice of law approach within Rule 69(a) demands some degree of flexibility and latitude.  *See Yazoo & M.V.R. Co. v. City of Clarksdale*, 257 U.S. 10, 24–25 (1921) (recognizing "the necessity for some play in adapting the state procedure to the practice of the federal courts"); *Duchek v. Jacobi*, 646 F.2d 415, 418 (9th Cir. 1981) (explaining that "[t]he principal error in [the defendant's] argument is the assumption that state law must be applied in a hypertechnical manner in rule 69(a) proceedings" and rejecting "literalism" that would interfere with the purposes of the rules).  As one prominent jurist explained:

22

> [A]pplying every jot and tittle of [state] procedural law and applying every jot and tittle of federal procedural law are not the only alternatives. We are dealing with supplementary proceedings; and while for some purposes, such as appealability, they are fruitfully analogized to regular civil proceedings, the analogy becomes strained when procedure at the trial level is in issue. Proceedings to enforce judgments are meant to be swift, cheap, informal. We do not think the draftsmen of Rule 69 meant to put the judge into a procedural straitjacket, whether of state or federal origin.

*Resol. Tr. Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993) (Posner, J.) (internal citations omitted).

The Sixth Circuit's textual reasoning is persuasive,[7] as is the Seventh Circuit's argument for a somewhat flexible, purposive approach to deciding which federal rules apply through Rule 69(a)(1) because most of the federal rules of procedure are not directed at or "strictly applicable" to postjudgment supplementary proceedings. *Id.* at 1227; *see also*, Fed. R. Civ. P. 1. Although some courts have accepted Defendant's argument regarding the territorial limits of Rule 45 within supplementary proceedings where the state laws involve subpoenas, *see Sabol v. Brooks*, 469 F. Supp. 2d 324, 327 (D. Md. 2006), the cases to the contrary are more persuasive. *See Textile Banking Co. v. Rentschler*, 657 F.2d 844, 851 (7th Cir. 1981) (holding that Rule 45 "is inapplicable" and "does not displace" the service rules in the Illinois supplementary proceeding citation statute); *H & S Realty Co. v. Donoghoe*, 765 F. Supp. 24, 26 (D. Me. 1991) (acknowledging some doubt on the

---

[7] The First Circuit does not appear to have considered the extent to which the phrase "federal statute" includes the Federal Rules of Civil Procedure, but the First Circuit has endorsed a degree of flexibility in the similar context of deciding which state rules should be imported to federal district court supplementary proceedings through Rule 69(a)(1). *See Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576, 582 (1st Cir. 1995) ("a district court must apply only those provisions of state law which specifically govern the enforcement of judgments" and need not incorporate general rules that might arise within supplementary proceedings in state court).

issue but rejecting the argument that Rule 45 or Rule 4 limit the Court's authority under the Maine disclosure hearing statute).

Defendant's reliance on the limitations of Rule 45 is also misplaced when one examines the Maine disclosure statute. The Maine statute plainly distinguishes between the service of the disclosure subpoena and a witness subpoena. *See* 14 M.R.S. § 3122. The disclosure proceeding is initiated by the service of a disclosure subpoena on a judgment debtor. As evidenced by Plaintiff's first attempt to conduct a disclosure hearing in this case, the matter cannot practically proceed without service on the judgment debtor even if witness subpoenas have been served. In this way, the service of the disclosure subpoena upon the debtor is more akin to the service of a summons. If a federal rule were to apply, the applicable rule or rules would likely be the those that govern service of process. *See e.g.*, *Meyer v. ERJ, Inc.*, No. 96 C 0143, 2000 WL 521481, at *1 (N.D. Ill. Apr. 5, 2000) ("The familiar rules of deposition discovery do not apply here, for a citation to discover assets is more akin to a summons than a deposition subpoena"); *Apostolic Pentecostal Church v. Colbert*, 169 F.3d 409, 414 (6th Cir. 1999) (discussing interaction of Rule 69 and service of process rules); *Hilao v. Est. of Marcos*, 95 F.3d 848, 852 (9th Cir. 1996) (same); *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 851 (7th Cir. 1981) (same). If Rule 45 were to apply simply because the Maine legislature chose to describe its initial pleading in an enforcement action as a "subpoena," a judgment creditor over whom a court has personal jurisdiction in an ongoing case in which the relevant judgment was entered, could leave the jurisdiction and avoid accounting to the court that entered the judgment.

Because the Court has personal jurisdiction over Defendant and because the Court has the authority to compel Defendant to appear at the disclosure hearing, the Court overrules Defendant's objection to the Court's ability to include Defendant's Florida assets in any enforcement order the Court issues.[8]

## C.   Consideration of Alter Ego and Fraudulent Transfer Claims

Defendant contends the Court lacks subject matter jurisdiction over reverse veil piercing, alter ego, and fraudulent transfer claims within a supplementary proceeding, and Defendant argues that Maine's disclosure statute does not authorize the Court to consider those claims.

"Federal courts are courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute . . . ."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  For that reason, there must be "subject matter jurisdiction over every claim" considered in federal court.  *Curtis v. GreenPoint Mortg. Funding, Inc.*, 661 F. Supp. 2d 65, 67 (D. Mass. 2009); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996).  The most common bases for subject matter jurisdiction are federal

---

[8] Defendant initially argued that the parties' agreement as reflected in the Court's prehearing procedural order limited Plaintiff to Defendant's Maine assets. (Response at 3; Sur-Reply at 2, ECF No. 480.)  In a recent hearing, Defendant withdrew the argument but maintained his underlying argument that the Court did not have the jurisdiction to take any action regarding the assets that Defendant contends are Florida assets. (Conference of Counsel, ECF No. 492.)  Whether Plaintiff could access what Defendant maintains are Florida assets has been a contested issue throughout the proceedings and one that the parties had reserved for argument after the disclosure hearing and is an issue I address herein.  *See, e.g.*, Hearing Transcript Vol. II at 180 (contemplating briefs in which the parties would, among other things, make arguments about what relief the creditor is entitled to pursue or is prohibited from pursuing); Transcript of Motion Hearing, ECF No. 491.)

question jurisdiction, *see* 28 U.S.C. § 1331, and diversity of citizenship jurisdiction, *see id.* § 1332.

Supplemental jurisdiction also provides a federal court with discretion to adjudicate a claim for which there is no independent basis for subject matter jurisdiction provided that the claim is sufficiently related to another claim for which there is an independent basis for subject matter jurisdiction, such as federal question jurisdiction and diversity of citizenship jurisdiction. *Id.* § 1367; *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). Enforcement jurisdiction, or "ancillary enforcement jurisdiction," refers to "the inherent power of federal courts to exercise jurisdiction in order to enforce their judgments in certain situations where jurisdiction would otherwise be lacking." *Futura Dev. of Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico*, 144 F.3d 7, 9 n.1 (1st Cir. 1998).

In *Peacock v. Thomas*, 516 U.S. 349 (1996), the plaintiff obtained a federal judgment against a company on a federal question claim and, after unsuccessfully attempting to collect the judgment, filed a new federal lawsuit against an officer and shareholder of the company asserting claims to pierce the corporate veil and avoid fraudulent transfers. *Id.* at 351–52. The Supreme Court recognized that it had approved of enforcement jurisdiction "over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances," but the Supreme Court concluded that enforcement jurisdiction did not extend "beyond attempts to execute, or to guarantee eventual executability of, a federal judgment," and therefore did not cover "an entirely new and original" "subsequent lawsuit

26

to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Id.* at 356–59.

In *Futura Dev. of Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico*, 144 F.3d 7 (1st Cir. 1998), the First Circuit was asked in similar procedural circumstances to consider whether an alter ego claim against two different government entities was meaningfully different than the veil piercing claim in *Peacock* based on the argument that "unlike a generic veil-piercing claim, which represents a substantive rule of liability, an alter ego claim is a mere factual determination that identifies an original judgment debtor." *Id.* at 11. The First Circuit held that the jurisdictional limitations of *Peacock* applied to the alter ego claim. *Id.* at 11–12 ("Although we do not discount the possibility that some other alter ego claims can be so characterized, in this case, the Commonwealth and CDC are undeniably separate jural entities, and CDC (but not the Commonwealth) was the original judgment debtor. It is clear, then, that this alter ego claim seeks to do more than simply identify the original judgment debtor").

In *U.S.I. Properties Corp. v. M.D. Const. Co.*, 230 F.3d 489 (1st Cir. 2000), the First Circuit extended the subject matter jurisdiction limits of *Peacock* to circumstances where the judgment creditor rekindles supplementary proceedings within the original case rather than bringing an entirely new lawsuit. *Id.* at 500 n. 10 ("The appropriateness of the exercise of federal jurisdiction must be shown for supplemental proceedings as well, particularly where they involve the imposition of obligations on new parties. The simple fact that the supplemental proceeding is brought as part of the same case does not relieve the court from

27

independent consideration of its authority to address the specific claims before it in the supplemental proceeding").

The results and reasoning in *Peacock*, *Futura*, and *U.S.I. Properties* can be distinguished from this case in at least three ways. First, subject matter jurisdiction over claims to void fraudulent transfers in postjudgment supplementary proceedings is on firm ground as many courts have held before and after *Peacock* that enforcement jurisdiction can extend to those issues. *See Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1321 (10th Cir. 2022) (ancillary enforcement jurisdiction existed for claim seeking to void fraudulent transfer of stock); *Thomas v. Hughes*, 27 F.4th 995, 1019 (5th Cir. 2022) ("Under *Peacock*, 'a district court has enforcement jurisdiction over a judgment creditor's fraudulent conveyance claims against transferees who were not parties to the underlying action,' so long as the creditor limits himself to collecting the judgment debtor's assets, rather than attempting to impose liability on the transferees for the original judgment"); *Nat'l Mar. Servs., Inc. v. Straub*, 776 F.3d 783, 787 (11th Cir. 2015) ("In contrast with *Peacock*, the district court had ancillary jurisdiction over this supplementary proceeding because National Maritime sought to disgorge Straub of a fraudulently transferred asset, not to impose liability for a judgment on a third party"); *Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1453 (9th Cir. 1996) ("We are thus persuaded that Alaska courts would permit Thomas, Head to bring its fraudulent conveyance claims in a supplementary proceeding such as the one presented to the district court").

Second, because the business entities at issue here are closely held small companies owned and controlled only by Defendant or his spouse, Plaintiff's reverse veil piercing

claims and alter ego claims arguably present precisely the kind of claims the First Circuit identified for future consideration.  In other words, if (as the First Circuit has hinted) there are circumstances where reverse veil piercing or alter ego claims are not considered an attempt to establish or shift liability onto a new third party and can be better analogized to "a mode of execution to collect an existing judgment," like garnishment or attachment of the judgment debtor's property in the hands of a third party, the circumstances of several financially interconnected closely held small businesses would appear to be the most likely candidates.

Third, and more fundamentally, the jurisdictional problem in cases like *Peacock* and *U.S.I. Properties* arises in the absence of enforcement jurisdiction because claims lacking an independent basis for subject matter jurisdiction can only be heard in federal court when they are intertwined with claims before the federal court that have an independent basis for subject matter jurisdiction, but after final judgment entered resolving the claims for which there was an independent basis for subject matter jurisdiction, "the ability to resolve simultaneously factually intertwined issues vanished." *Peacock*, 516 U.S. at 355.  In other words, whether brought in an entirely new case or in a supplementary proceeding in the original case, the ordinary principles of supplemental jurisdiction cease to operate after a final judgment resolves all the claims over which the court had original, rather than supplemental jurisdiction.  Here, the Court retains subject matter jurisdiction over the claims awaiting trial, including a federal claim (i.e., the RICO claim).  The jurisdictional concern present in *Peacock* and *U.S.I. Properties* does not exist in this case.  Because Plaintiff's reverse veil piercing, alter ego, and fraudulent transfer arguments are sufficiently

factually intertwined with the other claims awaiting trial, the claims do not rest exclusively on enforcement jurisdiction and do not suffer from the jurisdictional problems associated with *Peacock* and its progeny because the Court has discretion to exercise supplemental jurisdiction over those claims just as it has done for the other state law claims in the complaint. *See Groden v. N&D Transportation Co., Inc.*, 866 F.3d 22, 31 (1st Cir. 2017) (noting in the context of a second lawsuit seeking to recover unpaid amounts from a prior default judgment that "[o]f course, if federal subject-matter jurisdiction exists for the alter ego claim against N&D (Count I), the JED Realty alter ego claim (Count V) . . . theoretically could proceed pursuant to the court's supplemental jurisdiction").

Defendant also contends that Plaintiff's requests are impermissible under Maine law. Defendant's argument, however, is contrary to the one reported Maine case identified by the parties. Plaintiff cited a disclosure hearing case in which the Maine District Court and Superior Court disregarded the fictitious separation between a judgment debtor and his solely owned business entities and voided fraudulent transfers. *See Estate of Donald Hodges v. Dane's Cleaning Ctr. of Lewiston, Inc.*, 1993 ME Super LEXIS 281, at *7–11 (Nov. 3, 1993). Defendant maintains the ruling is inapplicable to this matter, but he cites no subsequent criticism or contrary authority in the state court. Other state statutes as interpreted by the courts also allow inquiry into fraudulent transfers and orders against third parties to return assets. *See, e.g.*, *Star Ins. Co. v. Risk Mktg. Grp. Inc.*, 561 F.3d 656, 662 (7th Cir. 2009) (discussing Illinois citation statute); *Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1453 (9th Cir. 1996) (discussing Alaska supplementary proceeding

rules); *Mitchell v. Lyons Pro. Servs., Inc.*, 727 F. Supp. 2d 120, 123 (E.D.N.Y. 2010) (discussing New York special proceeding law).

Regardless of the merit of Defendant's argument distinguishing and questioning the applicability of the state court's decision in *Estate of Donald Hodges* and regardless of whether the remedies under Maine's Fraudulent Transfer Act are available to a judgment creditor in a disclosure proceeding, the basic principle endorsed by the state court—that a court in a disclosure hearing can consider the circumstances of a judgment debtor's recent property transfers—is sound. A disclosure proceeding is designed to permit a judgment creditor to inquire as to a judgment debtor's available assets to satisfy a money judgment. As part of that process, it is reasonable for a court to consider whether the judgment debtor can fairly be deemed the owner of certain assets the debtor might have transferred under questionable circumstances.[9] Otherwise, a debtor could, immediately before a disclosure hearing, convey all the debtor's assets to another person or entity, including an entity controlled by the debtor, for little or no value and the court could not consider the assets when determining whether the debtor had sufficient assets to satisfy the judgment. Such a result would be illogical and would allow a debtor to circumvent the disclosure process.

___

[9] The authority of a court to determine in the context of a disclosure hearing that a person has available certain assets to satisfy a judgment despite the purported transfer of the assets can be distinguished from the relief to which a creditor might be entitled under Maine's Fraudulent Transfer Act. I am not convinced that in a disclosure hearing, a judgment creditor can obtain the relief available under the Act. For example, the Act authorizes an award of damages not to exceed double the value of the property, 14 M.R.S.A. § 3578(1)(C)(3), which might not be available in a disclosure proceeding. Nothing in the language of the disclosure hearing statute, however, suggests a court cannot consider whether a judgment debtor has transferred property to defraud a creditor under circumstances where the property remains available to the debtor.

Because Rule 69(a)(1) generally tasks this Court with applying Maine's rules in supplementary proceedings and not with narrowing or modifying Maine's rules, the Court could consider and, if appropriate and necessary, will consider Plaintiff's arguments regarding the lack of separateness of Defendant's business entities and the alleged fraudulent transfer of property to his spouse's closely held business entity by which Defendant is employed.  However, given the objective of Plaintiff's arguments—to (1) void the transfer of the *Alliecat* from Poseidon Charters, Inc., to Allie Cat, LLC, and (2) collect the assets of the companies directly—there is no need to address the issue at this time.  As I explain below, because the question of whether Defendant fraudulently transferred property is not in order for resolution at this time, *see infra* Part D, and as discussed below, because the turnover and sale of Defendant's ownership interests in his closely held companies is appropriate rather than the turnover of the companies' assets, which could negatively impact other creditors of the companies, *see infra* Part E, the Court does not need to resolve the alter ego or reverse veil piercing issue at this time.

### D.   Hold and Answer Orders

"Upon a disclosure hearing when it is shown that there is a reasonable likelihood that a 3rd party has possession or control of property in which the judgment debtor may have an interest . . . the court, upon request of the judgment creditor, may approve the service on the 3rd party of an order to hold and answer.  14 M.R.S.A. § 3127-A(1).  The third party "shall withhold and account" for property belonging to the judgment debtor by filing an answer within twenty days, and the judgment debtor and creditor can seek a hearing within twenty days of the answer to explore issues such as "the extent of the

judgment debtor's interest in the property" and "the exempt status of property listed," so that the court can resolve the dispute and determine whether to issue a turnover order, a turnover and sale order, or a possessory lien order. *Id.* §§ 3127-A(2)–(4).

### 1.    The Vessel *Alliecat*

Maine law allows a court to void transfers of debtors made with intent to hinder, delay, or defraud and made without receiving reasonably equivalent value in exchange for the asset. *See* 14 M.R.S.A. § 3575(1); 4 M.R.S.A. § 152(5)(N).  Intent can be inferred from various factors, including whether: (A) the recipient was an insider; (B) the debtor retained possession or control after the transfer, (C) the debtor attempted to conceal the transfer; (D) the debtor was sued or threatened with suit before the transfer; (E) the transfer was of substantially all the debtor's assets; (F) the debtor absconded; (G) the debtor removed or concealed assets; (H) the value received was not reasonably equivalent to the asset; (I) the debtor was or became insolvent; (J) the transfer occurred around the time the debtor incurred a substantial debt; (K) the debtor transferred business assets to a lienor who then transferred the assets to an insider.  14 M.R.S.A. § 3575.

Consideration of the relevant factors reveals sufficient evidence to support a plausible fraudulent transfer claim as to the transfer of a 37-foot Freeman Boatworks catamaran from Poseidon Charters, Inc., to Allie Cat, LLC.  Defendant formed the LLC, replaced himself with his spouse as a member LLC, and still uses the vessel to generate income.  While the Court can consider such a claim during enforcement proceedings, there are two impediments to the consideration of the requested relief at this time.

First, the asset belonged (at least nominally) to Poseidon Charters, Inc., rather than Defendant personally.  Therefore, the fraudulent transfer claim is arguably contingent on the alter ego or reverse veil piercing claims.  There are several formulations of the elements for those claims.  To convince a court to "disregard the corporate entity, a plaintiff must establish that: (1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence.  *Blue Star Corp. v. CKF Properties, LLC*, 2009 ME 101, ¶ 43, 980 A.2d 1270, 1280.

> When a corporation is closely held, the interests of the corporation, its management and shareholders generally fully coincide.  If the corporate form is ignored by the corporation's proprietors, the corporation may be treated as their alter ego.  When corporate form has been properly adhered to, however, the fact that the interests of a closely-held corporation and its proprietors are usually identical should not abrogate the corporation's distinct legal identity" for most purposes.

*Spickler v. Dube*, 644 A.2d 465, 468 (Me. 1994) (citing Restatement (Second) of Judgments § 59 cmt. e (1982)) (internal citations omitted).  "In the ordinary case in which alter ego or piercing the corporate veil is raised, a third party seeks to disregard the corporate form in order to impose the corporation's liabilities on a shareholder," *Sturtevant v. Town of Winthrop*, 1999 ME 84, ¶ 21, 732 A.2d 264, 269, whereas reverse veil piercing allows a third party, typically a creditor, to disregard the corporate form in order to allow a third party, typically a creditor, to disregard the corporate form to impose the shareholder's liabilities on the corporation.  *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d

375, 385 (4th Cir. 2018).[10]  In this case, Defendant arguably did not transfer an asset if the separateness of Poseidon Charters, Inc., is to be respected, although even if the corporate veil must be respected, Defendant would still have reduced the value of one of his assets (the corporate ownership interest) and inflated the value of an insider's assets.  The record, however, would suggest Plaintiff has a colorable claim to disregard the separateness of Defendant and Poseidon Charters, Inc., for purposes of analyzing the fraudulent transfer claim.

Second, courts ordinarily find that the relevant third parties "must be given notice of the proceedings and an opportunity to appear" to be heard on the issue before a transfer is voided.  *See Wuori v. Otis*, No. BELDC-SA-2019-016, 2019 WL 2123759, at *1 (Me. Dist. Ct. Mar. 13, 2019) (reversed on other grounds) ("The Creditor herein seeks an Order against the 3rd party without any notice or procedure for hearing on the funds. Accordingly, no turnover order can issue against the 3rd party in possession of the funds); *Cent. Laborers' Pension Fund v. AEH Constr., Inc.*, No. 14-3052, 2015 WL 5462139, at *4 (C.D. Ill. Sept. 17, 2015).  The same rule ordinarily applies in similar contexts, such as

---

[10] Reverse piercing is disfavored in certain contexts, such as when a shareholder personally attempts to enforce the corporation's contract claims.  *Sturtevant v. Town of Winthrop*, 1999 ME 84, ¶ 21, 732 A.2d 264, 270 ("the better rule would seem to be that a person who has voluntarily adopted the corporate form to engage in business is precluded from asking courts to disregard that form merely because the person is disadvantaged by its use").  But courts are less hesitant to allow a creditor to look through the corporate form to pursue the assets of a corporation when the owner did not maintain adequately the separate corporate status.  *See Estate of Donald Hodges*, 1993 Me. Super. Lexis 281 at *12; *see also*, *Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387, 1390 (9th Cir. 1993) (collecting cases); *Sky Cable*, 886 F.3d at 387 (recognizing that reverse veil piercing is more defensible when it "permits a court to hold a company liable for a member's actions if recognizing the corporate form would cause fraud or similar injustice" and that "[r]everse veil piercing is particularly appropriate when an LLC has a single member, because this circumstance alleviates any concern regarding the effect of veil piercing on other members who may have an interest in the assets of an LLC").

an order against a third party for the garnishment of wages.  *See* 14 M.R.S.A. § 3127-B (requiring service of a hold and answer order on the judgment debtor and third-party employer before a hearing and order on withholding earnings); *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 725 (11th Cir. 2014) ("In a nutshell, Florida law provides certain protections to third parties claiming an interest in property subject to garnishment or execution").

Because Monica Pettegrow and Allie Cat, LLC did not appear at the disclosure hearing, and because they were not listed as parties in the amended complaint, notice and an opportunity to be heard would be necessary before ruling on the fraudulent transfer argument.  Because an order to hold and answer pursuant to 14 M.R.S.A. § 3127-A will provide that notice and opportunity, and because Plaintiff has established a reasonable likelihood that Monica Pettegrow or Allie Cat, LLC controls property that Defendant might own or might have formerly owned and wrongfully transferred, the Court will authorize Plaintiff to serve upon each of them an order to hold and answer to account for the *Alliecat*. The documents that Plaintiff serves should reference the docket in this case and must comply with the other requirements of § 3127-A(1).[11]

---

[11] The statute specifies that:

> The order to hold and answer shall state the amount owed on the judgment debt and shall set forth the specific property of the judgment debtor alleged to be in the possession of the 3rd party, as well as any specific debt other than earnings, alleged to be owed to the judgment debtor.  The order shall demand an answer under oath from the 3rd party listing all property in the possession of the 3rd party in which the judgment debtor has an interest and listing all debts, other than earnings, owed by the 3rd party to the judgment debtor, as of the date and time the order is served.  The order to hold and answer shall state the consequences of the failure of the 3rd party to answer.  An order to hold and answer shall

## 2.      Joint Tax Refund

The evidence establishes a reasonable likelihood that Defendant may have an interest in some or all the $75,000 tax refund that Monica Pettegrow received in June 2021. Plaintiff may include the tax return as part of the order to hold and answer.

## 3.      Income through Allie Cat, LLC

Defendant testified that (1) he began working full time doing charter fishing trips for Allie Cat, LLC, around August 2021, (Hearing Transcript Vol. II at 21), (2) a typical charter fishing trip generates $1,800 to $2,500, which clients pay to Allie Cat, LLC, (sometimes through Defendant) by cash, check, or electronic payment, (Deposition at 19–20), and (3) he has been or expects to conduct around ten charter trips per month. (Hearing Transcript Vol. II at 32, 75–78.) The most recent year for which there is evidence in the record about Allie Cat, LLC's finances, 2021, arguably shows zero revenue. (*Id.* at 32–36; Exhibit 60 at 14, 19.) More recent financial records might show greater revenue, but Defendant opposed further inquiry into Allie Cat, LLC's finances and assets, and Defendant asserted that he could not provide any information about Allie Cat, LLC's more

---

be served on the 3rd party and the judgment debtor within 20 days of the date of the order. An answer form shall be supplied to the 3rd party with the order.

The reference to the "consequences" of the failure of the third party to answer likely incorporates subsection (6):

Failure of a 3rd party, duly served with an order to withhold and answer, to timely file an answer shall constitute a default as to questions of possession and ownership between the 3rd party and the judgment debtor of the specific property or debt set forth in the order. In addition, the 3rd party shall be subject to an order pursuant to section 3131 or 3132 and shall be subject to a contempt proceeding.

*Id.* § 3121-A(6).

recent financial status.  There is also evidence that the LLC had the resources to purchase a Hinckley Yacht for $165,000 in July 2022.  (Title Abstract, ECF No. 443-1.)

Although Plaintiff argues that the Court should issue an installment order based on the current record, given the earnings-based limits on installment orders, 14 M.R.S.A. § 3126-A, the record does not support such an order at this time. However, the timing of Allie Cat, LLC's formation, the fact that the sole owner of the LLC is Defendant's spouse, the evidence of some financial relationship between Defendant's other business entities and Allie Cat, LLC, (*see* Exhibit 11 at 5; Exhibit 62A; Exhibit 67 at 9–10), and Defendant's testimony that he relies on his spouse's money to pay for his living expenses, (Hearing Transcript Vol II at 12), establish a reasonable likelihood that Allie Cat, LLC or Defendant's spouse may retain what would constitute Defendant's earnings. A hold and answer order is appropriate.

Plaintiff may therefore include Allie Cat's, LLC's revenue or earnings in its hold and answer order that Plaintiff is authorized to serve on Allie Cat, LLC, and Monica Pettegrow.

### 4.    Bank Accounts with Unknown Contributions and Intent

"Ownership of jointly held bank accounts is controlled by the Maine Probate Code." *Szelenyi v. Miller*, 564 A.2d 768, 770 (Me. 1989).  "During the lifetime of all parties, an account belongs to the parties in proportion to the net contribution of each to the sums on deposit, unless there is clear and convincing evidence of a different intent." 18-C M.R.S.A § 6-211.

There are several jointly owned bank accounts for which the record contains little evidence from which to determine the proportion of ownership interests.  Defendant jointly owns or is listed on seven relevant bank accounts with his mother: a BHB&T account ending in 1537 containing $4,255, (Hearing Transcript Vol. II at 18, 153; Exhibits 1, 18, 19), a BHB&T account ending in 2479 containing $250, (Hearing Transcript Vol. II at 18–19, 153–155; Exhibits 1, 20), a BHB&T account ending in 2495 containing $700, (Hearing Transcript Volume II at 19; Exhibits 1, 21), a BHB&T account ending in 1537 containing approximately $4,250, (Hearing Transcript Vol. II at 18, 153; Exhibits 1, 18, 19), a BHB&T account ending in 2479 containing approximately $250, (Hearing Transcript Vol. II at 18–19, 153–155; Exhibits 1, 20), a BHB&T account ending in 2495 containing approximately $750, (Hearing Transcript Volume II at 19; Exhibits 1, 21), and an account of unknown designation at Centennial Bank.  (Hearing Transcript Vol. II at 17–18; Exhibit 1.)  Monica Pettegrow and Defendant are named jointly on a First Horizon account ending in 8895.  (Hearing Transcript Vol. II at 153; Exhibit 25.)  Because a reasonable likelihood exists that Josette Pettegrow and Monica Pettegrow possess or control the funds in the accounts in which Defendant may have an interest, Plaintiff is authorized to serve hold and answer orders on Josette Pettegrow and Monica Pettegrow, which will presumably generate information regarding the relative contributions to the accounts or the intent of the owners.

The record also contains evidence sufficient to establish a reasonable likelihood that Defendant may own or have an interest in: a BHB&T account ending in 3227 with unknown value but generating annual interest of approximately $60, a BHB&T account

ending in 5631 with unknown value but generating annual interest of approximately $275, a BHB&T account ending in 5678 with unknown value but generating annual interest of approximately $160, and a BHB&T account ending in 1072 with unknown value. (Hearing Transcript Vol. II at 68, 158–159; Exhibits 53, 60.)  Defendant argues that there is reason to believe that other individuals (such as his parents or spouse) also own an interest in the accounts, although he did not testify to that during the hearing.  Plaintiff is authorized to serve a hold and answer order on BBH&T, which will allow the parties and the Court to review records such as bank statements, to confirm whether other individuals have an interest in the accounts and, if so, to determine the relative contributions or intent of the owners.

### 5.    Funds Paid to Attorney

Plaintiff argues that the Court should authorize a hold and answer order on Murphy and King because Defendant sold two trucks and turned over approximately $80,000 in proceeds to his attorney proximate to the start of the supplementary proceeding.  The parties dispute whether Plaintiff perfected properly a judgment lien on the vehicles before the sale and transfer.  Regardless of whether Plaintiff perfected a judgment lien, however, the issue is whether the record establishes a reasonable likelihood that Defendant may have an interest in the funds in the account. When asked at the hearing whether the funds were paid for work performed or whether the funds would be held as a retainer, he replied, "I guess we really didn't discuss that." (Hearing Transcript Vol I at 17-18.)  He also testified that he did not know the balance of the account. (*Id*. at 17.)

40

To the extent Defendant contends Plaintiff has failed to establish that Defendant had an interest in the source of the funds (i.e., the motor vehicles that were sold), Defendant's argument fails. Defendant testified that he has paid his attorney's fees. (*Id.*) When asked whether the source of the funds was "the sale of your two motor vehicles," Defendant answered, "i]t was." (*Id.* at 19.)

Plaintiff evidently relies on the amount of the funds paid to satisfy its obligation to demonstrate a reasonable likelihood that Defendant has an interest in the funds. Given the extensive litigation related to the supplemental proceedings, the conclusion is not self-evident based solely on the amount paid. With no evidence as to whether any of the $80,000 paid remains, one can only speculate whether the law firm currently holds funds in which Defendant has an interest.[12] Accordingly, an order directing the firm to hold and answer is not appropriate.

### 6.    Retirement Accounts

The record shows that Defendant has several IRA and 401(k) accounts worth approximately $275,000. Retirement funds up to $1,054,550 are exempt from collection "to the extent those funds are in a fund or account that is exempt from taxation" under the relevant provisions of the Internal Revenue Code, 14 M.R.S. 4422(13-A), except that amounts are not exempt if they were contributed "within 120 days before . . . the earlier of

---

[12] The parties' dispute regarding the status of the judgment lien when the motor vehicles were sold appears to raise the question of whether the law firm accepted the proceeds of the sale of encumbered property. That issue would not be relevant in an enforcement action designed to determine Defendant's ability to pay. Whether Plaintiff has recourse against the law firm based on the payment of the funds is not an issue for the Court's consideration in this proceeding.

the entry of judgment or other ruling against the debtor" or the imposition of remedies such as levy, attachment, or garnishment. *Id.* § 4422(13-A)(1).

Typically, if a judgment debtor makes an initial showing that the funds are exempt, the burden will shift to the judgment creditor to show that the relevant exemption does not apply. *See Costa v. Builders*, No. AP06-36, 2007 WL 4692867 (Me. Super. Ct. July 19, 2007) ("It is the judgment debtor's burden to prove that an exemption applies; once a prima [facie] exemption has been established, 'the burden shifts to the creditor' to challenge it") (quoting *Steelstone Indus. v. McCrum*, 2001 ME 171, ¶ 8, 785 A.2d 1256, 1259). Because Defendant was unable or refused to provide any detailed information about the accounts or the contribution dates, the question is whether Defendant has made out a prima facie case in the context of an exemption that contains exceptions for improperly maintained accounts and for funds that were contributed after an important qualifying date (e.g., 120 days before entry of judgment or ruling against Defendant).

While I am not persuaded that a turnover order is appropriate at this time, I am also not convinced that Defendant has demonstrated that all the funds are in fact exempt. If some of the funds are not exempt, the entities holding the funds control or possess Defendant's property that could be subject to turn over or sale. The record establishes a reasonable likelihood that the entities possess accounts in which Defendant may have a non-exempt interest. Accordingly, a hold and answer order regarding the retirement accounts is reasonable.

**E.     Turnover Order for Nonexempt Bank Accounts and Cash**

When a disclosure hearing reveals assets that are not wholly exempt, a court can "determine the value of the property or interest and the extent to which the property or interest is exempt" and "order the judgment debtor to turn over to the judgment creditor" assets which are nonexempt and "the value of which is determined to be less than or equal to the amount owed on the judgment, interest and costs."  14 M.R.S.A. § 3131(1).

Valuation is important when a freestanding turnover order is issued because a court must determine how much of the monetary judgment was satisfied by giving the asset to the creditor.  On this record, valuation is not necessarily a straightforward task for many of the assets revealed through the disclosure hearing.  Because the Court can also order the turnover of assets for sale without assigning the asset a specific value, *see infra* Part F, on this record, the reasonable approach is to limit the turnover orders to those assets with clearly defined values, such as cash or bank accounts.

Defendant's solely owned non-retirement accounts[13] are appropriate for a turnover order because the values are equivalent to the funds contained therein and are less than the amount of the judgment.  Those accounts include a health savings account at BHB&T containing approximately $45,000, (Hearing Transcript Vol. II at 16–17; Exhibit 1), a Fidelity brokerage account ending in 5245 containing approximately $21,000, (Hearing Transcript Vol. II at 15, 157–62; Exhibits 52, 57 at 2), a Royal Alliance brokerage account

---

[13] Defendant might have viewed certain accounts as including savings for his retirement, but as to those accounts, he did not satisfy his burden to show that they were exempt from collection as tax-free retirement accounts.  *See* 14 M.R.S.A. § 4422(13-A).

ending in 2284 containing approximately $525, (Hearing Transcript Vol. II at 162–63; Exhibit 59), a BHB&T certificate of deposit account ending in 5615 containing approximately $17,500 (Hearing Transcript Vol. II at 145, 158; Exhibits 62B, 72, 53), and a TD Bank checking account ending in 0536 containing approximately $650, (Hearing Transcript Vol. II at 15, 157; Exhibit 24).  To the extent Defendant argued there is some uncertainty about the accounts that would prevent a turnover order, Defendant's argument fails.  The evidence, including Defendant's testimony, establishes that he is the owner of the accounts.

Defendant and Josette Pettegrow are both listed on two additional accounts: a BHB&T account ending in 3434 containing $315, (Hearing Transcript Vol. II at 18, 71, 159; Exhibits 1, 17, 53, 60), and a Bangor Savings Bank account ending in 7122 containing approximately $4,200.  (Hearing Transcript Vol. II at 19, 156–57; Exhibits 1, 22.)  Because Defendant testified that they are accounts that he still owns and explained that he has owned them since he was a child when his mother opened them for him, and because there is no evidence contradicting Defendant's testimony, Plaintiff has established that the intent of the individuals listed on the two accounts was for Defendant to own the funds.[14]

_____

[14]  Regarding the account ending in 7122, Defendant testified that "I've had that account since I was two years old." (Hearing Transcript Vol. II at 19.)  He also testified that the sources of the money in the account

Although Defendant testified that he had $2,500 in cash at the time of deposition and $1,200 in cash at the time of the disclosure hearing, Defendant testified that the funds were from prior wages from Trenton Bridge before he stopped working there, and he relies entirely on his wife's income.  On this record, I am not convinced that Defendant retains any cash justifying a turnover order.

## F.    Turnover and Sale Orders

Maine's disclosure statute authorizes a court to order the turnover and sale of an asset by the judgment creditor if: (A) "the value of wholly nonexempt property is greater than the amount owed on the judgment, interest and costs, and the judgment creditor and judgment debtor cannot agree as to which items of property shall be applied to the satisfaction of the judgment;" (B) "wholly nonexempt property is not available to fully satisfy the judgment and it is determined that the value of partially exempt property is greater than the exemption available for that item and the property cannot practically be divided into its exempt and nonexempt portions;" or (C) "the judgment debtor's property is not subject to physical division or it is otherwise impractical to provide for satisfaction of the judgment in kind."  *Id.* § 3131(2).

---

was birthday and Christmas gifts and from his work as a young child. (*Id.* at 156-157.)   As to account 3434, Defendant testified:

> Q. Okay. Well, why do you have so many joint bank accounts with your mother?
> A. Because a lot of these bank accounts were set up when I was still a child.
> Q. Okay. So for all intents and purposes, even though your mother's name is on this account 3434, it's your account, correct?
> A. Yeah. Even though her name is on it.

(*Id.* at 71.)

Defendant argues that, with one exception, Plaintiff is not entitled to a turnover and sale order pursuant to § 3131(2) because Plaintiff did not state in writing which subparagraph allowed the sale of each item of property. Defendant's argument is not convincing. There is no requirement that as a condition of relief, a party specify and demonstrate the applicability of one of the statutory provisions for each property item potentially subject to a sale. Furthermore, the three subparagraphs of § 3131(2) can reasonably be viewed to create a sale remedy that is broadly applicable, not narrowly constrained.

Subparagraph A covers circumstances where a judgment debtor has more than enough nonexempt property to cover the entire judgment, but the parties require a court to resolve a dispute about which assets to sell. Subparagraph B covers a broad set of circumstances where a judgment debtor does not have enough wholly nonexempt property to cover the entire judgment, but the debtor owns some partially nonexempt assets that are not practically divisible into exempt and nonexempt portions. For example, while a fungible commodity like a stockpile of grain might easily be assigned a value based on a publicly traded market price, divided based on volume or mass, and turned over in satisfaction of a judgment without requiring a sale, a single higher-value item like a vehicle cannot be divided and must first be sold to convert it into money which can then be divided into exempt and nonexempt portions. Contrary to Defendant's argument, nothing in subparagraph B requires the Court to assign a precise value for an asset or all assets as a condition of a sale. All that is required is the conclusion that (1) there is insufficient wholly nonexempt property to cover the entire debt, and (2) there is value in some assets exceeding

46

the exemption for that asset.  Such findings can often be made without evidence on the precise value of every asset.

Subparagraph C is broader still.  It does not refer to the value of an asset or the amount of the judgment, but instead authorizes a sale order whenever property is not subject to physical division or is "impractical" to provide for direct satisfaction of the judgment.  The statute does not limit or list the circumstances that might render an asset "impractical" to provide to the judgment creditor for satisfaction of the judgment, but the most obvious scenario is where a value must be placed on an asset turned over as partial satisfaction of the judgment to determine the balance remaining on the judgment, which is an explicit and implicit requirement in the § 3131(1) remedy.  In other words, when there is no convenient and accurate method to determine a well-defined or reliable value for an asset that is not wholly exempt, a turnover and sale order is authorized to determine the value by means of an open market transaction (and simultaneously convert the asset into a form that can be divided if needed).

In short, the record contains sufficient evidence for the Court to order the turnover and sale of certain assets.

### 1.    Real Property in Somerset, Maine and Wesley, Maine

Defendant previously conceded that Plaintiff is entitled to the sale of the real estate in Somerset to satisfy the judgment, but Defendant proposes that he be allowed to sell the property, account for expenses and other costs like taxes, and then turn over the net proceeds to Plaintiff, rather than allowing Plaintiff to sell the property and apply the net proceeds toward the judgment. Under the circumstances in this case, which include

Defendant's apparent efforts to avoid satisfaction of the judgment, Plaintiff should conduct the sale and thereby have some control over the costs and the net proceeds from the sale. Defendant also admits that his undivided twenty-five percent interest in the Wesley real estate is not subject to physical division and thus would be appropriate for a turnover and sale order pursuant to § 3131(2)(C).  *See State v. Curro III*, No. CV-08-014, 2016 WL 4059277, at \*4 (Me. Super. Ct. June 03, 2016) ("The practical effect with respect to the real estate is that the joint tenancy may be severed and Lisa will be entitled to her share of proceeds from a sale as if there were a partition").

A turnover for sale of Defendant's interests in Maine real estate, therefore, is warranted.[15]

### 2.    Motor Vehicles

The evidence regarding the age, make, and model of Defendant's three vehicles suggest that each one has a value exceeding the $10,000 exemption in one motor vehicle under Maine law.  *See* 14 M.R.S.A. § 4422(2).  Defendant's argument that a turnover and sale order is inappropriate because Plaintiff did not produce valuation evidence proving that each vehicle is worth more than $10,000 fails because Defendant has the burden to demonstrate that an asset is wholly exempt.  Because Defendant has not met his burden, a turnover and sale order as to Defendant's three motor vehicles is warranted.

---

[15] Plaintiff must comply with the statutory rules governing the sale.  See 14 M.R.S.A. § 3131(3)–(7).

### 3.      Corporate Interests

A judgment debtor's shares in business entities, like most other assets, are generally subject to orders in aid of judgment pursuant to 14 M.R.S.A. § 3131. *Bahre v. Pearl*, 595 A.2d 1027, 1034 (Me. 1991). Defendant argues that the Court cannot order the sale of his corporate ownership interests because the interests are now located in Florida, and he argues that Plaintiff has not established under subparagraphs B and C of § 3131(2) that a turnover and sale is appropriate. I have already considered and declined to adopt Defendant's position. A turnover and sale order for Defendant's 100% interest in Poseidon Charters, Inc.,[16] Defendant's 100% interest in Acadia Sea Farms, Inc, Defendant's 10% interest in Winter Harbor, Marine, Inc., Defendant's 1% interest in Anchor Avenue, LLC, and Defendant's 33% interest in Pettegrow Properties, LLC is warranted.[17]

### 4.      Personal Property

A turnover and sale order for Defendant's personal property consisting of five firearms and a gun safe is appropriate.

---

[16] Although Plaintiff is entitled to a turnover and sale order regarding Defendant's ownership interest in Poseidon Charters, Inc., the unresolved issue regarding the transfer of Defendant's assets might inform the timing of that order. If Plaintiff is successful in establishing that claim before a sale occurs, the value of the entity would presumably be much greater than if Plaintiff's claim fails, because if Plaintiff is successful but a sale has already occurred, the vessel would revert to the company owned by the purchaser without altering the amount of the sale or the offset against the judgment. The Court might want to order the turnover of the ownership interest for sale but allow Plaintiff, if it prefers, to file a motion to stay the thirty-day deadline for the sale because of the unresolved fraudulent transfer issue. *See* 14 M.R.S.A § 3131(4)(B).

[17] Defendant previously argued that due to membership transfer restrictions, the Court lacked the authority to order Defendant to transfer or sell his ownership interests in the LLCs. Defendant has offered no evidence to support his contention.

G.      **Prejudgment Interest**

Plaintiff asks the Court to calculate the amount of interest to be added to the judgment.  Defendant argues that the Court is not permitted to consider the issue within a supplementary proceeding.  Although the assessment of interest does not appear to be included within the scope of the state disclosure proceeding, that fact does not preclude the Court from considering the relief as part of the post-hearing motion for relief filed by Plaintiff.  The issue is whether the law permits Plaintiff to request the assessment of interest at this stage of the proceedings on the current record regardless of whether Plaintiff initiated enforcement proceedings.

In any federal case, postjudgment interest is determined according to federal statutory law.  28 U.S.C. § 1961; *Cummings v. Standard Reg. Co.,* 265 F.3d 56, 68 (1st Cir. 2001) (noting that even when a federal court adjudicates state law claims, "postjudgment interest . . . is governed by federal law").  The law of prejudgment interest, in contrast, is not uniform.  For federal question claims, federal common law governs questions of prejudgment interest and gives district courts considerable discretion.  *See Richwell Grp., Inc. v. Seneca Logistics Grp.*, LLC, 433 F. Supp. 3d 58, 64–65 (D. Mass. 2019).  But "[w]hen state-law claims . . . are adjudicated by a federal court, prejudgment interest is normally a matter of state law."  *In re Redondo Const. Corp.*, 678 F.3d 115, 125 (1st Cir. 2012).

The calculation of postjudgment interest is usually unambiguous and calculated as a ministerial task by the parties and the clerk's office.  *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1141 (2d Cir. 1994).  If there is a dispute about the amount of

postjudgment interest or a mistake in the calculation, the parties can file a motion seeking clarification and correction from the Court. *Id.*; Fed. R. Civ. P. 60(a). Because the considerations impacting whether and how much to award in discretionary prejudgment interest are "intertwined in a significant way with the merits of the plaintiff's primary case as well as the extent of [a plaintiff's] damages," the Supreme Court has held that a discretionary award of prejudgment interest is not a clerical, collateral task (like postjudgment interest or attorney's fees) and therefore must be included in the original judgment or sought through a Rule 59(e) motion to alter or amend the judgment. *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175–76 (1989).

There is far less discretion under Maine law than Federal law regarding prejudgment interest. *See* 14 M.R.S.A. § 1602-B; *Packgen v. Berry Plastics Corp.*, No. 2:12-cv-80-NT, 2016 WL 878490, at *1 (D. Me. Mar. 7, 2016) (noting that under Maine state law, prevailing plaintiffs are generally entitled to prejudgment interest as a matter of right). Although Plaintiff contends that the task is closer to the clerical or ministerial task that can be performed without an alteration of the judgment, the Supreme Court suggested in dicta that close to a clerical task is not enough to remove the issue entirely from judicial assessment. *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 n.3 (1989) ("We do not believe the result should be different where prejudgment interest is available as a matter of right"); *Crowe v. Bolduc*, 365 F.3d 86, 92–93 (1st Cir. 2004) (applying Maine prejudgment interest law and "conclude[ing] that Rule 59(e) is the proper procedural vehicle for motions seeking to revise a judgment to include an initial award of prejudgment interest (whether mandatory or discretionary)").

51

Because the judgment allows interest to be assessed, this is a case in which Plaintiff could conceivably be entitled to prejudgment interest even if federal law governed "so long as that entitlement was properly preserved." *Crowe*, 365 F.3d at 90. The judgment specified that Plaintiff is entitled to "$1,021,000.00, plus interest as allowed by law." In cases where a judgment mentioned interest without further specifying whether that word referred only to postjudgment interest or also included prejudgment interest, courts have reached different results depending on the context and whether Plaintiff had requested prejudgment interest. *Compare U.S. S.E.C. v. Carrillo*, 325 F.3d 1268, 1271 (11th Cir. 2003) (finding it likely that the words "plus interest" was intended to include prejudgment interest because otherwise the reference would be superfluous because the plaintiff is entitled by virtue of the statute to postjudgment interest without any reference in the judgment) *and Student Loan Mktg. Ass'n v. Lipman*, 45 F.3d 173, 176–77 (7th Cir. 1995) (same) *with Pace Commc'ns, Inc. v. Moonlight Design, Inc.*, 31 F.3d 587, 591 (7th Cir. 1994) (finding it likely that the words "plus interest and costs" referred only to automatic postjudgment interest) and *Packgen,* 2016 WL 878490, at *1 (considering Rule 59(e) motion, implying that prior reference to an amount "plus interest as allowed by law" did not implicitly grant prejudgment interest). Plaintiff sought "interest" for each claim in the Complaint and the Amended Complaint, but it did not specifically mention prejudgment interest. In its motion for a separate judgment, Plaintiff specifically requested "pre- and post-judgment interest." (Motion for Judgment, ECF No. 271.) Prejudgment interest is thus potentially available.

The arbitration award also presents an issue that must be considered when determining whether prejudgment interest is available. The Court entered the judgment after confirming the arbitration award in accordance with the Federal Arbitration Act. The arbitrator explicitly declined to add interest to the award. (Arbitration Decision at 21, ECF No. 242-4.) At least one court considered it to be an abuse of discretion when a district court granted a Rule 59(e) motion amending the judgment such that the award of prejudgment interest conflicted with the arbitrator's decision regarding prejudgment interest. *DeMartini v. Johns*, 693 F. App'x 534, 539 (9th Cir. 2017).

Given the status of the case and the questions generated by Plaintiff's request for prejudgment interest, resolution of the interest issue should be deferred until after the parties have further briefed the relevant issues.

### CONCLUSION

Based the foregoing analysis,

1. I grant the motion to supplement the record; and

2. I grant in part and recommend the Court grant in part the motion for relief as follows:

   a. I authorize Plaintiff to serve hold and answer orders on Monica Pettegrow, Allie Cat, LLC, Josette Pettegrow, BHB&T, and the holders of Defendant's retirement accounts;

   b. I recommend the Court order Defendant to turn over the funds in several bank accounts. (Defendant is permitted to retain $3,000 in deposit account funds that are exempt under Maine law, 14 M.R.S.A § 4422(17),

and Defendant is permitted to retain $500 in any other property, *id.* § 4422(15), which exemption he evidently chose to apply toward his deposit accounts); the accounts include a BHB&T health savings account containing approximately $45,000, a Fidelity brokerage account ending in 5245 containing approximately $21,000, a Royal Alliance brokerage account ending in 2284 containing approximately $525, a BHB&T certificate of deposit account ending in 5615 containing approximately $17,500, a TD Bank checking account ending in 0536 containing approximately $650, a BHB&T account ending in 3434 containing $315, and a Bangor Savings Bank account ending in 7122 containing approximately $4,200.

c.   I recommend the Court order Defendant to turn over for sale the following property discussed above: two pieces of real property (in Somerset and Wesley, Maine), three motor vehicles, ownership interests in five business entities (100% interest in Poseidon Charters, Inc.,100% interest in Acadia Sea Farms, Inc, 10% interest in Winter Harbor, Marine, Inc., 1% interest in Anchor Avenue, LLC, and 33% interest in Pettegrow Properties, LLC), and his five firearms and gun safe; [18]

---

[18] Plaintiff's request to use a licensed firearm dealer as an intermediary for the transfer of firearms is reasonable.  Plaintiff also requested a turnover and sale order for Defendant's fishing tackle and a watch. The items appear to be exempt under 14 M.R.S. § 4422(4) (jewelry in the aggregate amount of $1,000) and § 4422(5) (tools of the trade in the aggregate amount of $9,500).  I do not assume that Defendant's aggregate interest in other tools of the trade and jewelry have exhausted the limit of the exemptions. Because this order and recommended decision contemplates further proceedings, if Plaintiff has evidence

d.   I recommend the Court not issue an installment payment order; and

e.   I recommend the Court defer ruling on Plaintiff's request for prejudgment

interest until after the parties have further briefed the relevant issues.

## NOTICE

Any objection to an order issued herein shall be filed, in accordance with Federal Rule of Civil Procedure 72, within 14 days of being served with a copy of the order.

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 30th day of August, 2023.

---

to establish that the exemptions have been exhausted, Plaintiff can present the evidence during the further proceedings.